## STATE OF CONNECTICUT *v.* PATRICK J. LENARZ
## (SC 18561)

Rogers, C. J., and Norcott, Palmer, Zarella, Eveleigh and Vertefeuille, Js.*

---

* This appeal was originally argued before a panel of this court consisting of Chief Justice Rogers, and Justices Norcott, Katz, Palmer, Eveleigh and Vertefeuille. Thereafter, Justice Katz resigned from this court and did not participate in the consideration or decision of the case, and Justice Zarella was added to the panel. Justice Zarella has read the record and briefs, listened to a recording of the oral argument and participated in the resolution of this case.

418

Argued October 28, 2010—officially released July 19, 2011

*Kevin C. Ferry*, with whom, on the brief, were *Monique S. Foley* and *Peter G. Billings*, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's

attorney, and *Christopher Parakilas*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

ROGERS, C. J. The central issue in this case is whether a prosecutor's intrusion into communications between a defendant and his attorney that are subject to the attorney-client privilege requires the dismissal of the criminal charges against the defendant. The defendant, Patrick J. Lenarz, was charged in three informations, each of which charged the defendant with risk of injury to a child in violation of General Statutes § 53-21 (a) (1) and (2), and sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (1) (A). Before trial, the prosecutor came into possession of and read certain written materials belonging to the defendant that were subject to the attorney-client privilege. Upon learning this fact, the defendant filed a motion to dismiss the charges against him, which the trial court denied. After a trial, the jury returned a verdict of guilty on one count of risk of injury to a child in violation of § 53-21 (a) (1). The jury found the defendant not guilty of all of the remaining charges, and the trial court rendered judgments in accordance with the verdict. The defendant then appealed,[1] claiming that the trial court improperly denied his motion to dismiss.[2] We conclude that, because the case is irreversibly tainted by the prosecutor's intrusion into the privileged communications, the only available appropriate remedy is dismissal of the charge of which he was convicted. Accordingly, we reverse the judgment of conviction.

[1] The defendant appealed from the judgment of conviction to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] The defendant also claimed that the trial court improperly excluded testimony by his expert witness concerning the proper protocol for interviewing children who make claims of sexual abuse and the dangers posed by improper interview techniques. Because we reverse the judgment of conviction on other grounds, we need not address this claim.

The record reveals the following relevant facts and procedural history.[3] The defendant was charged in two informations, each alleging two counts of risk of injury to a child and one count of sexual assault in the fourth degree, in connection with the defendant's alleged conduct toward two children at a karate school in the town of Granby, where the defendant was an instructor (respectively, Docket Nos. H12M-CR-03-128673-S and H12M-CR-03-129740-S; collectively, Granby cases). Thereafter, the defendant was charged in a third information with two counts of risk of injury to a child and one count of sexual assault in the fourth degree in connection with an incident involving a child at the defendant's residence in Simsbury (Simsbury case). Ultimately, all three cases were consolidated for trial.

As part of its investigation into the incident that formed the basis for the charges in the Simsbury case, the Simsbury police department obtained a search warrant for the defendant's residence. During the search, which took place on November 17, 2004, the police seized a computer, which they sent to the Connecticut Forensic Science Laboratory (state laboratory) to be forensically searched. The next day, at the defendant's arraignment, defense counsel advised the trial court, *Scheinblum, J.*, that certain materials in the computer were subject to the attorney-client privilege and asked the court to fashion orders to protect the defendant's rights. The court ordered that "any communications from [defense counsel] to [the defendant] or from [the defendant] to [defense counsel] remain unpublished [and] unread." The court entered a similar order with

[3] Because the details of the underlying offenses are not relevant to the claim raised in this appeal, and in light of the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to give a detailed description of those offenses. In addition, we decline to identify the complainants or others through whom their identities may be identified. See General Statutes § 54-86e.

respect to communications to and from the defendant's private investigator.

During its examination of the defendant's computer, the state laboratory discovered voluminous written materials containing detailed discussions of the defendant's trial strategy in the Granby cases. The state laboratory read and copied much of this material and transmitted it to the Simsbury police department along with its report. In turn, the Simsbury police department forwarded the materials and the report to the prosecutor. At a meeting between the prosecutor and defense counsel some time in September, 2005, the prosecutor provided defense counsel with a copy of the materials that he had received from the Simsbury police department. Defense counsel immediately requested a meeting with Judge Scheinblum in chambers, at which he advised the judge that the prosecutor had read materials that were subject to the attorney-client privilege. The trial court then ordered the police departments in Simsbury and Granby and the prosecutor to turn over any "questionable material" in their possession to the court and ordered that the material be placed under seal. Although it is unclear from the record how long the prosecutor had been in possession of the privileged communications before the September, 2005 meeting, defense counsel represented at a hearing on a motion to suppress the materials seized under the search warrant that the prosecutor had had the materials for six weeks, and the prosecutor did not dispute this claim.[4]

[4] In its memorandum of law in support of its opposition to the defendant's motion to dismiss, the state represented that, after the Simsbury police department gave the seized materials to the state, "[t]he prosecution did review the materials in total. The prosecution provided a copy of all materials to defense counsel on the next scheduled court date." Accordingly, although the record does not reveal the precise dates on which the prosecutor received and read the privileged documents, contrary to the dissent's argument, it is clear that the prosecutor did not read the materials for the first time on the date that he provided copies of them to the defendant.

The defendant then filed a motion to dismiss the informations in the Granby cases[5] on the ground that the state had intentionally invaded the attorney-client privilege, thereby depriving the defendant of his right to counsel under the sixth amendment to the United States constitution.[6] The defendant argued that the intrusion had resulted in substantial prejudice to him because the privileged communications contained detailed trial strategy. The state admitted that the prosecutor had read all of the materials and did not dispute that the documents contained trial strategy, but claimed that, because the prosecutor had not conducted any additional investigation and had not interviewed any additional witnesses as a result of reading the materials, the defendant had suffered no prejudice. In addition, the state claimed that the prosecutor had not wilfully violated the attorney-client privilege, but had obtained the privileged materials in good faith. Accordingly, the state argued that the appropriate remedy for its allegedly unintentional invasion of the attorney-client privilege was the suppression of the privileged communications.

The trial court, *Olear, J.*, issued a memorandum of decision on the defendant's motion to dismiss in which it concluded that, because the privileged communications had not been in the form of letters or e-mails between the defendant and his attorney, the state laboratory and the prosecutor had not intentionally violated Judge Scheinblum's order prohibiting the state from publishing or reading any privileged communications.

---

[5] We presume that the defendant limited his motion to dismiss to the Granby cases because the privileged communications related primarily to the defendant's trial strategy in one of those cases. Because the defendant had been arrested in the Simsbury case on the day after the search, his computer contained no privileged communications relating to that case.

[6] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense."

Nevertheless, because the defendant had testified at an ex parte hearing before the trial court that he had in fact delivered the materials to his attorney and had submitted an affidavit to that effect under seal, the trial court concluded that the materials were subject to the attorney-client privilege. Accordingly, the trial court ordered a hearing to determine whether the defendant had been prejudiced by the state's unintentional invasion of the attorney-client privilege and, if so, what was the appropriate remedy.

After an evidentiary hearing, the trial court denied the defendant's motion to dismiss. The court concluded that, because the Simsbury police department had not shared the privileged information with the Granby police department, the defendant had suffered no prejudice in the Granby cases. To ensure a fair trial, however, the trial court ordered that the Simsbury case be tried separately from the Granby cases. The defendant responded that he continued to believe that dismissal was the only appropriate remedy, and that, to avoid further delay in the proceedings, he wanted all of the cases to be tried together. The trial court granted the request to try the cases together.

After a trial, the jury returned a verdict of not guilty on all charges except risk of injury to a child in violation of § 53-21 (a) (1) in Docket No. H12M-CR-03-128673-S, and the trial court rendered judgments in accordance with the verdict. The defendant appealed to the Appellate Court from the judgment of conviction. He then filed a motion for articulation of the trial court's reasons for denying his motion to dismiss, which the trial court granted. In its articulation, the court reiterated that, because none of the privileged documents was "in the form of a 'communication' from the defendant to counsel, but rather [contained] the narrative thoughts, musings and opinions of a layman," on their face, they did not appear to be privileged. Nevertheless, because the

defendant had testified that he had communicated the documents to his attorney, the court concluded that the documents were covered by the attorney-client privilege. The court also reiterated that, because the privileged documents had not been given to the Granby police department, the defendant had not been prejudiced in the Granby cases and dismissal of the charges in those cases would have been inappropriate.

Thereafter, the trial court denied the defendant's motion for further articulation. The Appellate Court then granted the defendant's motion for review of the denial of his motion and ordered the trial court to render a further articulation on the following two questions: (1) "Whether, in denying the defendant's motion to dismiss, the court considered his argument that the [prosecutor] received and reviewed the documents covered by the attorney-client privilege"; and (2) "What prejudice, if any, it found that the defendant suffered as a result of the [prosecutor's] access to those documents." In its further articulation, the trial court stated that "[t]he defendant failed to introduce sufficient credible evidence for the court to make factual findings as to the timing, nature and extent of the receipt, review and possible dissemination by the [prosecutor] of the documents covered by the attorney-client privilege." The trial court further stated that it had denied the defendant's motion to dismiss because he had not presented any evidence to support a showing of prejudice.

The defendant claims on appeal that the trial court improperly denied his motion to dismiss. Specifically, he claims that the trial court's finding that the state had not intentionally invaded the attorney-client privilege when it read the materials taken from his computer was clearly erroneous and that the intentional invasion constituted a per se violation of the sixth amendment right to counsel for which dismissal is the sole appropriate remedy. In addition, the defendant claims that

he was irreparably prejudiced by the prosecutor's invasion of the privileged material because it contained trial strategy.[7] The state counters that, because the trial court properly found that the invasion of the privileged documents was unintentional, and because the defendant failed to establish that he was prejudiced by the disclosure, the trial court properly denied the motion to dismiss. The state further contends that, even if the defendant was prejudiced, the appropriate remedy would have been for the trial court to order a prosecutor who had not read the privileged documents to try the case, and the defendant had waived this remedy.

For the reasons that follow, we conclude generally that prejudice may be presumed when the prosecutor has invaded the attorney-client privilege by reading privileged materials containing trial strategy, regardless of whether the invasion of the attorney-client privilege was intentional. We further conclude that the state may rebut that presumption by clear and convincing evidence. Finally, we conclude that, when a prosecutor

[7] The defendant claimed in his brief to this court that "[i]n a case, [such] as . . . this one, where the state relied heavily if not entirely on the credibility of the witnesses, the type of material the [prosecutor] read and reviewed would be invaluable. . . . [I]t is simply impossible to determine exactly how this material may have influenced the [prosecutor] in his preparation for trial and specifically how that may have impacted the credibility of the witnesses at trial. To completely disregard such concerns is a complete failure to address the principles that are embodied by the sixth amendment." In addition, the defendant argued to the trial court in his memorandum in support of his motion to dismiss that "[t]he investigating officers had access to the strategy of the defendant and the [prosecutor] admittedly read all of it. The state's promise that it won't act on anything it learned or use it to its advantage is . . . impossible to live up to or monitor and does not remove the taint of what was done. The length of time the material was in the possession of the [prosecutor] . . . in violation of a court order, simply makes this a case of extreme prejudice and harm to [the] defendant. . . . Removal of the [prosecutor] would not cure the harm done . . . ." He further argued that the documents "were detailed, identified key persons with knowledge, involved trial strategy, important details of fact, questions for witnesses, and rebuttals to allegations."

has intruded into privileged communications containing a defendant's trial strategy and the state has failed to rebut the presumption of prejudice, the court, sua sponte, must immediately provide appropriate relief to prevent prejudice to the defendant.

In the present case we conclude that, because the privileged materials at issue contained the defendant's trial strategy and were disclosed to the prosecutor, the defendant was presumptively prejudiced by the prosecutor's intrusion into the privileged documents. We further conclude that, because, after reviewing the privileged materials, the prosecutor tried the case to conclusion, the taint caused by the state's intrusion into the privileged communications would be irremediable on retrial and the charge of which the defendant was convicted must be dismissed.

We begin our analysis with a review of the law governing governmental interference with the attorney-client privilege. "Connecticut has a long-standing, strong public policy of protecting attorney-client communications. . . . This privilege was designed, in large part, to encourage full disclosure by a client to his or her attorney so as to facilitate effective legal representation." (Citation omitted; internal quotation marks omitted.) *Gould, Larson, Bennet, Wells & McDonnell, P.C.* v. *Panico*, 273 Conn. 315, 321–22, 869 A.2d 653 (2005); see also *Hutchinson* v. *Farm Family Casualty Ins. Co.*, 273 Conn. 33, 38, 867 A.2d 1 (2005) ("the attorney-client privilege was created to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observation of law and administration of justice" [internal quotation marks omitted]).

Several courts have held that the government's intrusion into privileged attorney-client communications constitutes an interference with the defendant's right

to assistance of counsel in violation of the sixth amendment only when the intrusion has prejudiced the defendant. See *United States* v. *Costanzo*, 740 F.2d 251, 257 (3d Cir. 1984) (sixth amendment violation follows from finding of prejudice), cert. denied, 472 U.S. 1017, 105 S. Ct. 3477, 87 L. Ed. 2d 613 (1985); *United States* v. *Steele*, 727 F.2d 580, 585–86 (6th Cir.) (when government has intruded into attorney-client relationship, prejudice must be shown before constitutional violation can be found), cert. denied sub nom. *Scarborough* v. *United States*, 467 U.S. 1209, 104 S. Ct. 2396, 81 L. Ed. 2d 353 (1984); *Briggs* v. *Goodwin*, 698 F.2d 486, 495 (government intrusion into privileged information violates sixth amendment when "record suggests a realistic possibility that appellants suffered injury"), vacated on other grounds, 712 F.2d 1444 (D.C. Cir. 1983); see also *Weatherford* v. *Bursey*, 429 U.S. 545, 558, 97 S. Ct. 837, 51 L. Ed. 2d 30 (1977) (when government intrusion into privileged communications was not purposeful and did not result in tainted evidence or communication of defense strategy to prosecution, sixth amendment was not violated); cf. *United States* v. *Morrison*, 449 U.S. 361, 364, 367, 101 S. Ct. 665, 66 L. Ed. 2d 564 (assuming without deciding that government investigators violated sixth amendment when they met with defendant without knowledge or permission of her attorney, even without showing of prejudice, but concluding that remedy of dismissal was improper when assumed violation had no adverse impact on criminal proceedings), reh. denied, 450 U.S. 960, 101 S. Ct. 1420, 67 L. Ed. 2d 385 (1981).

A number of courts have held that, when the privileged communication contains details of the defendant's trial strategy, the defendant is not required to prove he was prejudiced by the governmental intrusion, but prejudice may be presumed.[8] In *Briggs* v. *Goodwin*,

---

[8] In cases in which the communications do not contain the defendant's trial strategy, the burden is on the defendant to establish a sixth amendment

supra, 698 F.2d 494–95, for example, the court stated that "[t]he prosecution makes a host of discretionary and judgmental decisions in preparing its case. It would be virtually impossible for an appellant or court to sort out how any particular piece of information in the possession of the prosecution was consciously or subconsciously factored into each of those decisions. Mere possession by the prosecution of otherwise confidential knowledge about the defense's strategy or position is sufficient in itself to establish detriment to the criminal defendant. Such information is inherently detrimental . . . unfairly advantage[s] the prosecution, and threaten[s] to subvert the adversary system of criminal justice. Further, once the investigatory arm of the government has obtained information, that information may reasonably be assumed to have been passed on to other governmental organs responsible for prosecution. Such a presumption merely reflects the normal high level of formal and informal cooperation which exists between the two arms of the executive."[9] (Internal quotation marks omitted.)

violation by showing that he was prejudiced by the government's intrusion into the communications. See *United States* v. *Steele*, supra, 727 F.2d 586–87 (defendants failed to show sixth amendment violation when they failed to show that government had obtained access to defense strategy or had obtained tainted evidence); see also *United States* v. *Davis*, 226 F.3d 346, 353 (5th Cir. 2000) (defendant failed to establish that he was prejudiced by government's seizure of privileged documents when documents were not offered as evidence at trial and there was no evidence that they revealed defendant's trial strategy), cert. denied, 531 U.S. 1181, 121 S. Ct. 1161, 148 L. Ed. 2d 1021 (2001); *United States* v. *Irwin*, 612 F.2d 1182, 1189 (9th Cir. 1980) (defendant failed to establish that he was prejudiced by interference in attorney-client relationship when evidence showed that attorney provided vigorous defense); cf. *United States* v. *Morrison*, supra, 449 U.S. 365–66 (no relief available without showing that interference in attorney-client relationship prejudiced defendant); but see *State* v. *Cory*, 62 Wn. 2d 371, 376, 382 P.2d 1019 (1963) (defendant can establish violation of sixth amendment without showing that he was prejudiced by government's intrusion into privileged communications). It is undisputed in the present case that the privileged communications contained trial strategy.

[9] In his dissenting opinion, Justice Palmer argues that *Briggs* v. *Goodwin*, supra, 698 F.2d 486, provides no guidance in the present case because, in

Similarly, in *United States* v. *Levy*, 577 F.2d 200, 208 (3d Cir. 1978), the court held that, when the defendant's trial strategy has been disclosed to the government, "there are overwhelming considerations militating against a standard which tests the sixth amendment violation by weighing how prejudicial to the defense the disclosure is." In support of this conclusion, the court reasoned that "it is highly unlikely that a court can . . . arrive at a certain conclusion as to how the government's knowledge of any part of the defense strategy might benefit the government in its further investigation of the case, in the subtle process of pretrial discussion with potential witnesses, in the selection of jurors, or in the dynamics of trial itself."[10] Id.

*Briggs*, the invasion of the attorney-client privilege was intentional. This fact, however, is unrelated to the court's conclusion in *Briggs* that prejudice may be presumed when the government has knowledge of the defendant's trial strategy because "[it] would be virtually impossible for an appellant or a court to sort out how any particular piece of information in the possession of the prosecution was consciously or subconsciously factored into" the prosecutor's decisions before and during trial. Id., 494.

[10] In his dissenting opinion, Justice Palmer argues that our reliance on *United States* v. *Levy*, supra, 577 F.2d 208, is misplaced because that court concluded only that prejudice may be presumed "[w]here there is a knowing invasion of the attorney-client privilege *and* where confidential information is disclosed to the government." (Emphasis added.) The court in *Levy* later clarified this statement, however, and held that "a sixth amendment violation would be found where, as here, defense strategy was actually disclosed *or* where, as here, the government enforcement officials sought such confidential information." (Emphasis added.) Id., 210. The court's conclusion that dismissal was required was premised on its conclusion that "in this case an actual disclosure of defense strategy occurred," not on its finding that the invasion had been intentional. Id. Accordingly, it is clear to us that the court would have presumed prejudice even in the absence of an intentional invasion.

This reading of *Levy* is supported by *United States* v. *Costanzo*, supra, 740 F.2d 251. In *Costanzo*, which, like *Levy*, was decided by the United States Court of Appeals for the Third Circuit, the court held that, under *Weatherford* v. *Bursey*, supra, 429 U.S. 545, the sixth amendment is violated "when the government (1) intentionally plants an informer in the defense camp; (2) when confidential defense strategy information is disclosed to the prosecution by a government informer; *or* (3) when there is no intentional intrusion or disclosure of confidential defense strategy, but a disclosure by

Although the dissent disagrees with our reading of
*Levy*, it has not cited a single case in which the govern-
ment unintentionally obtained privileged information

a government informer leads to prejudice to the defendant." (Emphasis
added.) *United States* v. *Costanzo*, supra, 254. The court affirmed the District
Court's finding that the government had not intentionally invaded the attor-
ney-client privilege and, therefore, concluded that only the second and third
prongs of this test applied. Id., 255. The court ultimately concluded that,
because none of the disclosures at issue in that case had involved trial
strategy, the *"Levy* rule," that "prejudice, and thus a violation of the sixth
amendment, will be presumed to occur when confidential defense strategy
is disclosed to the government," did not apply. Id., 257; see also *United
States* v. *Mastroianni*, 749 F.2d 900, 907 (1st Cir. 1984) ("The Third Circuit
and the District of Columbia Circuit have held that disclosure of defense
information by itself creates a sufficient showing of prejudice. See *Briggs*
v. *Goodwin*, [supra, 698 F.2d 494–95]; *United States* v. *Levy*, [supra, 577
F.2d 200]. The focus in these cases is on the proof of transmission of any
information of even the slightest potential strategic value."); *United States*
v. *Mastroianni*, supra, 908 n.3 ("the Third Circuit in *Levy* expressly ruled
that disclosure of attorney-client confidences conclusively established preju-
dice"); *United States* v. *Mastroianni*, supra, 907–908 (after defendant proves
that confidential communications were conveyed to government as result
of presence of government informant at defense meeting, burden shifts to
government to show that there has been and will be no prejudice to defen-
dant); *Bishop* v. *Rose*, 701 F.2d 1150, 1156 (6th Cir. 1983) ("The Third
Circuit holds that if privileged information obtained by the government's
interference with the attorney-client relationship is actually communicated
to prosecution authorities there has been a [s]ixth [a]mendment violation.
There is no need to establish the exact degree of prejudice actually suffered.
*United States* v. *Levy*, [supra, 209] . . . ."); cf. *United States* v. *Danielson*,
325 F.3d 1054, 1071 (9th Cir. 2003) (when defendant establishes that govern-
ment informant acted affirmatively to intrude into attorney-client relation-
ship and to obtain privileged information, burden shifts to government to
show that there has been no prejudice).

The dissenting justice in the present case argues that *Costanzo* lends no
support to our analysis. He apparently believes that *Costanzo* is distinguish-
able because, in that case, the information had been disclosed by an informer
while, in the present case, "the prosecutor came into possession of the
documents at issue as a result of the proper execution of a duly authorized
search warrant . . . ." The dissent further claims that there is no evidence
in the present case that the prosecutor "used" the privileged information.
The court in *Costanzo* expressly found, however, that the intrusion into the
privileged information had not been intentional. *United States* v. *Costanzo*,
supra, 740 F.2d 255. We are unable to discern the distinction between privi-
leged information that is unintentionally obtained from a government
informer—the employment of which is entirely lawful—and privileged infor-
mation that is unintentionally obtained pursuant to the execution of a govern-
ment issued search warrant, especially when the state is on notice that the
materials to be seized contain privileged information. If the execution of a
search warrant does not constitute affirmative government action, we are

relating to trial strategy, the prosecutor had knowledge of the privileged information, and the court held that, under *Levy*, prejudice could not be presumed because the intrusion was not intentional.[11] Indeed, if, as the

hard pressed to know what would. See *United States* v. *Danielson*, supra, 325 F.3d 1071. Moreover, the very reason for the presumption of prejudice recognized in *Levy*, *Briggs* and *Costanzo* is that, when the prosecutor who is prosecuting the case has knowledge of confidential defense strategy, *there is no way that the defendant can know whether the prosecutor has or has not "used" that information.* Thus, the dissent's apparent contention that prejudice can be presumed from such a disclosure only when the defendant has proved that the prosecutor has "used" the information does not withstand scrutiny.

[11] The dissent has cited a number of cases that cite *Levy* for the proposition that intentional intrusions into the attorney-client privilege constitute per se violations of the sixth amendment. See *Shillinger* v. *Haworth*, 70 F.3d 1132, 1141 (10th Cir. 1995) (*Levy* "adopted the rule that intentional intrusions by the prosecution constitute per se violations of the [s]ixth [a]mendment"); *United States* v. *Brugman*, 655 F.2d 540, 545 n.1 (4th Cir. 1981) (characterizing *Levy* as involving deliberate intrusion into attorney-client privilege); *United States* v. *Kember*, 648 F.2d 1354, 1363 (D.C. Cir. 1980) (quoting *Levy* to effect that " '[w]here there is a knowing invasion of the attorney-client relationship and where confidential information is disclosed to the government,' the [s]ixth [a]mendment is violated"); *United States* v. *Davis*, 646 F.2d 1298, 1303 n.8 (8th Cir. 1981) ("where there is gross misconduct on the part of the government no prejudice need be shown"); *United States* v. *Costanzo*, 625 F.2d 465, 469 (3d Cir. 1980) (quoting *Levy* for proposition that sixth amendment is violated when there is knowing invasion of attorney-client relationship and confidential information is disclosed to government); *People* v. *Ervine*, 47 Cal. 4th 745, 766, 220 P.3d 820, 102 Cal. Rptr. 3d 786 (2009) (under *Levy*, there is "per se violation of the [s]ixth [a]mendment once the defendant demonstrates that the prosecution has improperly obtained information concerning confidential defense strategy"), cert. denied, 562 U.S. 848, 131 S. Ct. 96, 178 L. Ed. 2d 60 (2010); *Scott* v. *State*, 310 Md. 277, 301 n.2, 529 A.2d 340 (1987) (characterizing *Levy* as involving prosecutorial misconduct); *State* v. *Sugar*, 100 N.J. 214, 228, 495 A.2d 90 (1985) (under *Levy*, "[c]ertain governmental intrusions on attorney-client relations, even when no severe prejudice to the defendant is apparent, must be dealt with in a manner that denies all effect to the illegal activity"); *Reeves* v. *State*, 969 S.W.2d 471, 492 (Tex. App. 1998) ("[t]he [holding] in *Levy* . . . turn[ed] on whether or not the intrusion was unlawful and for the sole purpose of determining defense strategy" [internal quotation marks omitted]), cert. denied, 526 U.S. 1068, 119 S. Ct. 1462, 143 L. Ed. 2d 547 (1999). We agree that *Levy* supports the proposition that the government's intentional invasion of the attorney-client privilege violates the sixth amendment. It does not follow that *Levy* does *not* support the proposition that the *unintentional* invasion of privileged materials containing trial strategy violates the sixth

amendment. Because none of these cases involved the unintentional disclosure of privileged information relating to trial strategy, they are of little persuasive value. See *Shillinger* v. *Haworth*, supra, 1135 (prosecutor's knowledge of privileged information was "acquired through a conversation with the deputy that was initiated by the prosecutor"); *United States* v. *Brugman*, supra, 546 (trial strategy was not disclosed to government); *United States* v. *Kember*, supra, 1364 ("[u]nlike the situation in *Levy*, the [g]overnment is not intruding upon confidential communications between attorney and client"); *United States* v. *Davis*, supra, 1303 (no evidence helpful to prosecution was disclosed); *United States* v. *Costanzo*, supra, 625 F.2d 470 (remanding case for determination of nature of communications that were disclosed); *People* v. *Ervine*, supra, 767 (defendant made no showing that confidential communications had been disclosed to government); *Scott* v. *State*, supra, 300–301 (defendant sought dismissal when state had violated gag order); *State* v. *Sugar*, supra, 229 (government had obtained privileged information in manner that was "offensive and illegal"); *Reeves* v. *State*, supra, 492 (government obtained no confidential information).

The other cases cited by the dissent in which prejudice was not presumed also do not involve intrusions by a prosecutor into privileged information concerning trial strategy. See *United States* v. *Aulicino*, 44 F.3d 1102, 1117 (2d Cir. 1995) (defendants presented no evidence that informant had revealed privileged information to government); *United States* v. *Schwimmer*, 924 F.2d 443, 445 (2d Cir.) (government obtained information from defendant's accountant regarding allocation of commissions), cert. denied, 502 U.S. 810, 112 S. Ct. 55, 116 L. Ed. 2d 31 (1991); *United States* v. *Ginsberg*, 758 F.2d 823, 833–34 (2d Cir. 1985) (mere presence of government informant at conferences between defendant and counsel does not violate sixth amendment); *United States* v. *Morales*, 635 F.2d 177, 179 (2d Cir. 1980) (reversal of convictions not warranted when defendants made no showing that government had breached confidences between defendants and their attorneys); *United States* v. *Irwin*, 612 F.2d 1182, 1188–89 (9th Cir. 1980) (prejudice was not presumed when government agent contacted defendant without knowledge of defense counsel); *United States* v. *Gartner*, 518 F.2d 633, 637 (2d Cir.) (government did not violate sixth amendment by taping meeting between defendant and attorney when third person was present at meeting), cert. denied, 423 U.S. 915, 96 S. Ct. 222, 46 L. Ed. 2d 144 (1975); *United States* v. *Rosner*, 485 F.2d 1213, 1225 (2d Cir. 1973) (defendant was not prejudiced when government informant who sat in on meetings between defendant and attorney had had no contact with government after he had agreed to cooperate with government and informant had been warned not to disclose defense strategy to prosecutors), cert. denied, 417 U.S. 950, 94 S. Ct. 3080, 41 L. Ed. 2d 672 (1974); *Lakin* v. *Stine*, United States Court of Appeals, Docket No. 99-1529, 2000 WL 1256900 (6th Cir. July 13, 2000) (denial of request for substitute counsel did not violate sixth amendment); *United States* v. *Shreck*, United States District Court, Docket No. 03-CR-0043-CVE (N.D. Okla. May 23, 2006) (government plan to control defense counsel's access to illegal Internet sites in course of preparing defense did not violate sixth amendment); *United States* v. *Marlinga*, United States District Court,

dissent claims, the intent of the government is the dis-

Docket No. 04-80372 (E.D. Mich. February 28, 2005) (government's passive receipt of privileged information regarding inculpatory evidence did not constitute fifth amendment violation); *United States* v. *Sattar,* United States District Court, Docket No. 02 Cr. 395 (JGK) (S.D.N.Y. August 6, 2002) (when defendants sought order requiring government to provide assurance that it was not monitoring attorney-client communications, and government had represented that screening processes were in place to ensure that any interceptions were not used against defendants, defendants had not established potential sixth amendment violation); *United States* v. *Pelullo,* 917 F. Sup. 1065, 1078 (D.N.J. 1995) (no sixth amendment violation when defendant failed to establish that government had access to privileged documents); *State* v. *Webbe,* 122 Wn. App. 683, 696–97, 94 P.3d 994 (2004) (no evidence that case involved intrusion into privileged information concerning trial strategy); *State* v. *Garza,* 99 Wn. App. 291, 300–301, 994 P.2d 868 (when jail officers read privileged documents containing confidential trial strategy, prejudice could not be presumed unless intrusion was intentional), review denied, 141 Wn. 2d 1014, 10 P.3d 1072 (2000); cf. *United States* v. *Singer,* 785 F.2d 228, 235 (8th Cir.) (finding sixth amendment violation when government knowingly intruded into confidential trial strategy), cert. denied, 479 U.S. 883, 107 S. Ct. 273, 93 L. Ed. 2d 249 (1986); *Sanborn* v. *Parker,* United States District Court, Docket No. 99-6780-C (W.D. Ky. February 14, 2007) (finding sixth amendment violation when government agent questioned defendant about trial strategy); *United States* v. *Horn,* 811 F. Sup. 739, 750–51 (D.N.H. 1992) (sixth amendment was violated when government improperly intruded into privileged information regarding defense strategy).

The dissent also contends that *Levy* was overruled by *United States* v. *Voigt,* 89 F.3d 1050 (3d Cir. 1996). *Voigt* did not, however, involve a claim that confidential trial strategy had been disclosed to the prosecutor. The defendant in that case sought to dismiss the charges against him on the ground of outrageous government conduct because his attorney was a government informant. Id., 1063. The court concluded that he had failed to demonstrate the prejudice prong of his claim because he had failed to show that the attorney had provided any privileged information to the government. Id., 1070. The court then noted that the defendant was claiming, under *Levy,* that the intrusion into the attorney-client relationship itself was prejudicial, even without a showing that confidences had been revealed. Id. The court distinguished *Levy* because: (1) unlike the case before it, *Levy* involved a sixth amendment claim; and (2) *Levy* "concerned the government's deliberate intrusion into a defendant's attorney-client relationship in order to gain access to confidential defense strategy." Id., 1070–71. The court also stated that, "to the extent that *Levy* can be read as holding that certain government conduct is per se prejudicial, we note that the [United States] Supreme Court has since held to [the] contrary. *United States* v. *Morrison,* [supra, 449 U.S. 365–66] (even where government conduct is deliberate, defendant must demonstrate prejudice to obtain a remedy)." *United States* v. *Voigt,* supra, 1071 n.9. Because neither *Morrison* nor *Voigt,* involved a claim that

positive issue in determining whether prejudice may be presumed when the government has intruded into privileged information relating to trial strategy, we are at a loss to understand why the court in *Levy* discussed the *nature* of the privileged information that had been intruded upon in that case at such length. See id., 209 ("The fundamental justification for the sixth amendment right to counsel is the presumed inability of a defendant to make informed choices about the preparation and conduct of his defense. Free two-way communication between client and attorney is essential if the professional assistance guaranteed by the sixth amendment is to be meaningful. The purpose of the attorney-client privilege is inextricably linked to the very integrity and accuracy of the fact finding process itself. Even guilty individuals are entitled to be advised of strategies for their defense. In order for the adversary system to function properly, any advice received as a result of a defendant's disclosure to counsel must be insulated from the government. No severe definition of prejudice, such as the fruit-of-the-poisonous-tree evidentiary test in the fourth amendment area, could accommodate the broader sixth amendment policies. We think that the inquiry into prejudice must stop at the point where attorney-client confidences are actually disclosed to the government enforcement agencies responsible for investigating and prosecuting the case. Any other rule would disturb the balance implicit in the adversary system and thus would jeopardize the very process by which guilt and innocence are determined in our society. In the instant case confidential information was disclosed to the government authorities."). If prejudice

---

confidential trial strategy had been disclosed to the prosecutor; see *United States* v. *Morrison*, supra, 362 (defendant claimed sixth amendment violation when government agents met with her while she was represented by private counsel and urged her to obtain different counsel); we conclude that neither case supports the proposition that prejudice cannot be presumed when confidential defense strategy *has* been disclosed.

may be presumed when the government has intentionally intruded into privileged information containing trial strategy because "advice received as a result of a defendant's disclosure to counsel must be insulated from the government"; id.; and "it is highly unlikely that a court can . . . arrive at a certain conclusion as to how the government's knowledge of any part of the defense strategy might benefit the government"; id., 208; prejudice may be presumed *for the same reason* when the intrusion was unintentional. Nowhere does the court in *Levy* suggest that the intent of the government somehow has a bearing on the prejudicial effect of such disclosures, and we cannot imagine how it might.[12]

Finally, a number of courts have held that the defendant is not required to prove that he was prejudiced by the government's intrusion into attorney-client communications when the intrusion was deliberate and was unjustified by any legitimate governmental interest in effective law enforcement. See *Shillinger* v. *Haworth*, 70 F.3d 1132, 1141–42 (10th Cir. 1995); *Morrow* v. *Superior Court*, 30 Cal. App. 4th 1252, 1258, 36 Cal. Rptr. 2d 210 (1994) (when prosecutor intentionally orchestrated eavesdropping on conversation between defendant and attorney, burden fell on state to prove that punitive dismissal was not warranted because defendant had

---

[12] The dissent argues that, "if the government is the cause of any harm that potentially may befall the defendant due to an intentional breach of the attorney-client relationship, any difficulty in discerning whether the defendant actually was prejudiced by the breach should be borne by the government," and when a government intrusion into the attorney-client privilege was not intentional, "there simply is no justification for shifting the burden to the government to disprove prejudice." Although we agree with the dissent that, when an intrusion has been intentional, shifting the burden to the state may be justified, it does not follow that, when an intrusion is *not* intentional, there can be *no* justification for shifting the burden to the state. As *Levy* and *Briggs* make clear, when privileged information containing defense strategy has been disclosed to the prosecutor, the justification for shifting the burden of proof is that the disclosure is inherently prejudicial and the state is in the best position to rebut the inference of prejudice.

not been prejudiced). The court in *Shillinger* reasoned that "no other standard can adequately deter this sort of misconduct." *Shillinger* v. *Haworth*, supra, 1142.

We agree with the courts that have held that the burden is not on the defendant to establish that he was prejudiced when the prosecutor has intruded on attorney-client communications that contain information concerning the defendant's trial strategy.[13] Rather,

[13] Justice Palmer contends that we are addressing a claim that was not raised on appeal. A fair reading of the defendant's brief to this court and his memorandum in support of his motion to dismiss reveals, however, that he argued both to this court and to the trial court that the disclosure of the privileged materials was inherently prejudicial because the materials contained trial strategy. See footnote 7 of this opinion. The arguments made by the defendant were essentially the same as those made by the courts that have found that the disclosure of privileged information relating to trial strategy is inherently prejudicial. Indeed, the Appellate Court apparently was concerned that the mere disclosure of the privileged documents to the prosecutor could be inherently prejudicial because it ordered the trial court to articulate: (1) whether it had "considered [the defendant's] argument that the [prosecutor] received and reviewed the documents covered by the attorney-client privilege"; and (2) "[w]hat prejudice, if any, it found that the defendant suffered as a result." Despite the fact that the prosecutor had admitted that he had read the privileged documents in their entirety, the trial court indicated in its response to the order for articulation that it could not answer these questions because "[t]he defendant failed to introduce sufficient credible evidence . . . as to the timing, nature and extent of the receipt [and] review . . . by the [prosecutor] of the documents covered by the attorney-client privilege." The defendant cannot be blamed for the fact that the trial court did not meaningfully respond to the order for articulation of its finding that, *even though the prosecutor had read the privileged documents*, the defendant had suffered no prejudice.

The dissent insists, however, that nothing in the defendant's arguments "even remotely resembles a claim that an unintentional violation of the attorney-client relationship gives rise to a presumption of prejudice," and that our reliance on the language of the defendant's brief to this court arguing that he was prejudiced is misplaced because it was contained in a section entitled "Requested Relief." We can only reiterate that the clear import of the defendant's arguments is that the prosecutor's knowledge of his trial strategy was inherently prejudicial. The prosecutor's intent or lack of intent, and the title of the section of the brief in which the defendant's argument is set forth, have no bearing on that question. Indeed, at oral argument before this court, the defendant agreed that this court could dismiss the charge against him if it found that the intrusion was prejudicial, even if the intrusion was not intentional. Moreover, although the defendant

because the disclosure of such information is *inherently prejudicial,* prejudice should be presumed, regardless of whether the invasion into the attorney-client privilege was intentional. The subjective intent of the government and the identity of the party responsible for the disclosure simply have no bearing on that question.[14]

did not expressly argue to the trial court or in his brief to this court that a prejudicial intrusion into the attorney-client relationship violates the sixth amendment even in the absence of intent, the dissent does not dispute that intrusions into the attorney-client privilege can violate the sixth amendment if they are prejudicial, even if they are not intentional. Thus, the dissent apparently believes that, even if the defendant is correct that intrusions into privileged information containing trial strategy are inherently prejudicial, and even if other courts correctly have held that prejudicial intrusions into privileged materials violate the sixth amendment, we cannot connect these ideas and draw the conclusion in the present case that the prosecutor's unintentional intrusion into privileged materials containing trial strategy presumptively violated the sixth amendment because the defendant did not make that connection and that precise claim. We decline to put so fine a point on the defendant's argument.

[14] We emphasize that we do not conclude that the mere unintentional intrusion into privileged information containing trial strategy automatically constitutes a sixth amendment violation. For example, if the government can establish that it notified the defendant and the court immediately of the intrusion, that it ensured that no government official with knowledge of the information had any contact with witnesses or investigators and that it ensured that no such person was involved in the prosecution of the case, the disclosure could well be harmless. We do not believe that it imposes an unreasonable burden on the state to take steps to insulate a prosecutor who has knowledge of the defendant's confidential trial strategy from involvement in the case. See *United States* v. *Danielson,* 325 F.2d 1054, 1072 (9th Cir. 2003) (prosecution can avoid burden of proving nonuse of privileged information by "insulating itself from privileged trial strategy information"); id., 1072–73 (discussing government policies and procedures for insulating prosecutor from privileged trial strategy information). If the government made no such efforts, its conduct can hardly be characterized as blameless.

In the present case, although the record does not reveal precisely how long the prosecutor was in possession of the privileged documents, contrary to the dissent's suggestion, it is clear that he did not notify the defendant and trial court immediately upon reading them. See footnote 4 of this opinion. It is also clear that, even after the defendant informed the trial court that the prosecutor was in possession of privileged materials and the trial court ordered the documents to be placed under seal, thereby unequivocally putting the state on notice that it would be improper for the prosecutor to use

We further conclude that the presumption of prejudice when trial strategy has been disclosed to the prosecutor may be rebuttable. For example, the state may be able to show that no person with knowledge of the privileged communications had any involvement in the investigation or prosecution of the case, the privileged communications contained only minimal information or that the state had access to all of the privileged information from other sources. In light of the important constitutional right at issue, however, we conclude that the state must rebut the presumption of prejudice by clear and convincing evidence. Cf. *In re Jeisean M.*, 270 Conn. 382, 394, 852 A.2d 643 (2004) ("protected fundamental right of a parent to make child rearing decisions mandates that where a third party seeks visitation, that third party must allege and prove, by clear and convincing evidence, a relationship with the child that is similar in nature to a parent-child relationship, and that denial of the visitation would cause real and significant harm" [internal quotation marks omitted]); *Miller* v. *Commissioner of Correction*, 242 Conn. 745, 796, 700 A.2d 1108 (1997) ("[c]onsistent with the heavy burden that [the clear and convincing] standard of proof imposes, courts and legislatures have employed it in constitutional . . . contexts involving extremely significant questions of fact"); *State* v. *Jarzbek*, 204 Conn. 683, 704–705, 529 A.2d 1245 (1987) (in light of defendant's constitutional right to confrontation

the information in the documents in preparing the case for trial, the prosecutor made no efforts to discontinue his discussions with the witnesses and investigators or to insulate himself in any manner from the prosecution of the case. Rather, he tried the case to conclusion. In any event, even if we were to assume that the government's conduct was entirely blameless, that would not prevent the disclosure of the privileged information to the prosecutor who actually tried the case from being presumptively prejudicial. See *United States* v. *Levy*, supra, 577 F.2d 209 ("[w]e think that the inquiry into prejudice must stop at the point where attorney-client confidences are actually disclosed to the government enforcement agencies responsible for investigating and prosecuting the case").

of witnesses, state must prove compelling need to exclude defendant from witness room during videotaping of child's testimony by clear and convincing evidence), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988); cf. *Morrow* v. *Superior Court,* supra, 30 Cal. App. 4th 1258 (when state has eavesdropped on privileged communications, burden falls on state to prove that sanctions are not warranted because there was no substantial threat of demonstrable prejudice).

In the present case, even a cursory review of the materials reveals that the defendant was presumptively prejudiced by the prosecutor's intrusion into the privileged communications taken from the defendant's computer because the privileged materials contained a highly specific and detailed trial strategy. Moreover, because the state's case in Docket No. H12M-CR-03-128673-S was based entirely on the complainant's account of the defendant's conduct,[15] and because the privileged communications contained highly specific facts relating to the credibility of the complainant and the adequacy of the police investigation in that case, the communications went to the heart of the defense.[16]

---

[15] The state presented no physical evidence or eyewitness testimony to corroborate the complainant's account.

[16] The state represented at oral argument before this court that the prosecutor believed that his knowledge of the defendant's trial strategy gave him no advantage because the strategy was one that any defendant would have developed. Upon review of the privileged materials, we cannot agree. Although the strategy involved common defense tactics, such as casting doubt on the credibility of state witnesses, the state could not have predicted the very specific manner in which the defendant intended to do so without having knowledge of the privileged materials. Cf. *United States* v. *Levy,* supra, 577 F.2d 208 (government's knowledge of specific defense strategy to discredit certain state witnesses "would permit it not only to anticipate and counter such an attack . . . but also to select jurors who would be more receptive to [those witnesses]"). Our review of the record strongly suggests that the prosecutor did, in fact, use the materials to anticipate and forestall the defendant's defense strategy. See footnotes 21 and 22 of this opinion.

Finally, the communications contained statements by the defendant of how best to defend the case, as opposed to general trial strategy being conveyed by an attorney to the client. Accordingly, we conclude that, contrary to the trial court's finding, it may be presumed that the prosecutor's intrusion into the communications was highly prejudicial.[17]

In light of this conclusion, we need not address the defendant's claims that the trial court's finding that the prosecutor's intrusion into the privileged materials had not been intentional was clearly erroneous, and that a showing of prejudice is not required when the intrusion was intentional. We must state, however, that we are extremely troubled by the prosecutor's conduct in this case. Although the privileged documents were not in the form of letters or e-mails, it could not have been more obvious on the face of a number of the documents that they were intended to be communications to the

---

[17] We do not address at this point in our analysis the question of whether the state rebutted this presumption of prejudice because the state was not on notice that it was required to do so. We note, however, that the only information presented by the state that was relevant to the question of prejudice was the prosecutor's conclusory and unsworn representation that he had not commenced any further investigation, had not interviewed any additional witnesses and had not requested anything further from the defense by way of discovery after he had read the privileged materials. Even if the prosecutor did not use his knowledge of the privileged communications to develop *new evidence* against the defendant, however, the prosecutor made no representations at the time of the hearing on the motion to dismiss, which took place more than one year after the prosecutor revealed that he had read the documents, that his knowledge of the defendant's trial strategy had not affected and would not affect his trial preparations, including discussions with witnesses and investigators, or his decisions on jury selection, witness selection, examination of witnesses, or any of the other innumerable decisions that he was required to make in preparation for and during trial. Even if we assume that the state could have presented additional evidence to rebut the presumption of prejudice before trial, however, as we discuss more fully later in this opinion, we conclude that it would be impossible for the state in this case to establish by clear and convincing evidence that the prejudice resulting from the prosecutor's intrusion into the privileged materials would be remediable now that the case has been tried to conclusion.

defendant's attorney.[18] For example, one of the documents stated near the top of the first page that "[t]he

[18] To the extent that the state claims that a document is not subject to the attorney-client privilege unless it actually has been communicated from a client to an attorney, we strongly disagree. The Court of Appeals of Washington addressed a similar claim in *State* v. *Perrow*, 156 Wn. App. 322, 231 P.3d 853 (2010), a case with remarkable similarities to the present case. In *Perrow*, the defendant was under investigation for the alleged sexual abuse of his daughter. Id., 325. The police obtained a search warrant for the defendant's residence and, during the course of the search, seized a number of documents. Id., 326. The defendant immediately called his attorney and informed him that the police had seized materials that he had prepared for the attorney. Id. The attorney advised the defendant to inform the police that the documents were covered by the attorney-client privilege, which the defendant did. Id. Nevertheless, the police removed the documents from the defendant's residence, read them, analyzed them and sent the written analysis to the prosecutor. Id. When the state brought criminal charges, the defendant filed a motion to dismiss the charges against him on the ground that the state had violated the statutorily protected attorney-client privilege and engaged in prejudicial misconduct. Id., 327. The trial court granted the motion, and the state appealed. Id. On appeal, the state claimed that the documents were not privileged because, among other reasons, the defendant had not shown that they were intended for his attorney. Id. The Court of Appeals concluded that, because the defendant had prepared the documents "to obtain legal advice, outline strategy and prepare a defense"; id., 330; and because the materials were intended for his attorney and were not intended to be disclosed; id., they were covered by the attorney-client privilege. Id. We agree with this conclusion. If a person creates a document with the intent to communicate it to an attorney for the purpose of facilitating the attorney's representation of that person, it would be entirely inconsistent with the purpose of the attorney-client privilege to allow third parties to obtain access to the document up to the time that the person actually communicates it to the attorney.

In his dissenting opinion, Justice Palmer places great weight on the trial court's finding that the prosecutor's invasion of the attorney-client privilege was not intentional. That finding, however, was premised on the court's conclusion that the prosecutor could not have known that the documents at issue were privileged because they were not formatted as e-mails or letters to an attorney and, therefore, he could not have known that they were "communications." As we have indicated, it is crystal clear on the face of a number of the documents that they were intended to be communications to the defendant's attorney, notwithstanding the fact that they were not formatted as letters or e-mails. We also have concluded as a matter of law that documents that are intended to be communicated to an attorney are subject to the attorney-client privilege regardless of their format or whether they have actually been provided to the attorney. Thus, in finding that the invasion was unintentional because the documents were not formatted as

following material is confidential and I would ask that you review it. If this is a case you believe you would have success in defending, I would like to schedule [an] appointment to discuss it." Another document was entitled "Strategy Issues" and stated in the first sentence: "I think that in the short term, especially for the court appearance on June 8, 2004, that our objective should be threefold . . . ." The first two sentences of another document provided: "We were asked by our original attorney . . . to keep a log of any events that we thought might pertain to this case. This document is the result . . . ." Moreover, the prosecutor expressly had been put on notice that there were materials in the defendant's computer that were subject to the attorney-client privilege and had been ordered not to read them. It is clear to us, therefore, that the prosecutor either knew or should have known immediately upon beginning to read these statements that the documents were privileged and that he should have stopped reading at once and notified the defendant and the court immediately that they were in his possession.

Having concluded that the defendant was prejudiced by the prosecutor's intrusion into the privileged communications, we turn to the defendant's claim that the trial court abused its discretion when it denied his motion to dismiss. The United States Supreme Court has held that "[c]ases involving [s]ixth [a]mendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe

---

e-mails or letters, even though they clearly were intended to be communicated to the defendant's attorney, the trial court applied an incorrect legal standard. We simply find it incredible that a trained attorney, who was on notice that the seized documents could contain privileged materials, would fail to recognize that, at the very least, it was highly probable that these documents were privileged. As we have indicated, however, because we conclude that the prejudice to the defendant cannot be cured by any remedy less than dismissal, we need not decide whether the invasion was intentional.

on competing interests." *United States* v. *Morrison*, supra, 449 U.S. 364. "Our approach has . . . been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial. The premise of our prior cases is that the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense. Absent such impact on the criminal proceeding, however, there is no basis for imposing a remedy in that proceeding, which can go forward with full recognition of the defendant's right to counsel and to a fair trial." Id., 365. "More particularly, *absent demonstrable prejudice, or substantial threat thereof*, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate." (Emphasis added.) Id.

Thus, when a defendant has been prejudiced by governmental intrusions into privileged communications, the remedy must be tailored to cure the prejudice. It follows that, although dismissal of criminal charges is a drastic remedy; *State* v. *Bergin*, 214 Conn. 657, 672, 574 A.2d 164 (1990); and although the decision to grant or deny a motion to dismiss a criminal charge "rests within the sound discretion of the trial court, and is one that we will not disturb on appeal absent a clear abuse of that discretion"; *State* v. *Kelly*, 256 Conn. 23, 77, 770 A.2d 908 (2001); the remedy of dismissal is required when there is no other way to cure substantial prejudice to the defendant.

Moreover, having concluded that, as a matter of law, the burden is on the state to rebut the presumption of prejudice by clear and convincing evidence, we similarly conclude that, if the state has not met its burden of showing the absence of prejudice, the burden is on the state to prove by clear and convincing evidence

that any prejudice to the defendant can be cured by a less drastic remedy than dismissal, such as the appointment of a new prosecutor who has not been exposed to the privileged materials. In addition, when the trial court learns that a government official has obtained knowledge of the defendant's trial strategy, it is incumbent on the court, sua sponte, to require the state to prove by clear and convincing evidence that prejudice to the defendant could be prevented by the proposed remedy and, if the state meets its burden, to order that relief, even in the absence of a request by the defendant. Cf. *State* v. *Gaines*, 257 Conn. 695, 708, 778 A.2d 919 (2001) (when evidence of conflict of interest is sufficient to alert reasonable trial court that defendant's sixth amendment right to effective assistance of counsel is in jeopardy, trial court has duty to inquire into conflict sua sponte).

In the present case, the trial court improperly found that the defendant had not been prejudiced by the prosecutor's intrusion into the privileged communications. Accordingly, it placed no burden on either party to devise an appropriate remedy.[19] Thus, if the trial court and the state had been on notice of the standards for addressing claims involving governmental intrusions into privileged communications that we adopt in this opinion, we would conclude that the trial court abused its discretion in denying the defendant's motion to dismiss. Because we are applying this standard for the first time, however, we recognize that it ordinarily would be appropriate to remand the case to the trial court for a new hearing on the motion to dismiss under the proper standard.

Under the circumstances of the present case, however, we conclude that a remand is not appropriate.

---

[19] The trial court offered to sever the Granby cases "to avoid the appearance of a taint of prejudice," not because it believed that the defendant actually had been prejudiced.

Even if we were to assume that the state could have proved before trial that a less drastic remedy than dismissal would have been an adequate remedy,[20] now that the case has been tried by the prosecutor who read the privileged communications, it clearly would be impossible to eliminate the potential for prejudice to the defendant with any other sanction. The prosecutor had had knowledge of the defendant's trial strategy during the one and one-half years preceding trial and, therefore, could use the information in preparing for trial. Indeed, the record strongly suggests that the prosecutor may have revealed the defendant's trial strategy to witnesses and investigators.[21] In addition, consciously or uncon-

[20] We note, however, that this seems highly unlikely. The record reveals that the prosecutor had known the substance of the privileged communications for approximately one and one-half years before the trial court ruled on the motion to dismiss on the eve of trial. It is reasonable to conclude that, during that period, wittingly or unwittingly, the prosecutor revealed the strategy to witnesses and investigators to whom the new prosecutor necessarily would have access. Cf. *Briggs* v. *Goodwin*, supra, 698 F.2d 494–95 (sharing of information between investigators and prosecutors may be presumed). Indeed, the record supports such a conclusion. See footnotes 21 and 22 of this opinion.

[21] In one of the privileged communications, the defendant stated that "Captain [Kevin] Bennett from the Granby police department," who had interviewed the complainant in Docket No. H12M-CR-03-128673-S after she made the accusations against the defendant, had given a presentation regarding child abuse at a Granby church. According to the defendant, Bennett stated during the presentation that, when child abuse is suspected, it is important for the police to arrange for a single interview of the child by a specially trained interviewer to make sure that the child is not picking up clues about what the investigators are looking for. The defendant also stated that the Granby police department had not followed this procedure with the complainant. Rather, it was the defendant's understanding that she had been interviewed multiple times by untrained interviewers, and the interviews had not been recorded. At trial, the prosecutor asked David Watkins, the chief of the Granby police department, if he had given any instructions to the complainant's parents after they complained to the police about the defendant's conduct. He responded that he had instructed them that they should not interview the complainant or engage her in any conversation about the defendant. The prosecutor also asked Bennett if he had given any instructions to the complainant's parents. He indicated that he told them that they should not discuss the incident with her. The prosecutor also asked the complainant's mother if she had asked "about what was to

sciously, the prosecutor's knowledge of the defendant's trial strategy may have affected his selection and examination of witnesses during trial, which is now a matter of public record. Again, the record strongly suggests that the prosecutor drew on his knowledge of the privileged communications when examining the accusing witness in Docket No. H12M-CR-03-128673-S to anticipate and thereby neutralize what otherwise might have been a devastating cross-examination of that witness.[22]

happen next" after she reported the defendant's conduct to the police. She responded that she had been "given instructions as to what would happen next." When the prosecutor asked what the instructions were, the complainant's mother responded that she had been told not to speak to the complainant about what had happened. The complainant's father gave similar testimony when the prosecutor asked him if he had been told what would happen next after they reported the defendant's conduct to the police. The fact that both of the complainant's parents gave the same specific answer to the prosecutor's open-ended question as to whether they had been informed by the Granby police department as to what would happen next suggests that the prosecutor had discussed with these witnesses the importance of persuading the jury that the complainant's account of the defendant's conduct had not been tainted by multiple interviews.

The dissent points out that defense counsel had argued during pretrial negotiations that the videotaped forensic interviews had little evidentiary value because of the methods used by the interviewer and argues that this shows that defense counsel had "made no secret of the fact that he intended to challenge the credibility of the alleged victim on the basis of the nature of the questioning to which the victim had been subjected." The fact that the state knew that the defendant intended to challenge the methods used by the forensic interviewer does not mean, however, that it knew that the defendant intended to argue that the complainant's account of the defendant's conduct had been tainted by repeated conversations with members of her family and investigators.

[22] In one of the privileged communications, the defendant suggested that the complainant in Docket No. H12M-CR-03-128673-S had disliked attending karate classes because she had been falling behind her classmates in her karate skills. He also implied that she may have lied about the defendant's conduct so that she would no longer have to attend the classes. At trial, the prosecutor asked the complainant whether she had been able to keep up with her peers in the karate classes, and she responded, "Yes." Indicating that this was not the answer that he had expected, the prosecutor then rephrased the question and asked the complainant if she had ever fallen behind. Again, she said, "Yes." The prosecutor then asked the complainant why that had happened, and she replied that she had traveled a lot with her mother. Later, the prosecutor asked the complainant whether the reason

Even if he did not draw on this knowledge, however, we agree with the court in *Briggs* v. *Goodwin,* supra, 698 F.2d 494–95, that "[m]ere possession by the prosecution of otherwise confidential knowledge about the defense's strategy or position is sufficient in itself to establish detriment to the criminal defendant." Moreover, the testimony of tainted witnesses at the first trial

that she had not wanted to go to karate was because of the defendant's conduct, and she agreed. The complainant also agreed with the prosecutor when asked whether they had met "a lot of times" before trial to discuss the case. Thus, contrary to Justice Palmer's assertion in his dissenting opinion, we do not conclude that the prosecutor imparted knowledge to this witness merely by asking her questions at trial. Of course, there is no way of knowing whether there were questions that the prosecutor decided *not* to ask as the result of his knowledge of the defendant's trial strategy.

The dissent states that this information was contained in a document that "bears no indication of any kind that it is intended to be a privileged communication from the defendant to his attorney" and "is an e-mail from the defendant to his wife, and makes no reference to the defendant's attorney . . . ." The document in question is entitled "Strategy and Questioning." It contains numerous references to the defendant's trial strategy, such as "[w]hen we are questioning [the complainant]"; "[w]e should be able to exploit this at all levels during testimony at the trial"; "[w]e . . . need to lay the groundwork for this by asking [police captain Kevin Bennett] what a police officer's job is"; "[n]ow is where we can start questioning [Bennett's] integrity and duty"; "[w]e need to point out to the jury that [the investigator's] job is to investigate"; "[w]e need to lead her to a statement that her job is to conduct unbiased interviews"; "we need to get [the investigator] to define for the jury exactly what a pedophile is"; and "[w]e want to hammer this point over and over in front of the jury." It is perfectly clear that the reference to "we" in these statements is a reference to the defendant and his attorney. The fact that a handwritten note on the first page of the document indicates that the defendant had sent it by e-mail to his wife—a note that could not have been on the document when it was seized from the defendant's computer—has no bearing on the question of whether it is privileged. In any event, even if the prosecutor could not have known that this document was privileged when he read it, we would still conclude that the defendant was prejudiced by his knowledge of its contents.

The dissent also claims that "*even on appeal,* the defendant has not alluded to anything that occurred during the trial that would tend to implicate the proposed strategy contained in the privileged documents. Thus, the majority's references to the record are not based on any argument that the defendant has *ever* made . . . ." (Emphasis added.) As the dissent acknowledges, however, the defendant argued at oral argument to this court that the prosecutor may have asked the complainant about her spotty attendance at karate classes because he had read the privileged materials.

could be admissible in a second trial as prior inconsistent statements. See *State* v. *Winot*, 294 Conn. 753, 778, 988 A.2d 188 (2010). Finally, as we have indicated, the information in the privileged communications went to the heart of the defense in that case. Accordingly, even if the case were to be retried by a prosecutor who has not read the privileged communications, it would be impossible for the courts or the defendant to have any confidence that a second trial with a new prosecutor would be untainted by the constitutional violation in the first trial, particularly because the new prosecutor would necessarily have access to the transcript of the original trial. See *United States* v. *Levy*, supra, 577 F.2d 208 (after case has been tried to completion, "a trial court applying an actual prejudice test would face the virtually impossible task of reexamining the entire proceeding to determine whether the disclosed information influenced the government's investigation or presentation of its case or harmed the defense in any other way"); id., 210 ("As a result of the district court's decision that no sixth amendment violation occurred, the same strike force group which originally handled the case was allowed to proceed with the trial. The disclosed information is now in the public domain. Any effort to cure the violation by some elaborate scheme, such as by bringing in new case agents and attorneys from distant places, would involve the court in the same sort of speculative enterprise which we have already rejected. Even if new case agents and attorneys were substituted, we would still have to speculate about the effects of the old case agents' discussions with key government witnesses. More important, public confidence in the integrity of the attorney-client relationship would be ill-served by devices to isolate new government agents from information which is now in the public domain. At least in this case, where the trial has

already taken place, we conclude that dismissal of the indictment is the only appropriate remedy.").[23]

Finally, we address the state's claim that the appointment of a new prosecutor would have been an adequate remedy before trial and, because the defendant insisted that dismissal was the only remedy that would prevent prejudice to him, the defendant is now precluded from claiming that he was harmed by the court's failure to impose that remedy. We disagree. The following undisputed facts and procedural history are relevant to our resolution of this claim. The defendant argued to the trial court in his memorandum in support of his motion to dismiss that the appointment of a new prosecutor would not prevent prejudice to him because the privileged communications contained his trial strategy and had been in the possession of the prosecutor for a lengthy period of time.[24] He expressly disavowed any claim that the privileged communications contained anything of inculpatory, as opposed to strategic, value to the state. Accordingly, he argued, suppression of the

---

[23] See also *State* v. *Cory*, 62 Wn. 2d 371, 377, 382 P.2d 1019 (1963) ("If the prosecution gained information which aided it in the preparation of its case, that information would be as available in the second trial as in the first. If the defendant's right to private consultation has been interfered with once, that interference is as applicable to a second trial as to the first. And if the investigating officers and the prosecution know that the most severe consequence which can follow from their violation of one of the most valuable rights of a defendant, is that they will have to try the case twice, it can hardly be supposed that they will be seriously deterred from indulging in this very simple and convenient method of obtaining evidence and knowledge of the defendant's trial strategy."); cf. *Lykins* v. *State*, 288 Md. 71, 73, 85, 415 A.2d 1113 (1980) (when prosecutor previously had represented defendant but record showed no actual conflict of interest or improper motive for bringing prosecution, proper remedy was to disqualify prosecutor, not to dismiss charges); but see *People* v. *Pobliner*, 32 N.Y.2d 356, 362, 368–69, 298 N.E.2d 637, 345 N.Y.S.2d 482 (1973) (when state intercepted conversations between defendant and attorney that involved defendant's plans for investigation and possible witnesses, but defendant failed to show that defense had been affected by interception, dismissal was not required), cert. denied, 416 U.S. 905, 94 S. Ct. 1609, 40 L. Ed. 2d 110 (1974).

[24] See footnote 7 of this opinion.

documents also would not be an appropriate remedy. The state argued in its opposing memorandum that the appointment of a new prosecutor was not necessary because the prosecutor had not wilfully intruded into the privileged communications. At the conclusion of the hearing on the motion to dismiss, the trial court found that the defendant had not been prejudiced, but offered to sever the Granby cases in the apparent belief that any *potential* prejudice to the defendant arose exclusively from the possibility that the communications contained inculpatory evidence in the Granby cases, or information that could lead to the discovery of inculpatory evidence, and that the Simsbury police department had shared the information in the privileged communications with the Granby police department. The defendant emphatically rejected this proposal, presumably in the belief that the remedy would do nothing to prevent the prejudice to him resulting from the prosecutor's knowledge of his trial strategy in the Granby cases—an assessment with which we agree. Neither the state nor the trial court suggested at that time that the appointment of a new prosecutor would be an appropriate remedy.

We have concluded that, when the trial court becomes aware of a potential sixth amendment violation resulting from an intrusion into privileged communications, it is incumbent on the court, sua sponte, to devise a remedy adequate to cure any prejudice to the defendant. We also have concluded that it was apparent on the face of the privileged communications at issue in the present case that the defendant would be prejudiced by the prosecutor's knowledge of their contents. Accordingly, we conclude that it was incumbent on the trial court to devise an adequate remedy for the sixth amendment violation, even in the absence of any request by the defendant. The fact that the defendant believed that no remedy short of dismissal would be

adequate and, accordingly, did not affirmatively seek a lesser remedy did not relieve the trial court of this obligation.[25] In any event, as we have indicated, it is unlikely that the appointment of a new prosecutor would have been an adequate remedy even before trial. See footnote 20 of this opinion. We therefore conclude that the defendant's failure to request that remedy from the trial court does not preclude him from seeking dismissal of the criminal charge of which he was convicted on appeal.

This is a case in which the prosecutor clearly invaded privileged communications that contained a detailed, explicit road map of the defendant's trial strategy. Compounding the problem, the prosecutor not only failed to inform the defendant and the trial court of the invasion immediately, but also continued to handle the case, to meet repeatedly with witnesses and investigators and ultimately to try the case to conclusion more than one year after the invasion occurred. Under these circumstances, any remedy other than the dismissal of the criminal charge of which the defendant was convicted would constitute a miscarriage of justice. Accordingly, we conclude that the charge of risk of injury to a child in violation of § 53-21 (a) (1) in Docket No. H12M-CR-03-128673-S must be dismissed.[26]

---

[25] If the trial court had offered an adequate remedy short of dismissal and the defendant had expressly rejected it, our conclusion might be different. We hold only that the defendant was not required to devise and request a less drastic remedy than dismissal when he believed that dismissal was the sole means of curing the prejudice against him.

[26] In his dissenting opinion, Justice Palmer contends that our decision is "radical and wholly unjustifiable," "unprecedented [and] deeply flawed," "completely at odds with sixth amendment jurisprudence" and based on "speculation." An objective review of the basic facts of the case, however, shows that the prosecutor had been warned that the defendant's computer contained privileged documents and had been ordered not to review them; the prosecutor read in their entirety documents that clearly were privileged on their face; the privileged documents went to the heart of the defense; the prosecutor failed to notify the defendant and the trial court immediately that he had read the documents; the prosecutor had knowledge of the contents of the privileged documents for well over one year before trial,

The judgment is reversed only with respect to the defendant's conviction of risk of injury to a child and the case is remanded to the trial court with direction to grant the defendant's motion to dismiss that charge and to render judgment thereon; the judgments are affirmed in all other respects.

In this opinion NORCOTT, EVELEIGH and VERTE-FEUILLE, Js., concurred.

PALMER, J., with whom ZARELLA, J., joins, dissenting. Until today, no federal or state court in this country ever has presumed a sixth amendment violation on the basis of a government's unintentional breach of the attorney-client relationship, and no federal or state court ever has dismissed criminal charges due to such a breach. Indeed, until today, this court never has ordered the dismissal of criminal charges as a remedial measure. In an opinion that represents a radical and wholly unjustifiable departure from settled sixth amendment principles, however, the majority does what no other court before it has done: it presumes a sixth amendment violation due to the state's inadvertent breach of the attorney-client relationship—despite the trial court's express and undisturbed findings that the breach was unintended and caused the defendant *no* harm—and it orders the dismissal of the criminal case of the defendant, Patrick J. Lenarz, solely because the assistant state's attorney (prosecutor), acting lawfully and in good faith, read a single e-mail, from the defen-

during which time he discussed the case repeatedly with state witnesses; and the prosecutor's questions to various witnesses at trial strongly support the conclusion that the prosecutor had discussed the contents of the privileged documents with the witnesses before trial. Thus, contrary to Justice Palmer's contention, our conclusion is not based on speculation, and it is the dissenting justice who ignores the import of the evidence in the record and speculates that all of this conduct somehow could be harmless. See *United States* v. *Levy*, supra, 577 F.2d 208 (prejudice is presumed when prosecutor learns of defendant's trial strategy because court can only speculate as to absence of prejudice).

dant to his wife, containing certain of his proposed trial strategy. The majority reaches this conclusion even though it was not determined until many months later that the e-mail in question was covered by the attorney-client privilege because, unbeknownst to the prosecutor and the court, the defendant also had forwarded the e-mail to his attorney. Moreover, there is nothing in the record to indicate that the prosecutor ever read the e-mail again, that he failed to notify the court and the defendant of the e-mail as soon as he received it, or that he or any other law enforcement officer used or otherwise benefited from the e-mail in any way. The record does reveal, however, that (1) the e-mail was placed under seal with the court immediately upon its disclosure, so that neither the prosecutor nor anyone else had access to it thereafter, (2) the defendant expressly rejected the remedy of having the prosecutor removed from the case and, in fact, sought no remedy at all until moving to dismiss the charges well over one year after being notified of the e-mail, and (3) the prosecutor's review of the e-mail caused the defendant no actual prejudice.

The majority's unprecedented decision is deeply flawed in a multitude of other fundamental respects, as well. In fact, there is not one aspect of the majority opinion that withstands scrutiny. Among the many, serious errors that the majority commits in reaching its extraordinary result are: (1) the majority resolves the case on the basis of a claim that the defendant never has raised and the state never has had the opportunity to address;[1] (2) it finds facts in violation of this court's strict prohibition against appellate fact finding and then relies on those facts—all of which directly contradict

---

[1] As I explain more fully in part III of this opinion, the fact that the majority's decision is based on a claim that never has been raised is clearly demonstrated by a review of the defendant's brief to this court, the relevant pages of which are reproduced in the appendix to this opinion.

the trial court's factual findings—in asserting that the state is to blame for the breach of the attorney-client privilege; (3) it ignores the critical and universally recognized distinction between a knowing violation of the attorney-client relationship by the state and the state's unintentional, good faith breach of that relationship— the latter of which occurred in the present case—and then presumes prejudice and a sixth amendment violation solely on the basis of a patently incorrect application of *United States* v. *Levy*, 577 F.2d 200 (3d Cir. 1978), a case that has absolutely no bearing on the present case because *Levy* involved an egregious and intentional invasion of the attorney-client relationship; see id., 208 (holding that sixth amendment violated when "confidential information is disclosed to the government" due to "a *knowing* invasion of the attorney-client relationship" [emphasis added]); (4) it denies the state any opportunity to rebut this newly created presumption of prejudice; (5) it establishes a presumption that dismissal is the appropriate remedy notwithstanding unanimous contrary authority; and (6) it orders the dismissal of the case despite the defendant's failure to allege actual prejudice, and without affording the state any opportunity to demonstrate why dismissal is neither necessary nor appropriate.

Finally, the majority devises its unprecedented methodology without any input from the parties, and then proceeds to apply that methodology retroactively to the present case, also without any input from the parties. In doing so, the majority effectively has taken over the litigation of the case from the parties themselves, an approach that this court rightly has characterized as exceeding the proper limits of its authority; see, e.g., *Sequenzia* v. *Guerrieri Masonry, Inc.*, 298 Conn. 816, 822, 9 A.3d 322 (2010) (rejecting contention that reviewing court may decide case on any basis, regardless of nature of claims raised on appeal, because con-

tention "misconstrues the limits of the [reviewing] [c]ourt's authority"); because the result is not the product of a truly adversarial process. In fact, the fair and impartial application of settled sixth amendment principles requires that the defendant's claim be rejected in view of his failure to present any evidence that the prosecutor's review of the privileged documents was either wrongful or prejudicial. I therefore dissent.

# I

## ADDITIONAL FACTS

Before discussing my disagreement with the majority in greater detail, I first set forth certain undisputed facts and factual findings that, although overlooked by the majority, are particularly important because they place the issue presented by this appeal in proper context. The defendant's computer was seized pursuant to a duly authorized search warrant on November 17, 2004, but the state laboratory did not complete its report on the contents of the computer until July 21, 2005, and the record does not reveal either when the prosecutor received the report or when he read the five documents that are the subject of this appeal. The record does indicate, however, that the prosecutor provided defense counsel with those documents at a meeting between them on September 19, 2005. Thus, as the defendant's appellate counsel expressly acknowledged at oral argument before this court, as far as the record discloses, the prosecutor provided defense counsel with the documents immediately upon receiving and reviewing them.[2]

---

[2] Although conceding that "it is unclear from the record how long the prosecutor had been in possession of the privileged [documents] before the September, 2005 meeting," the majority nevertheless states that "defense counsel represented at a hearing on a motion to suppress the materials seized under the search warrant that the prosecutor had had the materials for six weeks, and the prosecutor did not dispute this claim." In suggesting that the prosecutor did not disclose the documents until six weeks after he had reviewed them, the majority engages in pure speculation. The record simply does not reveal when the prosecutor received the state laboratory report, when he read that report or when he turned the documents over to

Furthermore, on that same date, the defense sought and obtained a court order requiring the prosecutor and the Simsbury and Granby police departments to turn over to the defense any "protected material," that is, documents arguably subject to the attorney-client privilege. In addition, the prosecutor provided the court with the state's copies of those documents, which then were placed under seal. It therefore appears that, from that date on, the prosecutor had no access to any of those documents. Even though defense counsel received the documents on September 19, 2005, the defendant did not file his motion to dismiss until November 20, 2006, a full fourteen months thereafter. Finally, in his motion to dismiss, the defendant expressly rejected any remedy other than dismissal, including the remedy of having the case tried by another prosecutor from outside the judicial district of Hartford, with no prior involvement in or knowledge of the defendant's cases.

As the trial court expressly found, personnel at the Connecticut Forensic Science Laboratory (state laboratory) had made a good faith effort to comply with the order issued by Judge Scheinblum on November 18, 2004,[3] barring them from reading or publishing any

defense counsel. Indeed, the trial court expressly stated that the defense had failed to adduce evidence sufficient to permit the court "to make factual findings as to the timing, nature and extent of the receipt, review and possible dissemination by the [prosecutor] of the documents covered by the attorney-client privilege." Thus, it is perfectly possible that the prosecutor provided the documents to defense counsel as soon as he received and reviewed them. In fact, although the defendant expressly observed in his motion to dismiss that the date that the prosecutor received the documents from the state laboratory was "an important date *that [the] defendant [did] not know,* but which [had to] be disclosed for full determination of [his] motion"; (emphasis added); the defendant never sought to obtain that information from the state and never provided it to the trial court.

[3] Although the record does not contain such an order, notes from one of the court's docket sheets provide: "Court orders—that the computer to lab—any comm[unications] from [defense counsel] to [the defendant] or vice vers[a] remain unpublished [and] unread and this also [is] true for [defense counsel's private investigator]."

"communications" between the defendant and defense counsel, Kevin Ferry, or Ferry's investigator, Allen Cowling, that might be discovered in connection with the search and analysis of the defendant's computer. In support of this conclusion, the trial court explained that state laboratory personnel had neither read nor published any communications between the defendant and defense counsel or his investigator that were styled as e-mails or letters to or from the defendant and defense counsel or his investigator.

Although the majority notes that the state laboratory "discovered voluminous written materials containing detailed discussions of the defendant's trial strategy" and, thereafter, forwarded them to the prosecutor, the defendant claimed that five documents were subject to the attorney-client privilege, only one—an e-mail from the defendant to his wife—of which contains certain trial strategy proposed by the defendant.[4] Thus, of all the materials seized from the defendant's computer, only a *single document* contains trial strategy. Furthermore, no other document contains any other information that, if disclosed, could have been harmful to the defendant in any way. In addition, the trial court found that none of the documents was in the form of an e-mail or letter by or to defense counsel or his investigator, and, further, that they bore no indication that they contained privileged attorney-client communications. Moreover, the trial court determined that the documents were privileged only after conducting an ex parte hearing on November 27, 2006, at which the

[4] The trial court identified these documents generally as follows: (1) " 'Strategy Issues' under a file entitled 'Strategy Issues.doc' "; (2) " 'HL (name withheld [by the court in] accord[ance] with the provisions of General Statutes § 54-86e) Interview Notes' under a file entitled 'St. Ignatius Novena. doc' "; (3) " 'Patrick Lenarz Background and Charges' under a file entitled 'Issuesdoc.doc' "; (4) " 'Event Log' under a file entitled 'Eventlog.doc' "; and (5) " 'Strategy and Questioning' from an e-mail from [the defendant] to Roberta Lenarz [the defendant's wife], dated August 17, 2004 . . . ."

defendant explained that he had prepared the documents with the intention of forwarding them to his attorney.[5] Prior to that ex parte hearing, however, the trial court had been unable to discern that the documents were privileged "[c]ommunications between client and attorney . . . made in confidence for the purpose of seeking legal advice." (Internal quotation marks omitted.) *Gould, Larson, Bennet, Wells & McDonnell, P.C.* v. *Panico*, 273 Conn. 315, 321, 869 A.2d 653 (2005). In fact, the defendant himself maintains that only two of the documents appear to be privileged on their face, and neither of those two documents contains any trial strategy.[6]

[5] The trial court credited the defendant's testimony and, consequently, found the documents "to be communication[s] to an attorney by the defendant made for the purpose of obtaining legal advice and [that] such documents [were] therefore covered by the attorney-client privilege."

[6] A review of the three other documents—including the only document that contains trial strategy—fully supports the trial court's finding that neither state laboratory personnel nor the prosecutor knew that those documents were privileged upon reading them. With respect to the first such document, entitled "Strategy and Questioning," the trial court found, on the basis of the state laboratory's review of the document, that it was an e-mail from the defendant to his wife, Roberta Lenarz. The document contains proposed trial strategy no different from the strategy that one would expect in a case of this kind. There is nothing in or about the document, however, to indicate that the defendant intended that the document would be communicated to his attorney. Indeed, although styled as an e-mail from the defendant to his wife, references to the defendant are to "Pat," suggesting that it might have been drafted by someone other than the defendant. For example, the document states the following: "The entire investigation was one-sided, aimed at getting charges filed against *Pat*, and getting *him* to accept a plea or [to] go to trial." (Emphasis added.) "When [the Granby police] interviewed *Pat* at the karate studio, two things from the interview should be noted." (Emphasis added.) "At one point in [an] interview [conducted by Lisa Murphy, a hospital employee, the alleged victim in one of the Granby cases] says that *Pat* put *his* hands in her pants." (Emphasis added.) "That was the file *Pat* used to keep track of the days and hours *he* was working at the studio. *He* did this to prove . . . the number of hours *he* worked at the studio." (Emphasis added.) In addition, in discussing what should be done to defend the criminal case, the author of this e-mail uses "we" rather than "I." Although the majority asserts that "[i]t is perfectly clear that the reference to 'we' in [the] statements [identified by the majority] is a reference to the defendant and his attorney"; footnote 22 of the majority opinion; that simply is not true. Even if it is assumed that the defendant is the author,

The trial court's finding that the state acted in good faith applies with equal force to the conduct of the prosecutor in reading those five documents upon receiving them from the state laboratory. Indeed, the trial court expressly found that the breach of the attor-

---

it is perfectly reasonable to interpret the defendant's use of "we" as referring to the defendant and his wife, the recipient of the e-mail. In fact, only once is it possible to discern with certainty to whom the term "we" refers, and that reference is to the defendant and his wife. Specifically, the e-mail states: "First of all, two . . . investigators [from the department of children and families] showed up at our home unannounced. At the time the kids were not home and we were on our way out to a veterinary appointment. We politely told them we would not meet with them at that [time]." It also is entirely plausible that the defendant employed "we" in its royal sense, without intending a reference to anyone else. For example, the e-mail states: "We mentioned earlier [in this e-mail] that we think that [the hospital employee] did not do any research into the incidents before the interview." Most importantly, however, even if the term "we" is a reference to the defendant and his attorney, that fact alone sheds no light on the issue of whether the defendant intended for the document to be *communicated to his attorney* as opposed, or in addition, to the e-mail's *actual* addressee, the defendant's wife.

The second document, entitled "Strategy Issues," identifies certain objectives for purposes of the defendant's court appearance on June 8, 2004, but contains no trial strategy. This document refers to defense counsel and defense counsel's investigator as "Kevin" and "Allen," respectively. Specifically, the document states: "I am not sure if this is the best time to present them with this piece of information. . . . Kevin and Allen should discuss this." The document also states: "Whether or not now is the right time I probably will leave up to Kevin and Allen." Although the document is written in the first person, there is nothing on the face of the document indicating that the defendant intended to forward it to his attorney.

The third document, entitled "HL Interview Notes" and stored as "St. Ignatius Novena.doc," is a transcript of a tape-recorded interview of the alleged victim in one of the Granby cases that had been conducted by Murphy. Although the document contains a few brief notes, apparently authored by the defendant, indicating that certain portions of the tape recording are inaudible or indecipherable, there is nothing in the document that reveals anything pertaining to strategy, trial or otherwise.

The prosecutor also reviewed two additional documents that the trial court ultimately determined were privileged. One such document is entitled "Patrick Lenarz Background and Charges" and sets forth certain factual information pertaining to the defendant's personal and professional history. Although the fifth paragraph of the document states that the material contained therein is "confidential" and being transmitted for the purpose of

ney-client privilege was not intentional, explaining that the documents "are not in the form of a 'communication' from the defendant to counsel . . . . Rather, [they] are documents containing the narrative thoughts and opinions of a layman, and [one of them] is [a] transcript of [an] interview of the [alleged victim] in one of the Granby cases and the defendant's comments and critique thereof. There is no indication from a review of the documents themselves that they are communications between the defendant and his counsel made for the purpose of obtaining legal advice. The mere mention of the name of defense counsel in such documents is not sufficient to establish that the same [are] . . . communications that are entitled to receive the benefit of the attorney-client privilege." In fact, the trial court expressly found that "there [was] no evidence that [the documents] were communications between the defendant and counsel other than the [defendant's ex parte] testimony" at the hearing conducted by the court in November, 2006, more than one year after the prosecutor had received the documents from the state laboratory and forwarded them to defense counsel. Furthermore, as I have indicated, only one of the documents, an e-mail from the defendant to his wife entitled "Strategy and Questioning," actually contains the defendant's thoughts about trial strategy, and it cannot be discerned from a review of that e-mail whether the

determining whether the intended recipient, who is unidentified, would be interested in taking over the defense of the defendant's case, there is nothing in the document pertaining to strategy, trial or otherwise.

The last document is entitled "Event Log" and generally sets forth a chronological history of events, many of which the defendant appears to believe may somehow be relevant to his defense. The document begins with the following statement: "We were asked by our original attorney . . . Jack Weiselman, to keep a log of any events that we thought might pertain to this case. This document is the result of Roberta [Lenarz] and I keeping track of such events." The document contains no express indication to whom, if anyone, it was being forwarded; in any event, it contains no trial strategy or any other kind of strategy.

defendant intended to forward it to defense counsel for the purpose of receiving legal advice. See footnote 6 of this opinion. It bears emphasis, moreover, that a review of that e-mail reveals that the trial strategy contained therein is typical of what would be expected in a case involving the charges at issue, that is, risk of injury to a child and sexual assault in the fourth degree.[7]

In addition, the investigation by the Granby police of the incident on May 24, 2003, in Granby involving one of the alleged victims (Granby incident) that ultimately led to the defendant's arrest for and conviction of risk of injury to a child was not tainted in any way by the breach of the attorney-client relationship. This is so because it was the Simsbury police that sought and obtained the search warrant for the defendant's computer, the state laboratory provided the results of its analysis of the contents of that computer to the Simsbury police, and neither the Simsbury police nor the prosecutor ever provided the Granby police with any information obtained from the computer. Indeed, the Simsbury police did not even obtain the search warrant for and seize the defendant's computer until the middle of November, 2004, more than sixteen months after the defendant's arrest for the Granby incident on July 8, 2003. Consequently, the seized materials that ultimately were found to be privileged played no role whatsoever in the police investigation that resulted in the defendant's arrest and prosecution.

Finally, following an evidentiary hearing to determine whether the defendant had suffered any prejudice as a result of the breach of the attorney-client privilege and, if so, what remedy would be appropriate, the trial court

---

[7] There is no need to detail the strategy set forth in the documents; suffice it to say that it would not be uncommon defense strategy in a case alleging child sexual abuse to challenge the child's credibility, to present a motive or motives for why the child would falsify the allegations and to question the propriety of the techniques employed by investigators.

found that the defendant had failed to present *any* evidence of prejudice. Furthermore, in his memorandum of law filed prior to the hearing, the prosecutor stated that, "[a]s a result of [his] review of these materials, [he] did not commence [or] conduct any further investigation, did not interview any additional witnesses and did not request anything further from the defense by way of discovery." The prosecutor concluded: "Actually, the information in question provided no benefit to the state." Although defense counsel had stated at the commencement of the hearing that he intended to call the prosecutor as a witness for the purpose of exploring how, if at all, the prosecutor had used the privileged information, he ultimately elected not to call the prosecutor, and the defense adduced no evidence challenging the accuracy of the statements that the prosecutor made in his memorandum of law.[8]

## II

## THE MAJORITY OPINION

In the trial court, the defense claimed that the review of the documents by the state laboratory, the police and the prosecutor constituted an intentional and unlawful invasion of the attorney-client privilege and, further, that that invasion gave rise to a presumption of prejudice and, thus, a sixth amendment violation. The trial court, however, found both that the breach was unintentional and that the defense has failed to demonstrate any harm. On appeal, the defendant contends that the trial court's finding that the breach was inadvertent was clearly erroneous, and he renews his claim that the prosecutor's intentional violation of the attorney-client privilege warrants a presumption of prejudice. The majority, however, expressly declines to address the defendant's claim that the trial court clearly erred in

---

[8] The only witnesses at the hearing were officers of the Granby and Simsbury police departments.

finding that the breach of the privilege had been inadvertent, concluding, instead, that an unintentional breach of the privilege constitutes a sixth amendment violation when, as in the present case, that breach involves the defendant's trial strategy.

With respect to the threshold issue of whether the state or the defendant bears the burden of proving prejudice, the majority, after a brief review of the relevant case law, expresses its agreement with those courts "that have held that the burden is not on the defendant to establish that he was prejudiced when the prosecutor has intruded on attorney-client communications that contain information concerning the defendant's trial strategy." The majority further states that, "because the disclosure of such information is *inherently prejudicial*, prejudice should be presumed, regardless of whether the invasion into the attorney-client privilege was intentional. The subjective intent of the [state] and the identity of the party responsible for the disclosure simply have no bearing on that question." (Emphasis in original.) The majority also states, however, that "the mere unintentional intrusion into privileged information containing trial strategy [does not] automatically [constitute] a sixth amendment violation. For example, if the [state] can establish that it notified the defendant and the court immediately of the intrusion, that it ensured that no [state] official with knowledge of the information had any contact with witnesses or investigators and that it ensured that no such person was involved in the prosecution of the case, the disclosure could well be harmless." Footnote 14 of the majority opinion. The majority further explains that, "[i]f the [state] made no such efforts, its conduct can hardly be characterized as blameless"; id.; and, consequently, prejudice will be presumed.

The majority also concludes that the state may overcome the presumption of prejudice, but, to do so, it

"must rebut the presumption of prejudice by clear and convincing evidence."[9] By way of example, the majority asserts that the state could meet that burden by showing "that the privileged communications contained only minimal information or that the state had access to all of the privileged information from other sources."

Rather than remanding the case to the trial court for a hearing at which this new standard would be applied, the majority proceeds to apply the standard itself. Despite the prosecutor's unrebutted representation at the evidentiary hearing that he had conducted no further investigation as a result of his review of the privileged documents and, further, that the state had not benefited from the documents in any way, and notwithstanding the trial court's finding that the breach of the privilege had caused the defendant no harm, the majority concludes that the facts give rise to a presumption of prejudice as a matter of law.[10] According to the majority, "even a cursory review of the [five documents at issue]

---

[9] "A rebuttable presumption is equivalent to prima facie proof of a fact and can be rebutted only by the opposing party's production of sufficient and persuasive contradictory evidence that disproves the fact that is the subject of the presumption. . . . A presumption requires that a particular fact be deemed true until such time as the proponent of the invalidity of the fact has, by the particular quantum of proof required by the case, shown by sufficient contradictory evidence, that the presumption has been rebutted." (Internal quotation marks omitted.) *Fish* v. *Fish*, 285 Conn. 24, 46 n.21, 939 A.2d 1040 (2008).

[10] The majority also rejects as unpersuasive the representation of the state at oral argument in this court that the prosecutor did not believe that his review of the privileged documents had provided him with any advantage because the strategy identified in those documents was of a kind that the prosecutor readily would have anticipated and prepared for in any event. The majority rejects this assertion because, "[a]lthough the strategy involved common defense tactics, such as casting doubt on the credibility of state witnesses, the state could not have predicted the very specific manner in which the defendant intended to do so without having knowledge of the privileged materials." Footnote 16 of the majority opinion. The majority also states that a review of the record "strongly suggests that the prosecutor did, in fact, use the materials to anticipate and forestall the defendant's defense strategy." Id. I vigorously disagree with these assertions.

reveals that the defendant was presumptively prejudiced by the prosecutor's intrusion into the privileged communications taken from the defendant's computer . . . ." In fact, the majority states that, in light of the nature and extent of the communications contained in those documents, "it may be presumed that the prosecutor's intrusion into the communications was highly prejudicial." The majority further states that, in light of this conclusion, it "need not address the defendant's claims that [1] the trial court's finding that the prosecutor's intrusion into the privileged materials had not been intentional was clearly erroneous, and [2] a showing of prejudice is not required when the intrusion was intentional."[11] The majority then concludes, also as a matter of law, that the state cannot meet its burden of rebutting the presumption of prejudice. In light of this determination, the majority also concludes that there is no need for a hearing to afford the state the opportunity to rebut that presumption.

Having determined that the defendant was presumptively prejudiced by the breach, the majority finally turns to the issue of whether the trial court abused its discretion in denying the defendant's motion to dismiss. To decide this issue, the majority concludes that, if the state has not met its burden of disproving prejudice, the state bears the burden of demonstrating by clear and convincing evidence that such prejudice can be cured by a less drastic remedy than dismissal, such as a new trial at which the state is represented by a different prosecutor who has not reviewed the privileged documents. The majority then acknowledges that, because the trial court had found no prejudice, that court placed

[11] The majority nevertheless asserts that it is clear on the face of some of the documents that they are privileged and, further, that the prosecutor knew or should have known that those documents were privileged upon reading them. The majority's assertions represent an improper usurpation of the trial court's fact-finding function. See part IV of this opinion.

no burden on either party to devise an appropriate remedy. Although further acknowledging that, ordinarily, it would be necessary to remand the case for a hearing on this issue to permit the state the opportunity to demonstrate that a dismissal is not warranted, the majority concludes that no such hearing is necessary in the present case because "it clearly would be impossible to eliminate the potential for prejudice to the defendant with any . . . sanction" other than a dismissal. Indeed, the majority goes so far as to say that any remedy other than a dismissal "would constitute a miscarriage of justice."

## III

## THE MAJORITY IMPROPERLY DECIDES A CLAIM NEVER RAISED BY THE DEFENDANT

At trial, the defense claimed that the prosecutor *intentionally and purposefully* had invaded the attorney-client privilege by reviewing the privileged documents with knowledge that they were privileged. The fact that his claim was predicated on intentional state misconduct is clearly reflected in the defendant's submissions to the trial court. The defendant commences his motion to dismiss by explaining that "[t]he basis for this motion is that the [prosecutor] . . . gained an extreme and unfair advantage by intentionally violating the defendant's [s]ixth [a]mendment right to counsel when [he] conspired with the [s]tate [l]aboratory and [the] Simsbury [p]olice [department] to breach the protection of the [s]ixth [a]mendment . . . and a specific court order designed to preserve and protect those constitutional rights." Furthermore, the defendant's brief in support of the motion to dismiss is captioned: "Defendant's Court Ordered Brief Regarding Remedy for the Intentional Constitutional Violations by the State of Connecticut Department of Public Safety, Simsbury

Police [Department] and [State's] Attorney's Office." In his motion to dismiss, the defendant further alleged that the prosecutor had taken "unfair advantage by intentionally violating the defendant's [s]ixth [a]mendment right to counsel" and that, "[t]ogether the conduct of [the state laboratory, the Simsbury police department and the prosecutor] is reprehensible, criminal, immoral and an unbelievable display of arrogance and contempt for Connecticut's system of justice." The defendant also asserted that, in light of what he characterized as the state's "deliberate efforts to invade [his attorney-client] privilege," the trial court was obliged to "act swiftly and powerfully to curb the illegal behavior of state actors and make it known [that] this type of conduct cannot [continue to] exist in the [s]tate of Connecticut . . . ." Indeed, the majority does not dispute the nature of the defendant's claim, stating that the defendant "filed a motion to dismiss . . . on the ground that the state had intentionally invaded the attorney-client privilege, thereby depriving the defendant of his right to counsel under the sixth amendment . . . ."[12]

On appeal, the defendant renews the same claim that he raised in the trial court,[13] stating in his brief to this court that the prosecutor's "intentional intrusion [into] the defendant's attorney-client material in this case constituted a per se violation of the sixth amendment," such that prejudice is presumed and need not be estab-

[12] I further note that the trial court, in ruling on the defendant's motion to dismiss, characterized the defendant's claim as follows: "The basis of the motion [to dismiss] is the defendant's claim that the state, through no fault of the defendant, gained an unfair advantage by *intentionally* violating the defendant's sixth amendment right to counsel." (Emphasis added.) This represents an accurate statement of the defendant's claim, and the majority does not suggest otherwise.

[13] In contrast to his claim in the trial court, however, the defendant's claim on appeal is limited to the contention that the prosecutor, as distinguished from the police and the state laboratory, intentionally violated his attorney-client privilege.

lished by him. Indeed, the caption to the defendant's claim in his brief reads as follows: "The Prosecuting Attorney's Intentional Invasion [into] the Defendant's Attorney-Client Privileged Material in Violation of a Court Order Warrants a Per Se Finding of Prejudice Under the Sixth Amendment." Moreover, in support of his claim, the defendant expressly relies on the observation of the Second Circuit Court of Appeals in *United States* v. *Morales*, 635 F.2d 177 (2d Cir. 1980), that there *cannot be a per se violation of the sixth amendment* due to the government's interference with the attorney-client privilege *unless* the evidence "disclose[s] *an intentional, governmentally instigated intrusion* [into] confidential discussions between [defendants] and their attorneys . . . ." (Emphasis added.) Id., 179. The defendant also relies primarily on two cases from the Third Circuit Court of Appeals, namely, *United States* v. *Costanzo*, 740 F.2d 251, 254 (3d Cir. 1984), cert. denied, 472 U.S. 1017, 105 S. Ct. 3477, 87 L. Ed. 2d 613 (1985), and *United States* v. *Levy*, supra, 577 F.2d 210, which he characterizes as "hav[ing] adopted a rule that *intentional intrusions by the prosecution* constitute a per se violation of the sixth amendment," and a case from the Tenth Circuit Court of Appeals, namely, *Shillinger* v. *Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1995), which the defendant quotes for the proposition "that when the state becomes privy to confidential communications because of its *purposeful intrusion* into the attorney-client relationship and *lacks a legitimate justification for doing so,* a prejudicial effect on the reliability of the trial process must be presumed. . . . [N]o other standard can adequately deter this sort of misconduct." (Emphasis added; internal quotation marks omitted.)

Undoubtedly, the claim that the defendant raises in this court and had raised in the trial court is predicated on an allegedly intentional invasion of the attorney-

client privilege because courts, like *Morales*, that have addressed claims of a sixth amendment violation based on a breach of the privilege are unanimous in holding that a per se violation occurs only when the state is responsible for the breach. Indeed, a primary purpose of a per se rule is to sanction the state for official misconduct, the deterrence of which is of paramount importance. See, e.g., *United States* v. *Gartner*, 518 F.2d 633, 637 (2d Cir.) ("[The per se rule] has been applied in the past to the [g]overnment's intrusion [into] the attorney-client relationship of a defendant [when] that conduct has been an offensive interference with the defendant's rights without any justification. The per se rule represents a moral as well as a legal condemnation of such egregious and unequivocal conduct for which sanctions are imposed against the [g]overnment as punishment regardless of the defendant's guilt."), cert. denied, 423 U.S. 915, 96 S. Ct. 222, 46 L. Ed. 2d 144 (1975); *United States* v. *Rosner*, 485 F.2d 1213, 1227 (2d Cir. 1973) ("A per se rule must . . . be thought of in terms of sanction against the [g]overnment rather than as a search for truth. . . . In all such cases the [g]overnment has been treated as ruthless beyond justification. It has stooped to conduct well below the line of acceptability. . . . When the [g]overnment is found guilty of such [misconduct], the dereliction . . . is a corrupting practice [that] may justify freeing one guilty person to vindicate the rule of law for all others." [Citations omitted.]), cert. denied, 417 U.S. 950, 94 S. Ct. 3080, 41 L. Ed. 2d 672 (1974). Although the defendant's claim of a per se violation in the present case is founded on his allegation of such intentional and egregious misconduct by the state, the majority nevertheless concludes that prejudice must be presumed even though the trial court found that the state's conduct was neither intentional nor egregious.

Both at trial and on appeal, however, the state has addressed only the claims that the defendant actually

has *raised.* Consequently, the state has been given no opportunity to address the claim on which the majority resolves this case. This court repeatedly has observed that, with the exception of an issue that implicates the court's subject matter jurisdiction, a reviewing court "may not reach out and decide a case before it on a basis that the parties never have raised or briefed"; (internal quotation marks omitted) *Sequenzia* v. *Guerrieri Masonry, Inc.,* supra, 298 Conn. 821; because to do so, at least without ordering supplemental briefing, would unfairly deprive the parties of an opportunity to present argument on the dispositive issue. Id. Of course, a claim will be deemed to have been raised on appeal only if it can be said that the opposing party had reasonable notice of the claim. The majority violates this fundamental notice requirement in concluding that an unintentional breach of the attorney-client privilege gives rise to a presumption of prejudice, a claim that the defendant never has raised. The unfairness to the state is compounded by the fact that, as I discuss in part VI of this opinion, no court ever has adopted anything close to the unique methodology that the majority announces in the present case.

Despite the unmistakable clarity of the defendant's claim at trial and on appeal, the majority asserts that "[a] fair reading of the defendant's brief to this court and his memorandum [of law] in support of his motion to dismiss reveals . . . that he argued both to this court and to the trial court that the disclosure of the privileged materials was inherently prejudicial because the materials contained trial strategy."[14] Footnote 13 of the major-

[14] The majority also states that the "arguments made by the defendant were essentially the same as those made by the courts that have found that the disclosure of privileged information relating to trial strategy is inherently prejudicial." Footnote 13 of the majority opinion. It is absolutely true that the defendant makes the same arguments as those cases that have discussed the prejudice inherent in state intrusions into the attorney-client relationship; see, e.g., *Shillinger* v. *Haworth,* supra, 70 F.3d 1142; *United States* v. *Levy,* supra, 577 F.2d 208–10; but, as I explain more fully hereinafter; see part VI

ity opinion. In other words, the majority seeks to convey the impression that the defendant's claim encompasses the contention that prejudice may be presumed *either* when the breach of the attorney-client relationship is intentional *or* when it is unintentional. The majority's contention is palpably and demonstrably incorrect. A review of the briefs that the defendant filed with this court and in the trial court reveals that they contain nothing that even remotely resembles a claim that an unintentional violation of the attorney-client relationship gives rise to a presumption of prejudice, and the majority's contrary assertion is simply groundless. The defendant's claim is, and always has been, that a presumption of prejudice follows a threshold finding that the state intentionally breached the attorney-client relationship because, in such circumstances, the state, as the party responsible for the violation, should bear the burden of disproving prejudice in light of the fact that it often will be difficult to determine exactly how that breach may have aided the prosecutor or harmed the defendant. See part V of this opinion.

Because of the importance of this issue, and because the majority fails to acknowledge that it is deciding a claim that never has been raised, I have reproduced the relevant portion of the defendant's brief pertaining to his sixth amendment claim in the appendix to this opinion.[15] Even a cursory examination of that brief makes clear that the defendant's claim is limited to the contention that when the state intentionally invades the attorney-client relationship, as the defendant alleges occurred in the present case, the defendant should not

---

of this opinion; and as the defendant expressly has acknowledged; see appendix to this opinion; those cases all are predicated on the fact that the state's invasion of the attorney-client relationship was *intentional* or *otherwise wrongful.*

[15] For practical reasons, I have not reproduced the briefs that the defendant filed in the trial court. Suffice it to say, however, that they are identical in all material respects to his appellate brief.

bear the burden of proving actual prejudice because of the inevitable difficulty in establishing the nature and extent of any such possible harm.[16] No other reading of the defendant's brief is possible, let alone "fair," as the majority asserts.[17] Footnote 13 of the majority

[16] To support its contrary argument, the majority relies on the following language from the defendant's brief to this court: "[I]t is simply impossible to determine exactly how this [privileged] material may have influenced the [prosecutor] in his preparation for trial and specifically how that may have impacted the credibility of the witnesses at trial." (Internal quotation marks omitted.) Footnote 7 of the majority opinion. What the majority fails to explain, however, is that it has lifted that language from the final section of the first part of the defendant's brief, entitled "Requested Relief," in which the defendant, after having argued at length in that part of the brief that the prosecutor's intentional misconduct in reviewing the five documents gave rise to a per se sixth amendment violation, contends that the charges against him should be dismissed "in light of this per se violation . . . ." Thus, the defendant's claim on appeal is *not* that prejudice should be presumed due to the prosecutor's inadvertent breach of the attorney-client privilege; *that* claim is the claim that the *majority* decides. Rather, the defendant claims that dismissal is required due to the sixth amendment violation that had resulted from the prosecutor's *intentional* breach of the privilege because nothing short of dismissal would be adequate to address the state's misconduct and any possible prejudice that might flow from that breach. The defendant made precisely the same claim in the trial court.

[17] In support of its argument that it is deciding a claim that the defendant actually raised, the majority also asserts that "the Appellate Court apparently was concerned that the mere disclosure of the privileged documents to the prosecutor could be inherently prejudicial because it ordered the trial court to articulate: (1) whether it had 'considered [the defendant's] argument that the [prosecutor] had received and reviewed the documents covered by the attorney-client privilege'; and (2) '[w]hat prejudice, if any, it found that the defendant suffered as a result.' " Footnote 13 of the majority opinion. In addition, the majority asserts that, "at oral argument before this court, the [defendant's appellate counsel] agreed that this court could dismiss the charge against [the defendant] if it found that the intrusion was prejudicial, even if the intrusion was not intentional." Id. Neither of these assertions has any merit. With respect to the majority's first assertion, there simply is no basis for its novel claim that the Appellate Court's decision to grant the defendant's motion for review of the trial court's denial of his second motion for articulation reflects the Appellate Court's apparent concern regarding the merits of the defendant's claim on appeal. The sole purpose of an articulation is to ensure that the record is sufficient to decide the claims raised on appeal; the decision whether to grant or deny a motion for articulation says absolutely nothing about the merits of those claims, including, of

opinion. Nevertheless, the majority seeks to rationalize

course, the reviewing court's concern about the merits of that claim. Indeed, even if it did, the questions posed by the Appellate Court in the present case provide no indication of any kind that that court believed that the prosecutor's review of the privileged documents was "inherently prejudicial . . . ." Id.

The majority's second assertion is no more persuasive. At oral argument before this court, the defendant's appellate counsel argued the defendant's claim—the only claim that the defendant ever has raised—that the prosecutor's review of the privileged documents constituted an *intentional* violation of the defendant's right to counsel, which warrants dismissal of the case. The following colloquy then ensued between the court and counsel:

"[Chief Justice Rogers]: As I recall, the [trial] court did make a finding that it was not intentional, what [the prosecutor] did. Are you asking us to find that that was a clearly erroneous finding?

"[The Defendant's Appellate Counsel]: Absolutely. [There was] no basis whatsoever for the court to make that finding. It was clearly error for [the trial court] to make that finding, given what [the prosecutor] knew about the [circumstances]—and that . . . was evident in the record—given that he agreed that he read all [of] the documents, and given that two of documents [on] their very face indicate[d] that . . . privilege was being made.

"[Justice Norcott]: Do you go so far as to say that it doesn't matter whether it was intentional or not?

"[The Defendant's Appellate Counsel]: Do I go so far? . . . No. I think it's important, it's an important distinction to make because, in order to fashion a per se remedy, I believe [the applicable United States Supreme Court cases], the teachings of those cases that in the event of an intentional intrusion into the defense camp—and we're saying that's what this was—when there's an intentional intrusion and strategy documents or defense plans are uncovered, then, in that circumstance, when those two criteria are met, there should be a per se finding of prejudice. And that's what I'm asking the court.

"[Chief Justice Rogers]: But, I mean, as a fallback position, are you also asking us that, [if] we find that it couldn't have been harmless, even if it wasn't intentional, it couldn't have been harmless?

"[The Defendant's Appellate Counsel]: Not—

"[Chief Justice Rogers]: You're not asking us to do that?

"[The Defendant's Appellate Counsel]: Your Honor, what I'm saying is that the fact that the state read the documents and that a clear reading of what those documents say—I know there's some order about getting into that—but, very clearly, these were detailed strategy documents—

"[Chief Justice Rogers]: Okay. Listen to what I'm saying to you. As a fallback position, if we find, if we say, look, we can't find that it was clearly erroneous for [the trial court] to have found that it was not intentional, are you asking us that, even in that event, it should be a per se, it should be a dismissal, because, even if we do a harmless analysis, we would have to

its decision to treat the defendant's claim as it does by

find that it was harmful?

"[The Defendant's Appellate Counsel]: Oh, yes, I'm sorry. Absolutely. Given the lack of evidence in this case, given the fact that this case . . . [hinges] on [the] credibility of witnesses, given the fact that much of the documents pertained to how to attack the very witness and complainant . . . in the case that led to the conviction—

"[Justice Norcott]: That has to be your argument because it goes to the heart of the defense, doesn't it?

"[The Defendant's Appellate Counsel]: Absolutely, Your Honor. Yes. So, Your Honor, given the unique facts of this case, the fact that there was an order sought and received, and the prosecutor was on notice, the fact that two of the documents themselves indicated exactly that the defendant was claiming a privilege, the court should find an intentional intrusion into the defense camp, and that it was per se prejudice by nature of what was learned by reading those documents."

The claim of the defendant and his appellate counsel is perfectly clear from this colloquy. When counsel was asked whether he was suggesting that there is no difference between the state's intentional breach of the attorney-client relationship and the state's unintentional breach of that relationship, he unequivocally and without hesitation stated that he was *not* making any such argument, that the distinction was "important," and that, "when there's an intentional intrusion [into the attorney-client relationship] and strategy documents or defense plans are uncovered, *then, in that circumstance, when those two criteria are met*, [the cases indicate that] there should be a per se finding of prejudice." (Emphasis added.) Counsel underscored his position by concluding, "*that's* what I'm asking the court." (Emphasis added.) Only when counsel was asked in leading terms by the court whether, as a "fallback position," the defendant should be granted the relief that he seeks even if this court determined that it could not disturb the trial court's finding that the breach was unintentional did counsel agree that the defendant should prevail under that scenario, as well. Counsel then immediately returned to the argument that he had been making all along, stating that, in sum, this court should conclude that the state's "intentional intrusion into the defense camp" was per se prejudicial. Thereafter, at various points in his argument, counsel characterized the prosecutor's conduct as "egregious" and representing a "very harmful and intentional intrusion into the defense camp." It is hardly surprising that counsel would accept the invitation extended to him at oral argument in this court by agreeing that the defendant could prevail under the entirely different factual scenario advanced by members of this court, a scenario predicated on the assumption that the defendant could not prevail on the claim that he and his trial and appellate counsel had been advancing all along. Indeed, the only other response that counsel could have given would have been to reject the premise of the questions posed and concede that the defendant could *not* prevail under the different scenario posed by the questioners, a position

"connect[ing]" certain "ideas" that it claims to have collected from different sections of the defendant's appellate brief for the purpose of discerning the general import of the defendant's claim. Id. The majority undertakes this effort even while acknowledging that the defendant himself did not "connect" these ideas or otherwise "expressly argue to the trial court or in his brief to this court that a prejudicial intrusion into the attorney-client relationship violates the sixth amendment even in the absence of [wrongful] intent . . . ." Id.

The majority's attempt to cobble together language from the defendant's brief in an effort to formulate a plausible explanation for its treatment of the defendant's claim falls far short even of that modest goal. A claim cannot be found to have been raised unless the opposing party had reasonable notice of the claim, a requirement that is met only if the claim was articulated with sufficient clarity and specificity such that the opposing party knew or should have known of the claim. In the present case, the state *could not possibly have anticipated* that the majority would treat the defendant's claim that the state *intentionally* had violated the attorney-client relationship as a claim that the state *unintentionally* had breached that relationship. A review of its opinion reveals that the majority does not contend otherwise; indeed, it cannot contend otherwise.[18] Rather, the majority seeks to explain why, from

that no rational advocate would have taken on behalf of his or her client. Finally, even if the majority were correct in asserting that counsel's response to the court's questions represented a belated attempt by the defense to raise the claim, it nevertheless is improper for this court to consider the claim "because [i]t is well settled that claims on appeal must be adequately briefed . . . and cannot be raised for the first time at oral argument before the reviewing court." (Internal quotation marks omitted.) *State* v. *Butler*, 296 Conn. 62, 70 n.10, 993 A.2d 970 (2010).

[18] In fact, the majority accurately states that the defendant's motion to dismiss was predicated on his claim "that the state had *intentionally* invaded the attorney-client privilege . . . ." (Emphasis added.) The majority also accurately states that, on appeal, the defendant claims that the state's *"inten-*

its perspective, it is possible to read the defendant's brief as encompassing a far broader, and materially different, claim than the defendant actually has articulated. The fundamental problem with the majority's approach is obvious: the majority simply has plucked language from different portions of the defendant's brief and declared that, when those portions of the brief are read together and in the light and context in which the majority places them, they are consistent with the claim that the majority has elected to decide. This manner of determining whether a claim has been raised is a far cry from the proper approach that asks, simply, would a fair reading of the defendant's brief place the state on notice of the claim that the majority has decided? The answer most certainly is "no" because no reasonable person would understand the defendant's brief as raising a claim that an *unintentional* violation of the attorney-client relationship gives rise to a presumption of prejudice. Indeed, the defendant's brief refers only to intentional violations of the attorney-client relationship and contains no reference to any other kind of breach. The state, therefore, has been deprived of any opportunity to address the fundamental rationale on which the majority opinion rests.

Finally, as I explain more fully hereinafter; see part V of this opinion; the distinction between the two kinds of breaches is critical—indeed, defense counsel expressly acknowledged the importance of the distinction at oral argument before this court; see footnote 17 of this opinion—because, although some courts have held that intentional violations of the attorney-client privilege give rise to a presumption of prejudice, no court ever has held that an inadvertent or good faith breach of the privilege gives rise to such a presumption. In other words, courts recognize that there is a critical

*tional* invasion [of the attorney-client relationship] constituted a per se violation of the sixth amendment right to counsel . . . ." (Emphasis added.)

distinction between claims involving the government's intentional breach of the attorney-client relationship and claims involving the government's unintentional violation of that relationship.

In fact, the defense undoubtedly made a conscious, strategic decision not to raise a claim of an unintentional violation because there is nothing in the record to indicate that the defendant suffered any actual prejudice as a result of the breach, a showing that *all* courts require unless the government's conduct was improper or unlawful. See part V of this opinion. Indeed, the defendant never has claimed or demonstrated actual prejudice. In such circumstances, the defendant's failure to raise such a claim constitutes a waiver of that claim. "For this court to . . . consider [a] claim on the basis of a specific legal ground not raised during trial [or on appeal] would amount to trial by ambuscade, unfair both to the [court] and to the opposing party." (Internal quotation marks omitted.) *Council* v. *Commissioner of Correction*, 286 Conn. 477, 498, 944 A.2d 340 (2008). The majority simply ignores this principle in devising a claim on the defendant's behalf and then resolving it in the defendant's favor.

Having elected to decide a claim that the defendant never has advanced, the majority is obligated, at an absolute minimum, to give the state an opportunity to address that claim. The majority, however, reaches its unprecedented conclusion that there is no difference between the two kinds of breaches *without any input on the issue from the state.* For the majority to decide this appeal on the basis of a claim that the state never has had a chance to address is both grossly unfair to the state and inimical to our adversarial system of justice.

IV

## THE MAJORITY ENGAGES IN IMPROPER FACT FINDING

The majority expressly declines to address the defendant's claim that the trial court's finding of an unintentional breach of the attorney-client privilege was clearly erroneous. Although purporting not to consider that claim, however, the majority makes repeated factual assertions that directly contradict the trial court's finding that the breach was inadvertent. The majority also finds that the state is to blame for the breach of the privilege and, further, that the breach resulted in substantial, actual prejudice to the defendant. Each of these findings, which I address in turn, is the product of a manifestly improper exercise of this court's authority as an appellate tribunal.

As I previously discussed, following an ex parte hearing at which the defendant testified, the trial court concluded that, although the five documents that the prosecutor reviewed were subject to the attorney-client privilege, it was not clear from the face of those documents that they were intended to be communicated to counsel and, therefore, subject to the attorney-client privilege. Consistent with that determination, the trial court further found that the prosecutor's breach of the privilege was inadvertent. Despite the fact based nature of these findings, and despite the majority's decision not to consider the defendant's challenge to the trial court's determination that the breach was inadvertent, the majority asserts that (1) "it is crystal clear on the face of a number of the documents that they were intended to be communications to the defendant's attorney"; footnote 18 of the majority opinion; (2) "it could not have been more obvious on the face of a number of the documents that they were [privileged]," (3) "the prosecutor either knew or should have known immedi-

ately upon beginning to read [the documents] that [they] were privileged and that he should have stopped reading at once and notified the defendant and the [trial] court immediately that they were in his possession," and (4) "[w]e simply find it incredible that a trained attorney . . . would fail to recognize that, at the very least, it was highly probable that these documents were privileged." Id.

In view of the fact that the majority declines to decide whether the trial court's finding of inadvertence was clearly erroneous, it simply is improper for the majority to opine about the validity of the trial court's finding or the propriety of the prosecutor's conduct. Indeed, in doing so, the majority violates a cardinal rule of appellate decision making, namely, that appellate courts "cannot find facts; that function is, according to our constitution, our statute[s], and our cases, exclusively assigned to the trial courts." *Weil* v. *Miller*, 185 Conn. 495, 502, 441 A.2d 142 (1981); see also *State* v. *Lawrence*, 282 Conn. 141, 156, 920 A.2d 236 (2007) (explaining that there is "[a] fundamental distinction between the function of the fact finder, which is to make credibility determinations and to find facts, and the function of the appellate tribunal, which is to review, and not to retry, the proceedings of the trial court" [internal quotation marks omitted]).

Furthermore, it is both improper and unfair for the majority to disparage the trial court's findings and to cast aspersions on the prosecutor's good faith while at the same time purporting to decline to reach the disputed factual claims underlying those issues in accordance with the standard required of an appellate tribunal. This is particularly true because none of the documents that the trial court found to be privileged was styled as a communication between the defendant and counsel. Indeed, three of the documents, including the only document containing trial strategy, bear no

indication whatsoever that the defendant intended to forward them to counsel. Furthermore, the other two documents each contain only a fleeting reference to counsel. See footnote 6 of this opinion. Indeed, the trial court found it necessary to hear the testimony of the defendant during an ex parte hearing before it could determine whether the defendant had intended to share the documents with his attorney.[19] This is hardly surprising in view of the well established principle that "[o]nly communications between a client and attorney are protected by the privilege, *not discussions with non-lawyers concerning the same subject matter.*" (Emphasis added.) *United States* v. *Bein,* 728 F.2d 107, 113 (2d Cir.), cert. denied sub nom. *DeAngelis* v. *United States,* 469 U.S. 837, 105 S. Ct. 135, 83 L. Ed. 2d 75 (1984); cf. *Ullmann* v. *State,* 230 Conn. 698, 711, 647 A.2d 324 (1994) ("The attorney-client privilege protects communications between client and attorney when made in confidence for the purpose of seeking or giving legal advice. . . . Statements made in the presence of a third party, on the other hand, are usually not privileged because there is then no reasonable expectation of confidentiality." [Citation omitted; internal quotation marks omitted.]). The only document containing trial strategy, namely, the defendant's e-mail to his wife, falls squarely into this latter category.[20]

---

[19] I note, moreover, that there is nothing in the record to suggest that defense counsel ever alerted the trial court or the state to the fact that some of the allegedly privileged documents to be retrieved from the defendant's computer were not styled as attorney-client communications and that they otherwise contained no indication that they were privileged. Because the defendant presumably was aware that such documents were in his computer, the risk of an unintentional intrusion into the attorney-client relationship could have been avoided if defense counsel had identified those documents for the state at the time he obtained the court order barring the state's review of communications between the defendant and defense counsel.

[20] Thus, there is absolutely no basis for the majority's assertion that the trial court "applied an incorrect legal standard" in finding that the prosecutor was unaware that the defendant had planned on forwarding the documents to his attorney; footnote 18 of the majority opinion; and the defendant has not raised such a claim. As the trial court aptly stated, "the mere mention

The majority also engages in improper fact-finding to support its conclusion that the prosecutor is not "blameless" for his inadvertent intrusion into the defendant's privileged documents.[21] Footnote 14 of the majority opinion. Specifically, the majority asserts that, because, inter alia, the prosecutor did not notify the court and the defendant immediately of that intrusion, his "conduct can hardly be characterized as blameless." Id. In fact, the record contains no indication when such notice was given *because the defendant failed to adduce any evidence* on that issue. Although the record reflects that the prosecutor provided the court and the defen-

of the name of [the] defendant's counsel in such documents is not sufficient to establish . . . the same as being *communications* [from the defendant to counsel, which] are entitled to receive the benefit of the attorney-client privilege." (Emphasis added.) In fact, the majority cannot possibly reach its conclusion that the trial court had applied an incorrect legal standard in finding that the breach was inadvertent without first having determined that the documents are so obviously covered by the attorney-client privilege that the court's finding of inadvertence was clearly erroneous, a determination that the majority does not purport to make.

The majority also asserts that the trial court, in articulating that it had not found any prejudice arising from the prosecutor's review of the privileged documents because the defendant had failed to adduce *any* evidence of such prejudice, "did not meaningfully respond to the [Appellate Court's] order for [such an] articulation . . . ." Footnote 13 of the majority opinion. This criticism of the trial court is also gratuitous and entirely unwarranted. At no time has the defendant ever claimed that the trial court's articulation was inadequate, and there is nothing in the record to support the majority's accusation. Indeed, the trial court's articulation was thorough and complete and properly based on the evidence adduced at the hearing conducted by the court for the express purpose of affording the defendant the opportunity to demonstrate what prejudice, if any, he had suffered as a result of the breach of the attorney-client privilege. In sum, an objective evaluation of the manner in which the trial court handled the challenging issues presented by the prosecutor's discovery of the privileged documents reveals that the court fairly and properly applied governing sixth amendment principles in resolving the defendant's claim.

[21] As I have discussed; see part II of this opinion; the majority asserts that it would be inappropriate to presume prejudice if the state were able to establish that it took steps, following the prosecutor's review of the privileged documents, to ensure that, notwithstanding that review, the defendant was not prejudiced in any way.

dant with notice of the documents no more than six weeks following his receipt of those documents from the state laboratory, there is nothing in the record to indicate that he did not do so immediately upon receiving and reviewing them. Consequently, it is improper for the majority to level blame against the state on the basis of a factual scenario that the defendant failed to establish and the record does not support.

Presumably, the majority finds it necessary to ignore the factual findings of the trial court—findings that exonerate the state of responsibility for its good faith breach of the attorney-client privilege—and to substitute its own view of the evidence, because no court ever has presumed prejudice from an inadvertent or unintentional breach of the attorney-client relationship, as the majority does in the present case. See part V of this opinion. The majority, however, improperly seeks to have it both ways. Although the majority insists that it is refraining from deciding the defendant's claim that the trial court's finding of inadvertence was clearly erroneous—in fact, there is no basis for disturbing that finding—the majority nevertheless makes factual assertions that cannot possibly be squared with the trial court's findings. Tellingly, the majority does not even attempt to rationalize its entirely unjustified departure from the principle that this court is bound by the facts that the trial court reasonably found.

Finally, the majority also engages in improper fact finding in concluding that the prejudice that the defendant suffered as a result of the prosecutor's review of the five privileged documents is so great as to warrant the dismissal of the charges. The majority finds such overriding harm even though the defendant has neither claimed nor demonstrated that he sustained any actual

prejudice from the breach of the privilege,[22] and despite the fact that the trial court, in determining what remedy, if any, would be appropriate to ameliorate any harm arising out of the breach, expressly found that the defendant had suffered no such harm. Indeed, on appeal, the defendant does not challenge that factual finding as clearly erroneous. Consequently, the majority's finding of prejudice, like its other findings of fact, represents an improper usurpation of the trial court's authority.

## V

## THE STATE'S INADVERTENT BREACH OF THE ATTORNEY-CLIENT PRIVILEGE DOES NOT CONSTITUTE A SIXTH AMENDMENT VIOLATION

Having failed to address the claim that the defendant actually raised, that is, that the state's *intentional* breach of the attorney-client privilege violated his rights under the sixth amendment, the majority concludes that a constitutional violation exists when the state comes into possession of privileged defense trial strategy, irre-

---

[22] The majority argues that this statement is inaccurate because, at oral argument before this court, the defendant's appellate counsel noted one possible example of actual prejudice. The majority's contention lacks merit. First, to the extent that the defendant's appellate counsel purported to raise a claim of actual prejudice for the first time at oral argument, this court repeatedly has stated that such claims are untimely and, therefore, will not be considered. E.g., *State* v. *Butler*, 296 Conn. 62, 70 n.10, 993 A.2d 970 (2010). More importantly, however, the argument of counsel to which the majority refers is wholly conjectural. Specifically, the defendant's appellate counsel stated: "I think that there's some testimony in court which [the prosecutor] may have brought out . . . with [the victim]. He asked her why she hadn't been attending karate or did she miss a lot of karate classes. I'm not sure he would have gone there [if he] hadn't read our documents." This statement is nothing more than a speculative observation that, at the very most, raises the mere possibility that the prosecutor might have asked the alleged victim a question predicated on information that he had gleaned from the privileged documents. Counsel's comment, however, hardly can be characterized as a claim of actual prejudice, let alone as evidence of actual prejudice.

spective of whether the breach was intentional or inadvertent, as in the present case. This unprecedented conclusion has no foundation in sixth amendment jurisprudence.

Before explaining why the application of governing sixth amendment principles to the present case leads to the conclusion that no constitutional violation occurred, it is helpful to identify how the majority approaches the sixth amendment issue, that is, by simply equating a breach of the attorney-client privilege involving trial strategy with a sixth amendment violation. Specifically, after stating that the attorney-client privilege " 'was designed, in large part, to encourage full disclosure by a client to his or her attorney so as to facilitate effective legal representation,' "[23] the majority turns immediately to a discussion of how, in its view, other courts have handled the issue of prejudice. In each and every one of the cases that the majority cites, however, the holding of the court was predicated on a required threshold finding that the government's *unjustified* invasion of the attorney-client privilege had resulted in a sixth amendment violation. See *Shillinger* v. *Haworth*, supra, 70 F.3d 1142–43 (prosecutor violated defendant's sixth amendment rights by intentionally breaching attorney-client privilege, and hearing was required to determine proper remedy); *United States* v. *Steele*, 727 F.2d 580, 586–87 (6th Cir.) (defendants failed to establish sixth amendment violation because there was no intentional invasion of privilege by government), cert. denied sub nom. *Scarborough* v. *United States*, 467 U.S. 1209, 104 S. Ct. 2396, 81 L. Ed. 2d 353 (1984); *Briggs* v. *Goodwin*, 698 F.2d 486, 495 (evidence that government attorney made false statement about role of informer in defendants' criminal cases deemed sufficient to constitute sixth amendment violation for

---

[23] The majority quotes *Gould, Larson, Bennet, Wells & McDonnell, P.C.* v. *Panico*, supra, 273 Conn. 321–22, for this proposition.

purposes of civil action for damages under *Bivens* v. *Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 [1971]), vacated on other grounds, 712 F.2d 1444 (D.C. Cir. 1983); *United States* v. *Levy*, supra, 577 F.2d 208–10 (government's intentional invasion of attorney-client relationship constituted sixth amendment violation for which dismissal was appropriate remedy); *Morrow* v. *Superior Court*, 30 Cal. App. 4th 1252, 1261, 36 Cal. Rptr. 2d 210 (1994) (prosecutor's intentional violation of attorney-client privilege violated defendant's sixth amendment rights and warranted dismissal of charges); *Murphy* v. *State*, 112 S.W.3d 592, 602–603 (Tex. Crim. App. 2003) (defendant failed to make predicate showing of sixth amendment violation arising from prosecutor's allegedly knowing and unlawful review of materials covered by attorney-client privilege because defendant did not demonstrate prejudice), cert. denied, 541 U.S. 940, 124 S. Ct. 1660, 158 L. Ed. 2d 363 (2004).

It is true, of course, that "the essence of the [s]ixth [a]mendment right is . . . privacy of communication with counsel"; *United States* v. *Rosner*, supra, 485 F.2d 1224; and that the purpose of the attorney-client privilege "is to encourage full and frank communication between attorneys and their clients . . . ." *Upjohn Co.* v. *United States*, 449 U.S. 383, 389, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981). The attorney-client privilege, however, is founded in the common law, not the constitution, and, consequently, a violation of the privilege is not itself a constitutional violation. See, e.g., *Maness* v. *Meyers*, 419 U.S. 449, 466 n.15, 95 S. Ct. 584, 42 L. Ed. 2d 574 (1975); *Lange* v. *Young*, 869 F.2d 1008, 1012 n.2 (7th Cir.), cert. denied sub nom. *Lange* v. *McCaughtry*, 490 U.S. 1094, 109 S. Ct. 2440, 104 L. Ed. 2d 996 (1989); *Clutchette* v. *Rushen*, 770 F.2d 1469, 1471 (9th Cir. 1985), cert. denied, 475 U.S. 1088, 106 S. Ct. 1474, 89 L. Ed. 2d 729 (1986). By equating a breach of the privilege with

a sixth amendment violation, the majority improperly skews the analysis against the state and reaches a result that cannot be squared with the principles that govern the question of whether a particular breach of the attorney-client relationship also constitutes a violation of the sixth amendment.

I now turn to those principles. As the foregoing discussion demonstrates, "[n]ot all government interference with the attorney-client relationship . . . renders counsel's assistance so ineffective as to violate a defendant's sixth amendment right to counsel." (Internal quotation marks omitted.) *United States* v. *Chavez*, 902 F.2d 259, 266 (4th Cir. 1990), quoting *Hall* v. *Iowa*, 705 F.2d 283, 290 (8th Cir.), cert. denied, 464 U.S. 934, 104 S. Ct. 339, 78 L. Ed. 2d 307 (1983). Thus, in reliance on the analysis employed by the United States Supreme Court in *Weatherford* v. *Bursey*, 429 U.S. 545, 554–58, 97 S. Ct. 837, 51 L. Ed. 2d 30 (1977), the seminal case in this area, "courts have enunciated several factors to determine whether there has been an invasion of the attorney-client privilege in violation of the [s]ixth [a]mendment right to effective assistance of counsel. . . . These include: 1) whether the [intrusion] was purposely caused by the government in order to garner confidential, privileged information, or whether the [intrusion] was the result of other inadvertent occurrences; 2) whether the government obtained, directly or indirectly, any evidence [that] was used at trial as the result of the . . . intrusion; 3) whether any information gained by the . . . intrusion was used in any other manner to the substantial detriment of the defendant; and 4) whether the details about trial preparations were learned by the government."[24] (Citation omitted.)

---

[24] This test is derived from the court's analysis in *Weatherford*, a case in which an informer and the respondent, the informer's codefendant, had been charged with certain crimes and attended meetings together with the respondent's counsel so that his identity as an informer would not be revealed. *Weatherford* v. *Bursey*, supra, 429 U.S. 547. The informer, however, did not disclose to the government the substance of any of the conversations

*United States* v. *Steele,* supra, 727 F.2d 585; accord *United States* v. *Kelly,* 790 F.2d 130, 137 (D.C. Cir. 1986); *United States* v. *Brugman,* 655 F.2d 540, 546 (4th Cir. 1981).

It is apparent that the majority's conclusion cannot withstand application of this test to the facts of the present case. In this case, the prosecutor's receipt of the privileged documents was not purposeful or intentional but, rather, was inadvertent. The defendant has adduced no evidence to suggest that the prosecutor used the information contained in the privileged documents; indeed, the prosecutor himself expressly denied any such use of that information, and the defendant elected not to challenge that representation. In fact, the defendant has *not identified any actual prejudice at all* arising out of the breach. In addition, the prosecutor indicated that the privileged information did not benefit the state in any way. Finally, although the prosecutor reviewed the documents and learned some of the defendant's purported trial strategy, at oral argument before this court, the state explained that the prosecutor did not believe that those documents had afforded him any advantage because the strategy contained therein was applicable to all cases of a similar nature, and, consequently, he had learned nothing about the defense's case that he would not have otherwise known or anticipated. In such circumstances, there is no sixth amendment violation.

The majority nevertheless maintains that a presumption of prejudice attaches when there has been a breach of the attorney-client privilege involving trial strategy,

that occurred at those meetings. Id., 548. The court in *Weatherford* concluded that, in such circumstances, the informer's intrusion into the defense camp was neither purposeful nor harmful—indeed, the court explained that the government's interest in protecting the identity of the informer justified his participation in the defense meetings—and, therefore, the intrusion did not violate the respondent's sixth amendment rights. Id., 558.

*irrespective of whether the breach was intentional or the state otherwise bears responsibility for the breach.*[25] The majority's assertion is manifestly incorrect. Until today, no court ever has held that a presumption of prejudice arises when the breach of the attorney-client privilege is unintentional or inadvertent, and one searches the majority opinion in vain to find even one

[25] In support of its conclusion, the majority explains that courts have employed three different approaches to resolve claims involving "governmental interference with the attorney-client privilege." According to the majority, courts have held that (1) "the government's intrusion into privileged attorney-client communications constitutes an interference with the defendant's right to assistance of counsel in violation of the sixth amendment only when the intrusion has prejudiced the defendant," (2) "when the privileged communication contains details of the defendant's trial strategy, the defendant is not required to prove [that] he was prejudiced by the governmental intrusion, but prejudice may be presumed," and (3) "the defendant is not required to prove that he was prejudiced by the government's intrusion into attorney-client communications when the intrusion was deliberate and was [not justified] by any legitimate governmental interest in effective law enforcement." The majority then adopts the rationale of what it represents is the second category of cases. I disagree with the majority's enumeration of the three categories because, in fact, the second group of cases identified by the majority is not a category at all. To the extent that the case law properly may be characterized as including three distinct categories of cases, those categories were properly identified by United States Supreme Court Justice Byron R. White, who, joined by Chief Justice William H. Rehnquist and Justice Sandra Day O'Connor, summarized them in his dissent from the denial of a petition for a writ of certiorari in *Cutillo* v. *Cinelli*, 485 U.S. 1037, 108 S. Ct. 1600, 99 L. Ed. 2d 915 (1988). Justice White first explained that *Cutillo* presented "the issue of who bears the burden of persuasion for establishing prejudice or lack thereof when the [s]ixth [a]mendment violation involves the transmission of confidential defense strategy information." Id. He then identified the three approaches taken by the various circuit courts: (1) "[when] confidential defense strategy information is [unjustifiably] transmitted to the prosecution and the defendant makes a prima facie showing of prejudice, the burden then shifts to the prosecution to prove that there was no prejudice to the defendant from the disclosure"; id.; (2) "the approach . . . requiring the defendant to prove prejudice"; id., 1037–38; and (3) "once a defendant shows that the prosecution has improperly obtained confidential defense strategy information or has intentionally placed an informer in the defense camp then no showing of prejudice is required, for those acts constitute a per se violation of the [s]ixth [a]mendment." Id., 1038.

such case. Rather, as the Second Circuit Court of Appeals has explained, "unless the conduct of the [g]overnment has . . . been . . . manifestly and avowedly corrupt . . . a defendant must show prejudice to his case resulting from the intentional invasion of the attorney-client privilege."[26] (Citation omitted; internal quotation marks omitted.) *United States* v. *Schwimmer*, 924 F.2d 443, 447 (2d Cir.), cert. denied, 502 U.S. 810, 112 S. Ct. 55, 116 L. Ed. 2d 31 (1991). In fact, when "the conduct of the [g]overnment has not been so manifestly and avowedly corrupt, the courts have applied a different and less rigid rule [that] attempts to measure the harm or prejudice, if any, to the defendant rather than [to] punish the prosecutor by freeing the defendant." *United States* v. *Gartner*, supra, 518 F.2d 637; see also *United States* v. *Rosner*, supra, 485 F.2d 1227 (noting that purpose of per se rule applicable to cases involving gross misconduct is sanction against government). In the present case, prejudice may not be presumed because the state engaged in no misconduct, and the majority has absolutely no legal basis to engage in such a presumption. Thus, as the Second Circuit Court of Appeals also has stated, a defendant cannot establish a sixth amendment violation "resulting from [the government's] unintentional or justifiable" intrusion into the defense camp in the absence of proof of "specific facts that indicate communication of privileged information to the prosecutor *and prejudice resulting therefrom.*" (Emphasis added.) *United States* v. *Ginsberg*, 758 F.2d 823, 833 (2d Cir. 1985). As I previously explained, the defendant has identified no actual prejudice, relying, instead, on the presumption of prejudice that arises when the state intentionally invades the attorney-client privilege; see part III of this opinion; a

[26] Although we are not bound by decisions of the Second Circuit Court of Appeals interpreting the federal constitution, we have indicated that those decisions are entitled to great weight. See, e.g., *State* v. *Wade*, 297 Conn. 262, 283 n.9, 998 A.2d 1114 (2010).

presumption that it inapplicable in the present case because the prosecutor's conduct was inadvertent.[27] Consequently, the defendant has failed to establish that he is entitled to any relief.

Unable to find a single case in which a court has held that the state's inadvertent or good faith breach of the attorney-client privilege gives rise to a presumption of prejudice, the majority relies on certain language in a case from the Third Circuit Court of Appeals, *United States* v. *Levy*, supra, 577 F.2d 208, for its unprecedented conclusion that such a breach gives rise to a presumption of prejudice. As the following discussion reveals, the majority's reliance on *Levy* is nothing short of astonishing.

In *Levy*, federal agents utilized an informer to obtain the trial strategy of the defendant, Donald Verna. See id., 202–203. Verna filed a motion to dismiss, claiming that his sixth amendment right to counsel had been violated by the admitted misconduct of the government. See id., 203. Indeed, the misconduct in *Levy* was so egregious that it subsequently was characterized by another panel of the Third Circuit as "a deliberate attempt to destroy [Verna's attorney-client relationship] and to subvert [his] right to effective assistance of counsel and a fair trial." *United States* v. *Costanzo*, 625 F.2d 465, 469 (3d Cir. 1980). After the District Court denied Verna's motion to dismiss, Verna appealed. *United States* v. *Levy*, supra, 577 F.2d 204–205. In ruling on the District Court's rejection of Verna's claim of a sixth amendment violation on the ground that he had failed to show any material prejudice flowing from the government's unlawful conduct, the Court of Appeals concluded that a presumption of prejudice was warranted

---

[27] The majority, however, has combed the record to find some evidence that the defendant actually was prejudiced by the breach. As I explain more fully hereinafter in part VIII of this opinion, the majority's effort on behalf of the defendant is unavailing.

under the circumstances. See id., 207–209. In reaching this conclusion, the court expressly held: "[*When*] *there is a knowing invasion of the attorney-client relationship* and [when] confidential information is disclosed to the government, we think that there are overwhelming considerations militating against a standard [that] tests the sixth amendment violation by weighing how prejudicial to the defense the disclosure is." (Emphasis added.) Id., 208. In other words, when the government *intentionally* invades the attorney-client privilege and thereby obtains confidential information, the defendant will not be required to prove prejudice; rather, the prejudice necessary to establish a sixth amendment violation will be presumed.

Notably, in explaining why the District Court had improperly declined to presume prejudice, the Court of Appeals expressly acknowledged that "the significance of [the] benefits" to be gained by the government from its invasion of the attorney-client relationship necessarily was "speculative . . . ." Id. The court nevertheless concluded that a test requiring Verna to prove actual prejudice was inappropriate when, as a result of its "knowing invasion" of the attorney-client relationship, the government comes to possess information that "might benefit" the government in its investigation and prosecution of the case. Id. The Court of Appeals then proceeded to determine how best to remedy the sixth amendment violation, concluding that dismissal was required. Id., 210. Because *Levy* involved an *intentional* intrusion into the attorney-client relationship, for the reasons set forth more fully hereinafter, *Levy* has no bearing on the present case.

Before turning to those reasons, however, it must be emphasized that the Third Circuit Court of Appeals has expressly disavowed its reasoning in *Levy*. In *United States* v. *Voigt*, 89 F.3d 1050 (3d Cir.), cert. denied, 519 U.S. 1047, 117 S. Ct. 623, 136 L. Ed. 2d 546 (1996), the

court addressed a claim by the defendant, John Voigt, that the government's allegedly deliberate and outrageous intrusion into the attorney-client relationship violated Voigt's fifth amendment right to due process. Id., 1061. In support of his claim, Voigt "invoke[d]" the court's prior decision in *Levy* "in an attempt to have [the court] find that the government's intrusion into the attorney-client relationship, standing alone, [was] per se prejudicial." Id., 1070. In rejecting Voigt's claim, the court observed that, "to the extent that *Levy* can be read as holding that certain government conduct is per se prejudicial"; id., 1071 n.9; that holding was contrary to the analysis and conclusion of the United States Supreme Court in *United States* v. *Morrison*, 449 U.S. 361, 365–66, 101 S. Ct. 665, 66 L. Ed. 2d 564 (1981), which, as the court in *Voigt* further observed, stands for the proposition that, "even [when] government conduct is deliberate, [a] defendant must demonstrate prejudice to obtain a remedy." *United States* v. *Voigt*, supra, 1071 n.9. Thus, the rationale of *Levy* has been rejected even with respect to the most egregious kind of intentional government intrusion into the attorney-client relationship.[28]

Even if *Levy* were still good law in the Third Circuit, however, when, as in *Levy*, the government is to blame for the breach of the attorney-client relationship, the government bears responsibility for any prejudice that

[28] The majority seeks to explain away *Voigt*, stating that it does not support "the proposition that prejudice cannot be presumed when confidential defense strategy has been disclosed" because *Voigt* itself did not involve "a claim that confidential trial strategy had been disclosed to the prosecutor." Footnote 11 of the majority opinion. The majority's attempt to minimize the import of *Voigt* is unavailing. The point is not whether *Voigt* involved trial strategy; rather, the point is that *Voigt expressly disapproved of the reasoning of Levy*, which *did* involve trial strategy. In light of that fact, *Levy* is no longer persuasive authority even in the Third Circuit. In any event, as I explain more fully hereinafter, the court in *Levy* made it crystal clear that prejudice may be presumed from a breach of the attorney-client relationship involving trial strategy *only* when that breach is intentional, as it was in *Levy*.

the defendant possibly may suffer as a result of the violation, and, therefore, in such circumstances, it has been deemed reasonable to place the burden on the government to demonstrate that its misconduct did not materially harm the defendant.[29] Put differently, if the government is the cause of any harm that potentially may befall the defendant due to an intentional breach of the attorney-client relationship, any difficulty in discerning whether the defendant *actually* was prejudiced by the breach should be borne by the government, not by the defendant. Moreover, intentional violations of the attorney-client relationship by the government undermine the integrity of our criminal justice system, a hallmark of which is the sixth amendment right to the effective—and confidential—assistance of counsel, and requiring the government to overcome a presumption that such official misconduct is prejudicial serves to deter future intrusions by the government into that relationship. Indeed, these are precisely the considerations that animate the holding of *Levy*. A completely different calculus is involved, however, when, as in the present case, the breach of the privilege is not intentional; in that situation, the government is not to blame for the breach, and, consequently, there simply is no justification for shifting the burden to the government to disprove prejudice. Although purporting not to perceive any reason why a court would draw a distinction between an unintentional or good faith breach of the attorney-client privilege, on the one hand, and the knowing or purposeful breach of the privilege, on the other,

---

[29] I note that, although it may be sensible to place such a burden on the government, it may not be permissible to do so under *Morrison*, as the court in *Voigt* indicated. See *United States* v. *Voigt*, supra, 89 F.3d 1071 n.9. For purposes of the present case, however, it is not necessary to determine the precise parameters of *Morrison* because, as I explain hereinafter, under no circumstances is it permissible to engage in a presumption of prejudice when the government's intrusion into the attorney-client relationship was not intentional.

the majority simply ignores this obvious and compelling rationale for treating the two kinds of invasions differently for purposes of the sixth amendment.[30]

Thus, the logic of this distinction has been recognized repeatedly by courts that have addressed the issue. For example, in *Shillinger* v. *Haworth,* supra, 70 F.3d 1132, a case on which the defendant expressly relies, the prosecutor intentionally intruded into the trial strategy of the defendant, Steven K. Haworth, by enlisting a deputy sheriff who had been present during communications between Haworth and his attorney to report the substance of those communications to the prosecutor. See id., 1134–35. In "determin[ing] the appropriate [s]ixth [a]mendment standards governing an intrusion by the prosecut[or] into [Haworth's] communications with his attorney"; id., 1134; the court in *Shillinger* concluded that an intentional violation of the attorney-client privilege without any legitimate justification warranted a presumption of prejudice. Id., 1142. The court explained that such a presumption was appropriate primarily because "no other standard [could] adequately deter this sort of misconduct"; id.; and also because, when the government engages in such a purposeful effort to obtain confidential information in violation of the attorney-client relationship, the likelihood of prejudice is sufficiently great such that a "case-by-case inquiry into prejudice is not worth the cost." (Internal quotation marks omitted.) Id. The court further explained that harmless error analysis does not "apply to this sort of [s]ixth [a]mendment violation because [the] per se rule recognizes that such intentional and groundless prosecutorial intrusions are never harmless

---

[30] Indeed, it is only by ignoring this important distinction can the majority assert that it "cannot imagine" how the "intent of the [state] somehow has a bearing on" the issue presented. Text accompanying footnote 12 of the majority opinion; see also text accompanying footnote 14 of the majority opinion (asserting that "intent of the [state] . . . simply [has] no bearing on [the] question" of whether state's conduct violated sixth amendment).

because they necessarily render a trial fundamentally unfair." (Internal quotation marks omitted.) Id. The court proceeded to explain, however, that "the rule [that it] adopt[ed] . . . in no way affects the analysis to be undertaken in cases in which the [government] has a legitimate law enforcement purpose for its intrusion"; id.; such as when, as in *Weatherford* v. *Bursey*, supra, 429 U.S. 557, an informer participates in a defense meeting for the purpose of protecting his identity as an informer and not for the purpose of obtaining confidential defense information.[31] *Shillinger* v. *Haworth*, supra, 1142. As the court in *Shillinger* further explained, "[s]uch cases would . . . require proof of a realistic possibility of injury to [the defendant] or benefit to the [government] in order to constitute a violation of [the] defendant's [s]ixth [a]mendment rights." (Internal quotation marks omitted.) Id.; see also *United States* v. *Rosner*, supra, 485 F.2d 1227–28 ("When the [g]overnment is found [to have engaged in misconduct resulting in a violation of the attorney-client privilege] . . . [that conduct] may justify freeing one guilty person to vindicate the rule of law for all others. . . . When the [g]overnment is not . . . guilty of such . . . conduct, however, the rule must, of necessity, be different. . . . There is then no need to punish the prosecutor by freeing the defendant. The matter must then proceed to an ultimate adjudication of whether the defendant was prejudiced in fact." [Citations omitted.]).

This precise issue also was recently addressed in *State* v. *Webbe*, 122 Wn. App. 683, 94 P.3d 994 (2004). In *Webbe*, the prosecutors were provided materials that were covered by the attorney-client privilege, but the prosecutors were not responsible for the disclosure. See id., 689, 692–94. The defendant, Roy E. Webbe, asked the court to adopt a presumption of prejudice arising out of a breach of the attorney-client privilege

---

[31] See footnote 24 of this opinion.

even though the prosecutors were not to blame for the violation. Id., 694. Although acknowledging that a breach of the privilege may give rise to such a presumption when a prosecutor actively "interferes in [an attorney's] representation [of a defendant]"; id., 695; the court rejected Webbe's claim, explaining: "Webbe calls our attention to cases finding a presumption of prejudice [simply] from the mere possibility of the [prosecutor's] access to privileged materials. *But these cases involve purposeful, wrongful intrusion [into] attorney-client privilege and uniformly concern the deterrence of state misconduct. . . .* [A] presumption of prejudice arises [when] the process loses its adversarial integrity because of affirmative [governmental] interference. *Since the [prosecutors'] conduct here was not improper, these cases are not helpful [to the court's] analysis.*" (Emphasis added.) Id., 697.

The court in *Webbe* also rejected Webbe's claim that the difficulty in proving prejudice alone was reason to adopt a presumption of prejudice regardless of whether the prosecutors' breach of the privilege had been intentional. The court stated: "Webbe argues [that the court] should presume prejudice because it would be difficult to demonstrate whether [his attorney's] notes provided any advantage to the [prosecutors]. This argument is unconvincing. Webbe cites no authority for the notion that the difficulty of establishing prejudice is relevant to whether such a showing is required at all." Id. The court further observed that Webbe did not face an insurmountable hurdle in demonstrating prejudice, noting that any use of the privileged information by the prosecutors likely could be identified in the record.[32] Id. The

[32] Indeed, the majority itself contends that the record in the present case supports its conclusion that the prosecutor shared aspects of the defendant's trial strategy with witnesses and investigators. Although I disagree with the majority's interpretation of the record, the fact is that the record in the present case likely would reveal what, if any, use the prosecutor made of the privileged documents. Moreover, to conclude that the defendant was deprived of the effective assistance of counsel on the basis of the mere

court concluded: "A violation of [the] attorney-client privilege could easily be gravely prejudicial. But despite the nature of the [disclosure] here, Webbe shows no prejudice, and our review of the record reveals none." Id., 698–99. "In sum, the events surrounding [the] disclosure of [the privileged material], however unsettling, did not result in an unfair trial . . . ." Id., 699. The reasoning and decision of the court in *Webbe* are in all respects applicable to the present case.[33]

Scholarly commentators also have recognized the crucial distinction between breaches of the attorney-client relationship for which the government bears responsibility and those for which the government is not to blame. For example, as one leading commentator, Robert P. Mosteller, has observed, when confidential, attorney-client privileged information is obtained by action of law enforcement personnel and members of the prosecution team, the issue of "party responsibility/ culpability is absolutely critical." R. Mosteller, "Admissibility of Fruits of Breached Evidentiary Privileges: The Importance of Adversarial Fairness, Party Culpability, and Fear of Immunity," 81 Wash. U. L.Q. 961, 990 (2003). In other words, "[p]urposeful governmental

---

speculative possibility of harm is unreasonable and unfair both to the state and the public.

[33] The majority appears to suggest that a defendant would be unable and, therefore, cannot be expected to establish that the prosecutor has not discussed the privileged information with investigators or witnesses, or that the prosecutor has not used the information in formulating his own trial strategy. As in all other cases, however, a defendant would establish such facts by calling and examining witnesses, including, when appropriate, the prosecutor, and the trial court then would make factual findings on the issue. Although it sometimes may be difficult to ascertain precisely the extent to which, if at all, the government used or communicated privileged information, our courts routinely confront and resolve similarly challenging issues. Merely because an issue may be challenging is hardly reason to conclude that it is not a matter for resolution by the court. This is especially true when, as in the present case, the parties have conducted themselves in good faith, and there is no reason for dismissing a criminal case as a sanction for misconduct.

intrusion into the confidential relationship or acquisition of confidential information is critical to finding a violation recognized as constitutionally protected." Id., 994. Thus, the cases demonstrate that a constitutional violation occurs only "if the government purposefully intrudes into [the attorney-client] relationship or knowingly acquires confidential information and uses it to the prejudice of the accused."[34] Id., 1002. Finally, as Mosteller also explains, in the absence of knowing or purposeful conduct by government officials in intruding into the confidential relationship, it would be unfair to require the government to prove the absence of prejudice unless the government consciously uses the improperly obtained information against the defendant. See id.

Although the court in *Levy* expressly held that a presumption of prejudice is warranted when, as in that case, the government obtains confidential information as a result of its "knowing invasion of the attorney-client relationship"; *United States* v. *Levy*, supra, 577 F.2d 208; the majority brushes aside that critical element of the *Levy* rationale and holding, baldly asserting that "[t]he court in *Levy* later clarified this statement . . . and held that 'a sixth amendment violation would be found where . . . defense strategy was actually disclosed or where . . . the government enforcement officials sought such confidential information.' " Footnote 10 of the majority opinion, quoting *United States* v. *Levy*, supra, 210. Simply stated, the majority's assertion is indefensible.

Because *Levy* undisputedly involved the government's gross and intentional breach of the attorney-client relationship rather than an inadvertent breach, the holding of *Levy* necessarily is limited to intentional

---

[34] For a discussion of the distinction between these two related but different types of intrusions, see footnote 40 of this opinion.

breaches of that relationship. Indeed, it is abundantly clear that *Levy* does not apply at all to unintentional or good faith breaches of the attorney-client relationship because its rationale is *predicated on* a finding of an intentional violation of the attorney-client relationship.[35]

Moreover, the language from *Levy* on which the majority relies—language that the majority would have us consider wholly out of context—merely represents the court's response to the government's contention that, in *Weatherford* v. *Bursey,* supra, 429 U.S. 545, the United States Supreme Court had "adopted the actual prejudice test [that] the [D]istrict [C]ourt applied [in *Levy*]"; *United States* v. *Levy,* supra, 577 F.2d 209; thereby foreclosing a test under which prejudice may be presumed. See id. In rejecting the government's reading of *Weatherford,* the court in *Levy* simply explained that *Weatherford* did not bar it from presuming prejudice, despite the absence of proof of actual prejudice.[36] Id., 210 ("We think that the [c]ourt [in *Weatherford*] was suggesting by . . . inference that a sixth amendment violation would be found [when, as in *Levy*]

[35] Although acknowledging, as it must, that *Levy* involved a completely different factual scenario than that of the present case because the breach of the attorney-client relationship in *Levy* was the product of egregious and purposeful government misconduct, the majority speculates that the result in *Levy* would have been the same irrespective of the nature of the government's conduct in that case. See footnote 10 of the majority opinion. It is telling that the majority must resort to such conjecture with respect to the applicability of the one case on which the entire majority decision is predicated. Moreover, for the reasons set forth hereinafter, the majority's assertion concerning the applicability of *Levy* to the present case is not just wholly conjectural, it is manifestly incorrect.

[36] As I previously noted; see footnote 24 of this opinion; in *Weatherford,* the United States Supreme Court concluded that prejudice may not be presumed when an informer attends meetings between a codefendant and the codefendant's counsel for the purpose of protecting his identity as an informer and when he does not disclose to the government the substance of any conversations that occurred during the meetings. See *Weatherford* v. *Bursey,* supra, 429 U.S. 555–58.

defense strategy was actually disclosed or [when, as in *Levy*] the government enforcement officials sought such confidential information. Whether or not that . . . inference was intended, the [c]ourt certainly did not lay down a rule that when actual disclosure occurred, additional prejudice still must be found. Thus we are at least free to decide on policy grounds whether such a rule would be desirable. . . . [W]e think that such a rule would be highly undesirable."). Thus, the language in *Levy* on which the majority's entire analysis is founded pertains to the *Levy* court's view of its authority, in light of the then recent holding of the United States Supreme Court in *Weatherford*, to adopt a presumption of prejudice, and has nothing to do with the court's foundational requirement that such a presumption is appropriate only when the government is responsible for intentionally invading the attorney-client relationship. In sum, there is absolutely nothing in *Levy* to suggest that the court did not mean what it said when it explained in direct and explicit terms that a presumption of prejudice is warranted when the government comes into possession of confidential defense information *as a result of the government's intentional intrusion into the attorney-client relationship*.[37] Thus, *Levy* clearly holds that, when government misconduct results in a violation of the attorney-client relationship, it is unreasonable to require that the defendant shoulder the burden of proving prejudice, for when the government is responsible for intentionally violating the sanctity of that relationship, fairness dictates that it must demonstrate that the defendant was not materially prejudiced by the violation.

---

[37] I also note that the court in *Levy* quoted approvingly from *United States* v. *Cooper*, 397 F. Sup. 277 (D. Neb. 1975), in which the District Court explained that prejudice will be not presumed from a breach of the attorney-client relationship unless the government's misconduct leads to an "intrusion [that] can be called 'gross.' " Id., 285; see *United States* v. *Levy*, supra, 577 F.2d 207.

The majority asserts that *Levy* is applicable even to those breaches of the attorney-client relationship for which the government does not bear responsibility on the basis of the statement in *Levy* that "it is highly unlikely that a court can . . . arrive at a certain conclusion as to how the government's knowledge of any part of the defense strategy might benefit the government . . . ." (Internal quotation marks omitted.) Text accompanying footnote 10 of the majority opinion, quoting *United States* v. *Levy*, supra, 577 F.2d 208. The majority asserts that this reasoning is no less persuasive when the breach of the relationship is innocent or inadvertent than when it is intentional. The majority completely misses the point. Although a court may never be able to discern with absolute *certainty* the precise extent to which the government may have benefited from its knowledge of defense strategy, that fact warrants a *presumption* of prejudice—that is, it justifies a per se finding of a sixth amendment violation—*only* when the government is responsible for the breach. This is so because courts frequently are called on to determine the extent to which an impropriety was harmful or prejudicial even though it is often impossible to make such a determination with any degree of precision. In other words, merely because it is difficult or perhaps even impossible to discern exactly how much prejudice resulted from an alleged impropriety, courts do not presume that the impropriety was harmful. In *Levy*, the court reasonably determined that it was appropriate to deviate from the general rule and to relieve the defendant of having to prove prejudice when the government had obtained the defendant's trial strategy by virtue of its *intentional and unjustifiable* invasion of the attorney-client relationship. See id. There is good reason to do so when the government bears responsibility for intruding into the defendant's relationship with his attorney because, as I previously explained, in those

circumstances, the government, as the party responsible for the breach, also should bear the burden of any difficulty there may be in ascertaining the extent of the prejudice arising out of that intrusion; placing the burden on the government also is appropriate because it serves both as a deterrent against future misconduct and as a sanction for improper conduct. There are no compelling reasons to burden the government in that manner when it bears no responsibility for the breach.[38]

Furthermore, the majority's untenable reading of *Levy* is at odds not just with the unambiguous language and reasoning of the opinion in that case, but also with the Third Circuit's own characterization of the holding of that case. For example, in *United States* v. *Costanzo*, supra, 625 F.2d 465, a case, like *Levy*, from the Third Circuit, the court stated: "In a series of recent cases,

---

[38] I note that this methodology, in significant respects, is similar to the approach that the United States Supreme Court has adopted for cases involving the failure of the police to preserve evidence that potentially might have exonerated the accused. In *Arizona* v. *Youngblood*, 488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988), the court concluded that the loss or destruction of such evidence does not constitute a due process violation unless the defendant can demonstrate bad faith on the part of the police. Id., 58. In such circumstances, however, the good or bad faith of the police has no bearing on the issue of whether the conduct of the police resulted in prejudice to the defendant and, if so, the extent of that prejudice; for reasons unrelated to that issue, however, the court in *Youngblood* concluded that due process concerns are implicated only when the police act in bad faith. Id. Similarly, courts have not imposed a presumption of prejudice in cases involving a breach of the attorney-client relationship unless the state bears responsibility for the breach, even though the nature and extent of the prejudice likely will be no different when the state has breached that relationship justifiably or in good faith. Indeed, although we declined to follow *Youngblood* for purposes of our state constitution and, instead, adopted a balancing test under which all of the various considerations are taken into account in determining whether the failure of the police to preserve evidence violated the defendant's due process rights; see *State* v. *Morales*, 232 Conn. 707, 726–27, 657 A.2d 585 (1995); we employ no presumption of a due process violation under the state constitution when the police fail to preserve exonerating evidence. In fact, the balancing test that we adopted in *Morales* closely resembles the balancing test that courts apply under *Weatherford* v. *Bursey*, supra, 429 U.S. 558, for claims under the sixth amendment.

[the Third Circuit] has also expressed its disapproval of [g]overnment interference with the attorney-client relationship. In [*Levy*], we held that dismissal of the indictment was warranted because law enforcement officials used a [g]overnment informer to obtain confidential information concerning defense strategy, including attorney-client confidences. We said: [*When*] *there is a knowing invasion of the attorney-client relationship* and [when] confidential information is disclosed to the government, we think that there are overwhelming considerations militating against a standard [that] tests the sixth amendment violation by weighing how prejudicial to the defense the disclosure is. [*United States* v. *Levy*, supra, 577 F.2d] 208. . . . The severity of the sanction imposed in [*Levy*] reflects our view of the importance of protecting a criminal defendant's attorney-client relationship from *a deliberate attempt to destroy it and to subvert the defendant's right to effective assistance of counsel and a fair trial.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *United States* v. *Costanzo*, supra, 625 F.2d 469; see also *United States* v. *Voigt*, supra, 89 F.3d 1066 (stating that *Levy* stands for proposition that "dismissal of indictment on [s]ixth [a]mendment grounds [is] warranted [when] government employs codefendant as confidential inform[er] in order to obtain and reveal confidential defense strategy"); *United States* v. *Costanzo*, supra, 740 F.2d 257 ("*Levy* held that prejudice, and thus a violation of the sixth amendment, will be presumed to occur when confidential defense strategy is disclosed to the government by an informer").[39]

---

[39] The majority refers to a single case, namely, *United States* v. *Costanzo*, supra, 740 F.2d 251, which, the majority maintains, supports its reliance on *Levy*. On the contrary, *Costanzo* provides no support for the majority's novel and incorrect application of *Levy*. In *Costanzo*, the defendant, Anthony J. Costanzo, claimed that his right to counsel was violated when a government informer improperly had provided confidential defense strategy to the government. See id., 253–54. In rejecting Costanzo's claim, the court identified two instances in which a sixth amendment violation will be found as

a result of the government's unlawful invasion of the defense camp without a showing of actual prejudice: (1) "when the government . . . plants an informer in the defense camp"; id.; and (2) "when confidential defense strategy information is disclosed to the prosecution by a government informer . . . ." Id. It is readily apparent that the present case involves neither of these two scenarios, and, consequently, *Costanzo* has no bearing on the proper resolution of the present case.

Ignoring the fact that, in stark contrast to the factual scenario involved in the present case, both of the scenarios that the court identified in *Costanzo* involve improper government conduct, the majority nevertheless asserts that *Costanzo* may be read to support the conclusion that an unintentional breach of the attorney-client relationship, as in the present case, also gives rise to a presumption of prejudice. The majority bases this assertion on the fact that, in *Costanzo*, the court indicated that the government had not sent the informer into the defense camp for the purpose of obtaining confidential defense strategy; rather, the informer obtained the information and then provided it to the government on his own initiative. See id., 255. Although the government did not induce the informer to obtain the confidential information in the first instance, the government knowingly accepted the information from the informer and allegedly used it against Costanzo. See id., 255–57. Obviously, such conduct by the government is plainly improper, and its knowing receipt and use of such privileged information cannot be condoned merely because it did not initiate the unlawful intrusion into the defense camp. See, e.g., R. Mosteller, supra, 81 Wash. U. L.Q. 996 n.153 ("Knowing or [wilful] governmental acquisition of confidential information is often distinct from the initial intrusion and constitutes a separate violation of constitutional principles . . . . [For example] [c]ourts have recognized that the need to maintain credible cover for informants may justify their participation in lawyer-client conferences when invited by co-participants. Acquisition of confidence in such situations is not considered a purposeful intrusion. However, when the prosecution knowingly or purposefully acquires the informant's information regarding attorney-client conversations, it takes action that may itself support the violation of the right to counsel even though the initial intrusion was not improper."); see also *United States* v. *Mastroianni*, 749 F.2d 900, 904–908 (1st Cir. 1984) (although informer was properly permitted to attend defense meeting "to avoid risk to [his] safety and his cover," government's subsequent debriefing of him was unjustified and, therefore, improper); *Bishop* v. *Rose*, 701 F.2d 1150, 1151, 1154–57 (6th Cir. 1983) (when police seized from defendant's jail cell statement that defendant had written at request of his attorney and then delivered it to prosecutor, who used it at trial to impeach defendant, prosecutor improperly used information to detriment of defendant, thereby necessitating new trial). In the present case, by contrast, the prosecutor's conduct was not improper; the prosecutor came into possession of the documents at issue as a result of the proper execution of a duly authorized search warrant and, as the trial court found, reviewed those documents—which were not determined to be privileged until a full year later—lawfully and in good faith, without knowledge that they were privileged. Furthermore, the defendant has failed

Indeed, until today, no court ever has read *Levy* as applying to an intrusion into the attorney-client relationship that is unintentional or for which the state otherwise does not bear responsibility. In fact, those courts that have had occasion to characterize the holding of *Levy* have done so in terms that clearly and unequivocally contradict the majority's reading of the case. See, e.g., *Shillinger* v. *Haworth*, supra, 70 F.3d 1140 ("[t]he Third Circuit [in *Levy*] has adopted the rule that intentional intrusions [into the attorney-client relationship] constitute per se violations of the [s]ixth [a]mendment"); *United States* v. *Brugman*, supra, 655 F.2d 545 and n.1 (rejecting defendant's reliance on *Levy* because, in contrast to defendant in *Levy*, he had not established deliberate intrusion by government into his confidential communications with counsel); *United States* v. *Kember*, 648 F.2d 1354, 1363 (D.C. Cir. 1980) ("In [*Levy*] . . . the court . . . stated that '[when] there is a knowing invasion of the attorney-client relationship and [when] confidential information is disclosed to the government,' the [s]ixth [a]mendment is violated. The only effective remedy, the *Levy* court held, [is] to order dismissal of the indictment." [Citation omitted.]); *People* v. *Ervine*, 47 Cal. 4th 745, 766, 220 P.3d 820, 102 Cal. Rptr. 3d 786 (2009) (citing *Levy* for proposition that "some [federal] circuit courts find a per se violation of the [s]ixth [a]mendment once the defendant demonstrates that the prosecution has improperly obtained information concerning confidential defense strategy"), cert. denied, 562 U.S. 848, 131 S. Ct. 96, 178 L. Ed. 2d 60 (2010); *Scott* v. *State*, 310 Md. 277, 301 n.2, 529 A.2d 340 (1987) (stating that dismissal was deemed to be

---

to demonstrate—and there is nothing in the record to suggest—that the prosecutor used any of the privileged information or that the defendant otherwise was prejudiced in any way by the breach. Thus, contrary to the assertion of the majority, this case bears no resemblance to *Costanzo*, in which the government knowingly and improperly received confidential defense strategy information from an informer.

warranted in *Levy* because of prosecutorial misconduct); *State* v. *Sugar*, 100 N.J. 214, 228, 495 A.2d 90 (1985) (citing *Levy* for proposition that "[c]ertain governmental intrusions [into] attorney-client relations, even when no severe prejudice to the defendant is apparent, must be dealt with in a manner that denies all effect to the illegal activity"); *Reeves* v. *State*, 969 S.W.2d 471, 492 (Tex. App. 1998, pet. ref'd) (explaining that holding of *Levy* "turn[s] on whether or not the intrusion was unlawful and for the sole purpose of determining defense strategy" [internal quotation marks omitted]), cert. denied, 526 U.S. 1068, 119 S. Ct. 1462, 143 L. Ed. 2d 547 (1999); see also 3 W. LaFave et al., Criminal Procedure (3d Ed. 2007) § 11.8 (b), p. 849 and n.33 (citing *Levy*, among other cases, for proposition that "[s]ome [courts] have concluded that the intentional invasion of the lawyer-client relationship producing . . . disclosure [of information passed between the defendant and counsel] constitutes a per se [s]ixth [a]mendment [violation], with no need to show that the defendant was prejudiced at trial as a result of the disclosure"); R. Mosteller, supra, 81 Wash. U. L.Q. 997, 998 (explaining that *Levy* exemplifies cases involving "purposeful intrusion" into attorney-client relationship and that decision in *Levy* "was based on the two findings that government enforcement officials [improperly] sought confidential information from [an] informant and that defense strategy was actually disclosed").[40] As I have indicated, the majority has not

---

[40] The majority states that I cite these cases "for the proposition that intentional intrusions into the attorney-client privilege constitute per se violations of the sixth amendment." Footnote 11 of the majority opinion. The majority further states that, "[b]ecause none of these cases involved the unintentional disclosure of privileged information relating to trial strategy, they are of little persuasive value." Id. Again, the majority misses the point. Each of those cases recites the holding of *Levy*, and each such case does so by reference to *Levy*'s requirement of an intentional invasion of the attorney-client relationship. In other words, the cases reflect the unanimous view of those courts that have addressed the issue that, under *Levy*, prejudice will be presumed only when the government intentionally violates

identified even one case that reads *Levy* as applying to breaches of the attorney-client relationship for which the state is not responsible. Thus, the majority's assertion that *Levy* does not turn on the intentional nature of the government's interference with the attorney-client relationship is simply wrong.[41]

the attorney-client relationship. Nevertheless, the majority cannot cite a single case for the proposition that *Levy*—or for that matter, any other case—holds that an unintentional breach of the attorney-client relationship gives rises to a presumption of prejudice.

Although the majority acknowledges that *Levy* "supports the proposition that the government's intentional invasion of the attorney-client privilege violates the sixth amendment"; id; the majority nevertheless contends that "[i]t does not follow that *Levy* does *not* support the proposition that the *unintentional* invasion of privileged materials containing trial strategy violates the sixth amendment." (Emphasis in original.) Id. On the contrary, *Levy* involved an intentional intrusion by the government into the attorney-client relationship, and, as I have explained, the court in *Levy* made it perfectly clear that the government's wrongful conduct was a critical part of its holding, stating that a presumption of prejudice is warranted "[*when*] *there is a knowing invasion of the attorney-client relationship* and [when] confidential information is disclosed to the government . . . ." (Emphasis added.) *United States v. Levy*, supra, 577 F.2d 208. The majority has identified no reason, and I can think of none, why the court in *Levy* would have framed its holding in such terms if *any* invasion of the attorney-client relationship, including unintentional or justified intrusions, would give rise to presumptive prejudice. Thus, it is not surprising that, *without exception*, courts have characterized the holding of *Levy* in the same terms as the *Levy* court itself, that is, as requiring a knowing or purposeful invasion of the attorney-client relationship.

[41] The majority also cites *Briggs* v. *Goodwin*, supra, 698 F.2d 495, in support of its conclusion that it is appropriate to presume prejudice from a breach of the attorney-client relationship, even when the breach is unintentional. *Briggs* provides no more support for the majority's view than *Levy*. In *Briggs*, the District of Columbia Circuit Court of Appeals concluded only that the plaintiffs were entitled to pursue their civil action under *Bivens* v. *Six Unknown Named Agents of the Federal Bureau of Narcotics*, supra, 403 U.S. 388, alleging a sixth amendment violation predicated on *intentional government misconduct* pertaining to their right to communicate privately with counsel. *Briggs* v. *Goodwin*, supra, 495–97. Indeed, in *American Civil Liberties Union Foundation of Southern California* v. *Barr*, 952 F.2d 457 (D.C. Cir. 1991), the District of Columbia Circuit Court of Appeals itself has so characterized *Briggs*, explaining that, "[t]he standard for a *Bivens*-type tort action based on the [s]ixth [a]mendment . . . requires a *deliberate intercepting of attorney-client communications*." (Emphasis added.) Id.,

In fact, the defendant *himself* expressly has acknowledged the proper holding of *Levy* and the line of cases that have followed. Indeed, in his brief to this court, the defendant forthrightly explains: "Numerous commentators and courts have suggested that *where the prosecution acts intentionally and without legitimate purpose [there is no requirement of] a showing of prejudice by the defendant.* See, e.g., [3 W. LaFave et al., supra], § 11.8 (b), [pp. 845–54][42] . . . [*United States*] v. *Morales,* [supra, 635 F.2d 179] ('[b]ecause the . . . evidence . . . does not disclose an intentional, governmentally instigated intrusion [into] confidential discussions between [the defendants] and their attorneys, the evidence does not support [a] claim of a per se violation of [the] right to counsel'). Moreover, the Third and Tenth Circuits have adopted a rule that *intentional intrusions by the prosecution* [constitute] . . . per se violation[s] of the sixth amendment. See [*United*

472; see also *United States* v. *Danielson,* 325 F.3d 1054, 1070 (9th Cir. 2003) ("[i]n a [civil action] arising out of the government's having obtained privileged trial strategy information in a prior criminal prosecution, the [court in *Briggs*] adopted a per se rule that a criminal defendant's proof of mere possession of *improperly obtained* trial strategy information by the prosecution constituted proof of prejudice" [emphasis added]). Despite the clarity of the holding of the court in *Briggs,* and even though the very same court has explained that *Briggs* requires a *deliberate violation* of the attorney-client relationship, the majority simply asserts that *Briggs,* like *Levy,* may be understood to support the majority's own unprecedented analytical framework. On the contrary, the presumption of prejudice that the courts in *Briggs* and *Levy* adopted is expressly predicated on a threshold finding of a violation of the attorney-client relationship for which the government is responsible.

[42] Professor Wayne R. LaFave observes that "[s]ome [courts] have concluded that the intentional invasion of the lawyer-client relationship producing . . . disclosure [of information passed between the defendant and his lawyer] constitutes a per se [s]ixth [a]mendment [violation], with no need to show that the defendant was prejudiced at trial as a result of the disclosure . . . ." 3 W. LaFave et al., supra, § 11.8 (b), p. 849. In support of this proposition, Professor LaFave cites to the following cases: *Shillinger* v. *Haworth,* supra, 70 F.3d 1132; *United States* v. *Levy,* supra, 577 F.2d 200; and *State* v. *Quattlebaum,* 338 S.C. 441, 527 S.E.2d 105 (2000). 3 W. LaFave et al., supra, p. 849 n.33.

*States*] v. *Costanzo*, [supra, 740 F.2d 254]; [*United States*] v. *Levy*, [supra, 577 F.2d 210]; [see also] *Shillinger* v. *Haworth*, [supra, 70 F.3d 1142] (holding 'that when the state becomes privy to confidential communications *because of its purposeful intrusion into the attorney-client relationship and lacks a legitimate justification for doing so*, a prejudicial effect on the reliability of the trial process must be presumed. . . . [N]o other standard can adequately deter this sort of misconduct.')." (Emphasis added.) Thus, it is entirely clear that the defendant fully appreciates the import and holding of *Levy* and its progeny, whereas the majority engages in a tortured reading of those cases that finds absolutely *no* support in *any* federal or state case law or scholarly commentary.

In recognition of the fact that a presumption of prejudice cannot be justified when the government is not to blame for the breach of the attorney-client relationship, some courts have concluded that such a presumption is appropriate *only* when the government is to blame for the breach, whereas other courts have held that a presumption of prejudice is *not warranted under any circumstances*. In either event, courts *never* presume prejudice in the absence of a showing by the defendant that the government, by virtue of its conduct or the conduct of its agent, is responsible for the breach of the attorney-client relationship. See, e.g., *United States* v. *Danielson*, 325 F.3d 1054, 1068–72 (9th Cir. 2003) (when government obtains confidential information by improper means, defendant makes prima facie showing of prejudice by establishing government's possession of confidential defense trial strategy, thereby shifting burden to government to prove that defendant was not harmed by government's use of that information); *Lakin* v. *Stine*, Docket No. 99-1529, 2000 U.S. App. LEXIS 17953, *12 (6th Cir. July 13, 2000) ("[f]rom *Weatherford* and [*United States* v.] *Morrison*, [supra, 449 U.S.

361] the Supreme Court precedent clearly rejects a per se approach to even purposeful or intentional government intrusion into privileged attorney-client communications"); *Shillinger* v. *Haworth*, supra, 70 F.3d 1142 ("[W]hen the state becomes privy to confidential communications because of its purposeful intrusion into the attorney-client relationship and lacks a legitimate justification for doing so, a prejudicial effect on the reliability of the trial process must be presumed. . . . [But this] rule . . . in no way affects the analysis to be undertaken in cases in which the state has a legitimate law enforcement purpose for its intrusion. . . . Such cases would, of course, require proof of a realistic possibility of injury [to the defendant] or benefit to the [s]tate . . . ." [Citations omitted; internal quotation marks omitted.]); *United States* v. *Aulicino*, 44 F.3d 1102, 1117 (2d Cir. 1995) ("assuming that the government has not interfered with the attorney-client relationship deliberately, the defendant bears the burden of alleging specific facts that indicate [the] communication of privileged information to the prosecutor and prejudice resulting therefrom" [internal quotation marks omitted]); *United States* v. *Schwimmer*, supra, 924 F.2d 446–47 ("unless the conduct of the [g]overnment has . . . been . . . manifestly and avowedly corrupt . . . a defendant must show prejudice to his case resulting from the intentional invasion of the attorney-client privilege" [citation omitted; internal quotation marks omitted]); *United States* v. *Singer*, 785 F.2d 228, 234 (8th Cir.) ("[t]o establish a sixth amendment violation, a criminal defendant must show two things: first, that the government knowingly intruded into the attorney-client relationship; and second, that the intrusion demonstrably prejudiced the defendant . . . or created a substantial threat of prejudice" [citations omitted]), cert. denied, 479 U.S. 883, 107 S. Ct. 273, 93 L. Ed. 2d 249 (1986); *United States* v. *Ginsberg*, supra,

758 F.2d 833 (to establish "sixth amendment violation resulting from [the government's] unintentional or justifiable [intrusion into the defense camp] . . . a defendant must allege specific facts that indicate [the] communication of privileged information to the prosecutor and prejudice resulting therefrom"); *United States* v. *Mastroianni,* 749 F.2d 900, 904–908 (1st Cir. 1984) (because government's initial intrusion into attorney-client communications by sending informer into defense camp was justified by legitimate considerations, that intrusion did not give rise to presumption of prejudice, but government's subsequent debriefing of informer was not justified, and, therefore, prejudice was presumed as result of that improper intrusion); *United States* v. *Steele,* supra, 727 F.2d 586 ("[e]ven [when] there is an intentional intrusion by the government into the attorney-client relationship, prejudice to the defendant must be shown before any remedy is granted"); *United States* v. *Morales,* supra, 635 F.2d 179 (there can be no per se violation of sixth amendment on basis of government's intrusion into attorney-client relationship in absence of intentional misconduct by government); *United States* v. *Irwin,* 612 F.2d 1182, 1186–87 (9th Cir. 1980) ("mere government intrusion into attorney-client relationship" does not, by itself, violate right to counsel; rather, sixth amendment is violated only "when intrusion substantially prejudices the defendant," which can result from, inter alia, prosecutor's use of confidential information pertaining to defense strategy); *United States* v. *Gartner,* supra, 518 F.2d 637 (when government's breach of attorney-client relationship is neither "corrupt" nor "egregious," defendant must demonstrate prejudice sufficient to warrant remedy); *United States* v. *Rosner,* supra, 485 F.2d 1224, 1227–28 (because "a finding of unlawful intrusion into attorney-client relationship "must precede the determination of its consequences," only when government

intentionally and without justification intrudes into defense camp will defendant be relieved of burden of establishing actual prejudice); *Sanborn* v. *Parker*, Docket No. 99-678-C, 2007 U.S. Dist. LEXIS 10747, *61 (W.D. Ky. February 14, 2007) ("[t]here is no necessary inference of prejudice to be drawn from the government's intrusion into the relationship between a defendant in a criminal case and his attorney; there must be a showing of prejudice as well as a showing of intrusion" to establish sixth amendment violation), aff'd in part and rev'd in part on other grounds, 629 F.3d 554 (6th Cir. 2010); *United States* v. *Shreck*, Docket No. 03-CR-0043-CVE, 2006 U.S. Dist. LEXIS 33158, *17–18 (N.D. Okla. May 23, 2006) ("The cases in which courts have applied [the] principle [that prosecutorial activities may interfere with the attorney-client relationship to such an extent that it constitutes a violation of the sixth amendment] are united by one predominant feature, that is, an allegation of affirmative actions on the part of the government [that] compromised the attorney-client relationship. . . . Here [however, the] defendant does not accuse the government of any such [improper] behavior." [Citations omitted.]); *United States* v. *Marlinga*, Docket No. 04-80372, 2005 WL 465432, *7 (E.D. Mich. February 28, 2005) (in absence of "purposeful government involvement in the breach" of attorney-client relationship, government's receipt and use of privileged materials are not barred by constitution); *United States* v. *Sattar*, Docket No. 02 Cr. 395 (JGK), 2002 U.S. Dist. LEXIS 14798, *20 (S.D.N.Y. August 6, 2002) ("[when] the intrusion [into] an attorney-client communication is unintentional or justified there can be no violation of the [s]ixth [a]mendment without a showing that the intercepted communication was somehow used against the defendant to the defendant's prejudice"); *United States* v. *Pelullo*, 917 F. Sup. 1065, 1078 (D.N.J. 1995) (when government inadvertently reviews

confidential documents that allegedly contain trial strategy, defendant must demonstrate that government actually had made use of those documents); *United States v. Horn,* 811 F. Sup. 739, 746 (D.N.H. 1992) (in order to make necessary showing of prejudice, "the defendant must show that confidential communications were conveyed as a result of government misconduct"). By contrast, the majority has not identified a *single case* in which a court has presumed prejudice as a result of a good faith or justifiable breach of the attorney-client relationship for which the government reasonably cannot be deemed responsible. The majority has failed to cite such a case because it does not exist.

Seeking to deflect attention from that fact, the majority states that I have not cited a case in which a court has concluded that the state's unintentional breach of the attorney-client relationship *by the prosecutor* and *involving trial strategy* cannot give rise to a presumption of prejudice.[43] This simply is not true. Contrary to

---

[43] Notably, there is no basis for the majority's assertion that the manner in which courts analyze claims of a sixth amendment violation arising out of a breach of the attorney-client privilege depends on whether the information involves trial strategy or some other privileged information that might be helpful to the government or harmful to the defendant. Indeed, courts generally refer to a breach of the attorney-client relationship in broad, inclusive terms, without differentiating between the many kinds of confidential information that are disclosed as a result of the breach. Thus, as reflected in United States Supreme Court Justice Byron R. White's explication of the three different approaches that various courts have taken in dealing with government violations of the attorney-client privilege; see footnote 25 of this opinion; there appears to be no material distinction between intrusions into the relationship that implicate trial strategy and intrusions that implicate other confidential interests for purposes of determining what party bears the burden of proving prejudice arising out of a breach of the privilege. See *Cutillo* v. *Cinelli,* 485 U.S. 1037, 108 S. Ct. 1600, 99 L. Ed. 2d 915 (1988) (White, J., dissenting) (broadly characterizing issue presented as involving "transmission of confidential *defense strategy* information" [emphasis added]). In fact, the majority has pointed to no case in which a court has indicated that the determination of whether to employ a presumption of prejudice depends on whether the intrusion involved trial strategy or other confidential attorney-client communications.

the majority's assertion, *every single court* that has addressed the issue has concluded that prejudice will not be presumed unless the state bears responsibility for the intrusion into the attorney-client relationship, *including intrusions involving trial strategy.*[44] See, e.g., *United States* v. *Danielson*, supra, 325 F.3d 1071 (presumption of prejudice will not apply unless government affirmatively and improperly intrudes into attorney-client relationship and thereby obtains privileged trial strategy); *Shillinger* v. *Haworth*, supra, 70 F.3d 1142 (prejudice is presumed only if defendant can establish that government's intrusion into defense trial strategy was purposeful, and, in cases in which defendant cannot demonstrate purposeful intrusion, defendant must demonstrate prejudice); *United States* v. *Singer*, supra, 785 F.2d 234–37 (rejecting defendant's claim of sixth amendment violation resulting from prosecutor's improper review of attorney's trial strategy file on ground that defendant had failed to show that government knowingly intruded into attorney-client relationship and that he suffered actual prejudice or substantial threat thereof); *Sanborn* v. *Parker*, supra, 2007 U.S. Dist. LEXIS 10747, *61 (to establish sixth amendment violation, defendant must demonstrate actual prejudice flowing from prosecutor's intrusion into confidential trial strategy); see also *United States* v. *Steele*, supra, 727 F.2d 586–87 (rejecting claim that government improperly had obtained defendant's trial strategy and concluding that defendant must demonstrate prejudice even when government intentionally obtains such infor-

---

[44] Although the majority is wrong that no court has rejected a presumption of prejudice for unintentional, good faith breaches of the attorney-client relationship, the majority's point is unavailing for another, perhaps more fundamental, reason, namely, that the *majority* has an affirmative obligation to demonstrate that the methodology it adopts has support in sixth amendment jurisprudence. Its inability to identify even one case in which a court has presumed prejudice from a good faith intrusion into the attorney-client relationship is highly persuasive, if not conclusive, evidence that its methodology is an outlier, unsupported by settled constitutional principles.

mation); *United States* v. *Irwin*, supra, 612 F.2d 1186–87 ("mere government intrusion into the attorney-client relationship" does not violate sixth amendment; rather, defendant must establish that intrusion caused prejudice, such as when prosecutor uses "confidential information pertaining to the defense plans and strategy"); *State* v. *Garza*, 99 Wn. App. 291, 298–300, 994 P.2d 868 (adopting approach employed in *Shillinger* v. *Haworth*, supra, 1140–42, and *United States* v. *Irwin*, supra, 1186–87, pursuant to which prejudice may not be presumed unless defendant establishes that government purposefully intruded into privileged communications pertaining to trial strategy, and, without proof of such misconduct, defendant bears burden of demonstrating that government actually used privileged trial strategy information), review denied, 141 Wn. 2d 1014, 10 P.3d 1072 (2000). The majority simply chooses to ignore these cases, which represent the unanimous view of state and federal courts throughout this country.[45]

As I previously noted, the majority appears to conclude that not all unintentional breaches of the attorney-client relationship result in a presumption of prejudice that, in turn, give rise to a sixth amendment violation. The majority explains that the state may avoid a presumption of prejudice if it can demonstrate that the defendant and the court were informed immediately of the breach and that no state official with knowledge of

[45] Although most of these cases involved knowing or intentional intrusions into the trial strategy of the accused, in each case, the court explained that unintentional or good faith intrusions can never give rise to a presumption of prejudice. Indeed, the majority has not identified even one case in which a defendant ever has *claimed* that a breach of the attorney-client relationship for which the state does not bear responsibility gives rise to a presumption of prejudice. Presumably, there is no such case because no defendant has been audacious enough to make such a claim, *including* the defendant in the present case, whose claim is limited to the contention that a presumption of prejudice is warranted when the state intentionally intrudes into the attorney-client relationship. See part III of this opinion.

the privileged information continued to participate in the case. See footnote 14 of the majority opinion. The majority further explains its rationale for requiring such a showing: "If the [state] made no such efforts, its conduct can hardly be characterized as blameless." Id. Without expressly saying so, however, the majority concludes that the state has failed to make such a showing in the present case.[46] The majority's conclusion is completely unfounded both as a matter of law and as a matter of fact.

First, as I discussed previously, no court ever has placed such a burden on the government to ameliorate any potential harm that may flow from an unintentional or innocent breach of the attorney-client relationship. Like it does with so much of its analysis, the majority merely creates this burden out of whole cloth to achieve its desired result. Furthermore, it is extremely unfair for the majority to conclude that the state is not blameless in the present case because it cannot meet the two requirements that the majority has identified for the first time today. With respect to the first requirement, there is nothing in the record to establish that the prosecutor did *not* notify the court and the defendant about the documents as soon as he became aware of them. Indeed, the defendant himself has conceded that fact. Because the trial court placed no burden on the state to prove when and under what circumstances the prosecutor had turned the documents over to the defense, there is no legitimate reason for the majority to conclude that the state improperly failed to adduce such evidence. At the very least, the state should be afforded the right to a hearing on the issue; the majority, however, denies the state such a hearing, concluding, instead, that the state bears the blame for the breach of

---

[46] This is the necessary implication of the majority's analysis, because if, in the majority's view, the state had satisfied these requirements, then the majority would not presume prejudice.

the attorney-client relationship despite the trial court's contrary finding.

With respect to the second requirement imposed by the majority, it also is extremely unfair, under the circumstances of the present case, to demand that the state demonstrate that neither the prosecutor nor anyone else with knowledge of the privileged information had any further involvement in the case following the prosecutor's review of that information. First, upon receiving the privileged documents from the state in September, 2005, the defendant did not seek to have the prosecutor or anyone else with knowledge of the information contained in the documents recused from the case. Indeed, the defendant's appellate counsel expressly acknowledged at oral argument before this court that the defense probably should have made such a request, but that it did not think to do so. If the *defense* did not think to seek such relief, it is impossible to see how the prosecutor can be blamed for not taking such action on his own. Indeed, because the defendant did not raise the privilege until he filed his motion to dismiss in November, 2006, the trial court was unable to determine that the documents actually were privileged until that time; for this reason, as well, the prosecutor cannot be faulted for failing to recuse himself from the case at any time prior to that date. In fact, however, in his motion to dismiss, the defendant *expressly rejected* the remedy of having another prosecutor handle the case, explaining that the only remedy he sought was a dismissal of the charges against him. Finally, although the defendant had asserted that the prosecutor remained in possession of the privileged documents for a considerable period of time, such that he had "ample time to read, reread and memorize" the documents, as far as the record reflects, the prosecutor did not review the documents until September 19, 2005, the day that he provided the defense with copies of the documents and turned over to the court for sealing all of the original

documents that had been in the state's possession. Thus, there is no reason to presume that the prosecutor possessed the documents for any more than one day, and the record reflects that he had *no access to them thereafter.* In such circumstances, it is unfair and unreasonable to hold the state responsible for its inadvertent and good faith breach of the attorney-client privilege arising out of the lawful execution of a duly authorized search warrant.[47] Moreover, that unfairness is compounded by virtue of the fact that the majority now places the burden on the state to demonstrate that it is not to blame for the intrusion but then denies the state any opportunity to meet that burden.[48]

---

[47] The majority asserts that it does "not believe that it imposes an unreasonable burden on the state to take steps to insulate a prosecutor who has knowledge of the defendant's confidential trial strategy from involvement in the case." Footnote 14 of the majority opinion. Although the majority does not say so, the only case that it cites in support of this proposition, *United States* v. *Danielson,* supra, 325 F.3d 1054, involved conduct that the court in that case characterized as "neither accidental nor unavoidable"; id., 1059; and "deliberate"; id.; "affirmative"; id.; and improper. Id., 1072. Even more importantly, however, although it may be appropriate generally to require that the state replace a prosecutor who gains access to a defendant's confidential trial strategy, in the present case, neither the defendant nor the court was aware that the sole document containing such strategy—the e-mail from the defendant to his wife—was covered by the attorney-client privilege. Indeed, the court did not determine that the e-mail was privileged until many months following its discovery, shortly before trial, following the ex parte hearing at which the defendant testified that he had forwarded the e-mail to his attorney. Furthermore, the defendant in the present case never requested that the prosecutor be replaced; in fact, he expressly disavowed all remedies short of dismissal, including removal of the prosecutor. Finally, the prosecutor represented to the court that he had not benefited or used the confidential information in any way, and the defense made no attempt to demonstrate otherwise. In such circumstances, it is both manifestly unreasonable and exceedingly unfair for the majority to hold that the prosecutor was required to recuse himself from the case, especially in view of the trial court's express findings that his review of the privileged material was neither harmful nor intentional.

[48] In contrast, the trial court afforded the defendant a full and fair opportunity to establish that the intrusion was knowing and prejudicial, but the defendant failed to demonstrate those facts. Indeed, the defendant adduced no evidence of any kind to establish that the breach resulted in harm.

Finally, the majority does more than just shift the burden of proof to the state by establishing a presumption of prejudice; the majority also requires the state to rebut the presumption by clear and convincing evidence. This standard requires evidence of a "highly and truly persuasive" nature; *Miller* v. *Commissioner of Correction*, 242 Conn. 745, 798, 700 A.2d 1108 (1997); and is satisfied only "if the evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true [and] that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." (Internal quotation marks omitted.) Id., 794. Thus, the "heavy burden" that this very demanding standard of proof imposes has been reserved for matters "involving extremely significant questions of fact"; id., 796; and, consequently, this court employs a clear and convincing standard of proof with caution. See id., 795. Indeed, the majority identifies no case involving a breach of the attorney-client privilege in which the state has been required to disprove prejudice by clear and convincing evidence. In fact, the majority has identified no case from any other jurisdiction, and I am aware of none, in which a court has imposed such a burden on the government in circumstances even remotely comparable to those of the present case. In sum, a clear and convincing standard of proof is wholly unwarranted.

VI

THE STATE IS DEPRIVED OF THE OPPORTUNITY
TO REBUT THE PRESUMPTION OF PREJUDICE

Having created a presumption of prejudice and determined that the state is required to rebut it by clear and convincing evidence, the majority denies the state any opportunity to meet that standard. Rather than remanding the case for a hearing at which the state would be permitted to adduce evidence that it believes

satisfies its burden, the majority decides instead that the state cannot possibly meet that burden, thereby treating the presumption as irrebuttable. In doing so, the majority ignores the trial court's factual finding that the defendant suffered no prejudice as a result of the breach of the attorney-client privilege and rejects, out of hand, the unchallenged representations of the prosecutor in the state's brief in opposition to the defendant's motion to dismiss.[49] The problem with the majority's approach is obvious: the state is entitled to an opportunity to rebut the presumed prejudice because it never has had the opportunity to do so. Indeed, at the hearing on the motion to dismiss, the trial court did not presume prejudice, and, therefore, the defendant, as the moving party, bore the burden of proving harm. As a consequence, the state had no reason to provide the court with an extensive factual showing to rebut such a presumption, let alone to provide the court with all of the evidence necessary to disprove prejudice under the clear and convincing standard of proof. For the reasons set out more fully in part VIII of this opinion, there is every reason to believe that the state could rebut this presumption if afforded the opportunity to do so.

VII

THE MAJORITY IMPROPERLY REQUIRES THE
STATE TO DISPROVE THAT DISMISSAL
OF THE DEFENDANT'S CRIMINAL
CASE IS THE PROPER REMEDY

The majority concludes that, because the state has not rebutted the prejudice that, it determines, presumptively flows from the prosecutor's review of the privi-

---

[49] The trial court was free to credit the prosecutor's representations; see, e.g., *State* v. *Smith*, 289 Conn. 598, 609, 960 A.2d 993 (2008) (trial court may rely on representations of counsel who, as officer of court, is bound to make truthful statements of fact and law); and clearly did so in view of the fact that the defendant elected not to challenge them.

leged documents, the state is obligated to demonstrate, again by clear and convincing evidence, that a remedy short of dismissal is appropriate. Simply put, this conclusion is completely at odds with sixth amendment jurisprudence generally and with case law governing the breach of the attorney-client relationship specifically.

The essential purpose of the sixth amendment right to counsel is to protect the fundamental right to a fair trial. E.g., *Lockhart* v. *Fretwell*, 506 U.S. 364, 368, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993); see also *United States* v. *Morrison*, supra, 449 U.S. 364. Thus, the " 'benchmark' " of a sixth amendment claim is the "fairness of the adversarial proceeding . . . ." *Nix* v. *Whiteside*, 475 U.S. 157, 175, 106 S. Ct. 988, 89 L. Ed. 2d 123 (1986). In other words, "the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial." *United States* v. *Cronic*, 466 U.S. 648, 658, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984). Accordingly, in the absence of "some effect of challenged conduct on the reliability of the trial process, the [s]ixth [a]mendment guarantee is generally not implicated." Id.

Furthermore, dismissal of a criminal case or conviction is an extraordinary remedy that both the United States Supreme Court and this court have characterized as "drastic"; *United States* v. *Morrison*, supra, 449 U.S. 367; *State* v. *Bergin*, 214 Conn. 657, 672, 574 A.2d 164 (1990); and that another court has described as "draconian . . . ." *United States* v. *Gonzalez*, 248 F.3d 1201, 1205 (10th Cir. 2001). Dismissal, therefore, "is a remedy of last resort"; *United States* v. *Stein*, 541 F.3d 130, 144 (2d Cir. 2008); appropriate, if at all, only in those "extreme circumstances" in which a fair trial is impossible due to the nature of the harm caused by the government's breach of the attorney-client relationship. *Shillinger* v. *Haworth*, supra, 70 F.3d 1143; see also

*United States* v. *Broward*, 594 F.2d 345, 351 (2d Cir.) ("the sanction [of dismissal] is so drastic that, especially [when] serious criminal misconduct is involved, it must be reserved for the truly extreme cases"), cert. denied, 442 U.S. 941, 99 S. Ct. 2882, 61 L. Ed. 2d 310 (1979); *State* v. *Morales*, 232 Conn. 707, 740, 657 A.2d 585 (1995) (*Borden, J.*, concurring) ("[a]lthough . . . there may be cases in which dismissal . . . would be the only appropriate remedy for the violation of the defendant's [constitutional] rights . . . that most drastic remedy [should be reserved] for the most drastic and prejudicial violations"). Accordingly, it is improper for a court to dismiss a case for the government's interference with the attorney-client relationship unless the court has considered and rejected as inadequate all other less severe remedies. See, e.g., *United States* v. *Morrison*, supra, 365–67 (improper for court to grant dismissal for sixth amendment violation when such remedy was out of proportion with violation); *United States* v. *Walker*, 839 F.2d 1483, 1487 (11th Cir. 1988) (in case involving interference with attorney-client relationship, court, relying on *Morrison*, concluded that "the relief must be tailored to the wrong"); *State* v. *Pecard*, 196 Ariz. 371, 381, 998 P.2d 453 (App. 1999) (trial court abused its discretion in ordering dismissal in case involving sixth amendment violation when that court failed to consider "lesser remedies assuring . . . a fair trial"). Consequently, "[d]ismissal is a result that courts move to with great caution. Since the outcome stops the prosecution, there are strong reasons to require both that the government ha[s] been in some measure in control of the violation and that it ha[s] been knowledgeable about the use of the privileged information." R. Mosteller, supra, 81 Wash. U. L.Q. 1007–1008. Indeed, as a general matter, even when the government engages in egregious misconduct, a dismissal is not warranted in the absence of a showing of irremediable prejudice.

See, e.g., *United States* v. *Morrison,* supra, 365 (observing that dismissal is improper, despite deliberate conduct by government agents, without sufficient showing of prejudice).

Thus, in *Morrison,* the United States Supreme Court agreed with the government that the Third Circuit Court of Appeals improperly had concluded that the respondent, Hazel Morrison, was entitled to a dismissal of the indictment against her because agents of the federal Drug Enforcement Administration had met and spoke with Morrison without the knowledge or consent of her counsel. See id., 362–64. In reaching its conclusion, the court observed that, "[i]n *Black* v. *United States,* 385 U.S. 26 [87 S. Ct. 190, 17 L. Ed. 2d 26] (1966), and *O'Brien* v. *United States,* 386 U.S. 345 [87 S. Ct. 1158, 18 L. Ed. 2d 94] (1967), law enforcement officers improperly overheard pretrial conversations between a defendant and his lawyer. None of these deprivations, however, resulted in the dismissal of the indictment. Rather, the conviction in each case was reversed and the [g]overnment was free to proceed with a new trial." *United States* v. *Morrison,* supra, 449 U.S. 364–65. The mere fact, therefore, that, as in the present case, a trial already has occurred following the prosecutor's unintentional interference with the attorney-client relationship does not mean that a new trial is an inadequate remedy for that breach. Rather, the "remedy characteristically imposed is not to dismiss the indictment but to . . . order a new trial if the evidence has been wrongfully admitted and the defendant convicted." Id., 365; see also id., 366 ("[t]he remedy in the criminal proceeding [for a sixth amendment violation] is limited to denying the prosecution the fruits of its transgression").

## VIII

## THE MAJORITY IMPROPERLY CONCLUDES THAT DISMISSAL IS REQUIRED AS A MATTER OF LAW

The defendant has not identified any actual prejudice flowing from the breach of the attorney-client privilege, either in the trial court or on appeal to this court. The majority nevertheless concludes that a dismissal is the only remedy available to address the presumed prejudice that flows from the prosecutor's review of the privileged documents. This determination clearly is wrong, however, first, because it is belied by the trial court's express finding that the defendant was not harmed by the disclosure and, second, because the majority unfairly deprives the state of the opportunity to demonstrate either that the defendant's conviction should stand or, if reversal is necessary, that a new trial, rather than a dismissal, is sufficient to protect the defendant's constitutional rights.

The majority's decision also is improper because its finding of prejudice is predicated on mere speculation. Because the police investigation was not tainted by the breach of the attorney-client privilege, the only possible prejudice that the defendant could have suffered as a result of the breach may be traced to the prosecutor's knowledge of some of the defendant's proposed trial strategy. Unless the prosecutor used that knowledge to the state's advantage, however, no harm flowed from the breach. Although the prosecutor denied using or benefitting from that knowledge in any way, and the defendant adduced no contrary evidence, the majority nevertheless concludes that the harm that the defendant suffered was so great as to require a dismissal. Even a cursory review of the rationale that the majority employs in reaching that conclusion reveals that it is conjectural.

In particular, the following assertions by the majority reflect its reasoning in concluding that the defendant was so seriously and irremediably prejudiced by the breach of the attorney-client privilege that a dismissal is necessary: (1) "It is *reasonable to conclude that . . . wittingly or unwittingly,* the prosecutor revealed the [defendant's trial] strategy to witnesses and investigators"; (emphasis added) footnote 20 of the majority opinion; (2) "the record *strongly suggests* that the prosecutor *may have revealed* the defendant's trial strategy to witnesses and investigators";[50] (emphasis added) text accompanying footnote 21 of the majority opinion; (3) "*consciously or unconsciously,* the prosecutor's knowledge of the defendant's trial strategy *may have affected* his selection and examination of witnesses during trial"; (emphasis added); and (4) "the record *strongly suggests* that the prosecutor drew on his knowledge of the privileged communications when examining the [alleged victim] . . . ."[51] (Emphasis added.) As the italicized

[50] The majority identifies only one transcript reference to support this contention. In particular, the majority's assertion pertains to the point that the defendant made in some of the privileged documents that, contrary to accepted practice, the alleged victim in one of the Granby cases may have been interviewed repeatedly by untrained interviewers, including her parents, thereby undermining the credibility of her version of the events. See footnote 21 of the majority opinion. According to the majority, the fact that several witnesses denied that such interviews had occurred "suggests that the prosecutor had discussed with these witnesses the importance of persuading the jury that the [alleged victim's] account of the defendant's conduct had not been tainted by multiple interviews." Id. The majority's reasoning is unpersuasive. The only reasonable way to determine whether the prosecutor conveyed such information to a witness or witnesses is a hearing at which that issue would be explored. Of course, the defendant failed to produce any such evidence when he had the opportunity to do so at the evidentiary hearing on his motion to dismiss. Having shifted the burden of persuasion on this issue to the state, the majority cannot possibly justify denying the state the right to satisfy that burden at an appropriate hearing in the trial court. Indeed, as I explain hereinafter, it is quite likely that the state could establish that it was aware of the defendant's strategy to attack the credibility of the alleged victim by challenging the legitimacy of the interview techniques employed by those who interviewed her.

[51] Again, the majority recites only one example to support this contention.

language indicates, the majority's conclusions are all based on supposition, belief and conjecture, not on facts or testimony. Indeed, as I have indicated, the defendant himself has not claimed any actual prejudice, relying, instead, on his claim of presumed prejudice. Even on appeal, the defendant has not alluded to anything that occurred during the trial that would tend to implicate the proposed strategy contained in the privileged documents. Thus, the majority's references to the record are not based on any argument that the defendant ever has made; rather, they are solely the result of the majority's own effort to buttress the defendant's argument that the majority *alone* advances in support of its contention. More importantly, the majority's conclusions are all flatly contradicted by the prosecutor's representation—which the defendant did not challenge—that the state did not benefit in any way from the privileged documents. Moreover, the prosecutor's representation is supported by a review of those documents, which, as

---

Specifically, the majority refers to a privileged document containing the defendant's suggestion that the alleged victim in one of the Granby cases had disliked attending karate classes because she had fallen behind her classmates, and that she had lied about the defendant's conduct so that she would not have to continue attending those classes. See footnote 22 of the majority opinion. The majority further contends that a certain line of questioning that the prosecutor employed, concerning the alleged victim's reason for not wanting to attend karate classes, may have been prompted by the prosecutor's knowledge of the defendant's trial strategy. Although the majority does not say so, this information is contained in one of the documents that bears no indication of any kind that it was intended to be a privileged communication from the defendant to his attorney. In fact, that document, which includes all or virtually all of the defendant's comments on trial strategy, is an e-mail from the defendant to his wife, and makes no reference to the defendant's attorney, or his attorney's investigator, or any other attorney or investigator. Furthermore, the majority's assertion that this information may have aided the prosecutor in formulating questions for the alleged victim is pure speculation, and, in fact, that assertion was directly contradicted by the prosecutor's unchallenged, contrary representations. In any event, even if the prosecutor had used the privileged information as an aid in crafting a question or two for the alleged victim, there is nothing in the record to suggest that the information was so important that its use by the prosecutor rendered the defendant's trial unfair.

I noted previously; see footnote 6 of this opinion; reveals that the trial strategy that the defendant suggested is no different from the strategy that ordinarily would be employed in defending similar cases.[52]

Even if the majority's assertions were not refuted by the prosecutor's representations, it still would be improper for the majority to engage in the kind of speculation that drives its conclusion. Contrary to the unsupported contention of the majority, there is nothing in the sparse record of this case to permit the conclusion that the prosecutor shared privileged information with witnesses or investigators. Even if it is assumed that the record could support such an inference, there is no justification for the majority to conclude that the drastic remedy of a dismissal is required as a matter of law. Indeed, to the extent that the majority's decision is predicated on its belief that the prosecutor "unconsciously" or "unwittingly" may have disclosed some of the defendant's trial strategy, this reasoning is legally unsound. "[T]he indirect use of privileged information by the prosecution is [not] prohibited. . . . [T]he mere [tangential influence that privileged information may have on] the prosecutor's thought processes in . . . preparing for trial [is] not an unconstitutional use." (Citations omitted; internal quotation marks omitted.) *United States* v. *Schwimmer*, supra, 924 F.2d 446. Such use is not improper because the effect of the information, like the effect of privileged information that merely confirms what the prosecutor already knows or has acquired through independent means, is deemed to be "conjectural and insubstantial."[53] (Internal quotation

---

[52] I also note that any assessment of possible harm to the defendant must be evaluated in light of the fact that the documents at issue contained strategy proposed by the defendant, not by counsel.

[53] In contrast to the Second Circuit Court of Appeals, some courts have suggested that it would be impermissible for a prosecutor to use improperly obtained evidence "in some significant way short of introducing tainted evidence. . . . Such use could conceivably include assistance in focusing the investigation, deciding to initiate prosecution, refusing to plea-bargain,

marks omitted.) Id.; see also *United States* v. *Walker*, supra, 839 F.2d 1486 (controlling United States Supreme Court precedent "requires that a defendant point to specific ways in which his trial was compromised").

For obvious reasons, it also is improper for the majority to deprive the state of an opportunity to demonstrate that the defendant was not prejudiced under the burden shifting methodology that it has adopted. As I discussed previously, in the trial court, the state had no burden of disproving prejudice, and, consequently, the state had no reason to do so. Indeed, the majority simply does not know what evidence the state could adduce in an effort to meet this burden. For example, the trial court stated the following in its decision concluding that the state had not intentionally breached the attorney-client privilege: "During pretrial negotiations [in connection with two of the defendant's criminal cases], including judicially supervised pretrials, [defense] counsel argued [that] the [video-recorded] forensic interviews of the [alleged victims] offered little or no evidentiary value due to the method and process for questioning in each case. The case was not resolved by the pretrial negotiations, and the case was set down for trial." The court goes on to explain that, prior to jury selection in those cases, the defendant was arraigned in a third case, and, in that same time frame, the police also executed the search warrant that resulted in the seizure of the defendant's computer. It thus appears that defense counsel made no secret of the fact that he intended to challenge the credibility of the alleged victim on the basis of the nature of the questioning to which the victim had been subjected. Consequently, the

interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy." (Citations omitted.) *United States* v. *McDaniel*, 482 F.2d 305, 311 (8th Cir. 1973). To the extent that this approach may be a sensible one, I note that there also is nothing in the record of the present case to support the conclusion that any of the privileged documents that the prosecutor reviewed fall into one or more of the foregoing categories.

prosecutor certainly could demonstrate that he was aware of this defense strategy—one of only two such strategies that the majority identifies in support of its conclusion that a dismissal is required—from a source other than the privileged documents. Undoubtedly, the state could present other evidence for the purpose of establishing that the defendant was not prejudiced by the prosecutor's review of the privileged documents, including, most likely, the testimony of the prosecutor himself. Inexplicably, however, the majority deprives the state of that opportunity. Once again, the majority purports to create a rebuttable presumption—in this instance, a rebuttal presumption of dismissal—but the majority then treats the presumption as irrebuttable by denying the state any opportunity to overcome it.

Thus, even under the standard that the majority adopts, it is by no means clear that the defendant is entitled to a new trial, let alone a dismissal. For the reasons that I set forth previously, a hearing is necessary to determine whether the defendant suffered any *material* prejudice as a result of the breach and, if he did, the nature and extent of that prejudice. A new trial is warranted only if, following a hearing, it is determined that the harm or taint arising out of the breach of the attorney-client privilege is to such a degree as to call into question the fairness of the defendant's trial.[54]

Finally, the drastic remedy of a dismissal cannot be justified under any standard. The majority's contrary conclusion is predicated primarily on its assertion that

[54] The majority suggests that, because it may be difficult to guarantee that any and all possible prejudice to the defendant would be eliminated at a new trial, there is no reason to afford the state an opportunity to demonstrate that a retrial would be an appropriate remedy. Even when state conduct results in a constitutional violation, however, the appropriate remedy need not be perfect; rather, it must be "one that as much as possible restores the defendant to the circumstances that would have existed had there been no constitutional error." *United States* v. *Carmichael*, 216 F.3d 224, 227 (2d Cir. 2000).

a new trial, at which the state presumably would be represented by a prosecutor with no knowledge of the case or the privileged documents, would be insufficient to purge the taint resulting from the prosecutor's questioning of the alleged victim and other witnesses. I do not understand how the prosecutor may be deemed to have imparted to the alleged victim and the few other state's witnesses knowledge of the defense strategy merely by posing questions to them. Indeed, the alleged victim was nine years old at the time of the offenses, and her version of the facts is quite simple and straightforward: the defendant repeatedly put his hands down her pants when she was alone with him at karate classes. The testimony of the other potential trial witnesses is no more complex or complicated. Moreover, in his brief to this court, the defendant expressly disavows any claim that the prosecutor engaged in any "intentional coaching" of the witnesses or otherwise prompted witnesses to testify untruthfully. The majority nevertheless insists that, because the prosecutor *must* have revealed the defendant's trial strategy to these witnesses, they are forever tainted, and the taint, whatever it may be, cannot be purged by the remedy of a retrial at which the state is represented by a new prosecutor who is unfamiliar with the history of the case and knows nothing about the defendant's trial strategy.[55] Again, this conclusion flies in the face of the prosecutor's representations and, even apart from those representations, simply is unfounded. There is no reason to conclude that the prosecutor necessarily shared privileged information with the witnesses or otherwise

---

[55] The new prosecutor also would be denied access to a transcript of the first trial. The defendant, however, would be entitled to review and use that transcript. The majority contends that this approach would be inadequate because the defendant could use the transcript for impeachment purposes, and, in such circumstances, the prosecutor then would have access to that portion of the transcript. I do not know why it would be prejudicial to the defendant for the prosecutor to have access to those transcript pages *after* defense counsel has cross-examined the alleged victim and any other witnesses for the state, and the majority has not explained why.

used that information to his advantage.[56] Similarly, there is absolutely no reason why the state's witnesses cannot be expected to answer questions posed by a new prosecutor, unaware of the content of the privileged documents, in a manner wholly unaffected by any of the privileged information to which they never were privy in the first place.[57]

[56] The majority asserts that "[t]he record reveals that the prosecutor had known the substance of the privileged communications for approximately one and one-half years before the trial court ruled on the motion to dismiss on the eve of trial. It is reasonable [therefore] to conclude that, during that period, wittingly or unwittingly, the prosecutor revealed the [defendant's trial] strategy to witnesses and investigators . . . ." Footnote 20 of the majority opinion. Contrary to the majority's unsupported assertion, it most emphatically is *not* reasonable to conclude that the prosecutor revealed defense strategy to witnesses and investigators. Although the trial court afforded the defendant every opportunity to demonstrate such prejudice, he made no effort to do so, and, for the reasons previously set forth in this opinion, the defendant's failure to demonstrate such prejudice defeats his claim on appeal. Even under the novel approach that the majority adopts, pursuant to which the state bears the burden of disproving prejudice, there is absolutely no justification for the majority's presumption of prejudice; rather, the state is entitled to show that the defendant suffered no material harm by virtue of the prosecutor's unintentional breach of the attorney-client privilege. Furthermore, the fact that the prosecutor had knowledge of the documents for a significant period of time before the trial court ruled on the defendant's motion to dismiss is due solely to the fact that the defendant did not file his motion to dismiss until approximately fourteen months after he became aware that the prosecutor had reviewed the documents. In addition, the defendant never sought to have a new prosecutor appointed or to have the prosecutor refrain from speaking to the state's witnesses until his claims concerning those documents could be resolved. When the defendant finally did file his motion to dismiss, he expressly rejected that remedy or any other remedy short of dismissal. In such circumstances, it is manifestly unfair to preclude the state from demonstrating that the defendant was not materially prejudiced by virtue of the prosecutor's unintentional breach of the attorney-client privilege or, alternatively, from demonstrating that a new trial is appropriate. The unfairness is compounded by the fact that, as far as the record reveals, the prosecutor immediately dispossessed himself of the documents after reviewing them and did not see them again, if at all, until after the defendant's trial.

[57] As I have explained, even when the state bears responsibility for the breach of the attorney-client relationship, the remedy of a new trial almost always is sufficient to vindicate the defendant's fifth and sixth amendment rights. See, e.g., *United States* v. *Morrison*, supra, 449 U.S. 365 (remedy for state's prejudicial interference with attorney-client relationship characteris-

## IX

## CONCLUSION

It is a bedrock principle of our adversarial system that courts decide only those claims that the parties have raised. The majority ignores this principle in resolving the present case on the basis of a claim that the defendant never has raised and that the state never has had a chance to address. Compounding this affront to the adversary process, the majority then adopts a number of novel rules and presumptions for application by the trial court, all of which operate against the state, yet, instead of remanding the case to the trial court for an evidentiary hearing at which the state would have the opportunity to prevail under the majority's unprecedented new methodology, the majority engages in improper fact finding and, on the basis of those findings, simply orders the dismissal of the case without further proceedings. Fundamental fairness is violated by this glaringly one-sided approach.

Moreover, the majority's determination that a dismissal is required under the circumstances presented is completely at odds with settled sixth amendment jurisprudence. Far from warranting a dismissal, the defendant has not established a constitutional violation. Indeed, even under the unique burden shifting approach that the majority adopts, it is by no means evident that

---

tically is new trial); *Shillinger* v. *Haworth*, supra, 70 F.3d 1143 (explaining benefits of retrial at which government is represented by new prosecutor with no knowledge of information that previous prosecutor had obtained unlawfully and in violation of defendant's sixth amendment rights); *Lykins* v. *State*, 288 Md. 71, 81–82, 415 A.2d 1113 (1980) (proper remedy when prosecutor possesses confidential information concerning defendant is to bar prosecutor's participation in new trial, not dismissal); see also *State* v. *Quattlebaum*, 338 S.C. 441, 449, 527 S.E.2d 105 (2000) ("[b]ecause a deputy solicitor . . . eavesdropped on a privileged conversation between [the defendant] and his attorney, we reverse [the defendant's] conviction and disqualify the . . . [s]olicitor's [o]ffice from prosecuting [the defendant] at his new trial").

the defendant's conviction should be reversed. As I have explained, at a minimum, a hearing is necessary to permit the state an opportunity to rebut the presumption of prejudice that the majority has established for the first time today. In the event that it were to be determined that a new trial is necessary, however, there is no doubt that a retrial and the appointment of a new prosecutor would eliminate any meaningful possibility of harm to the defendant. Although the majority asserts that it would be a miscarriage of justice *not* to dismiss the charges against the defendant, in my view, it is the majority that perpetrates an injustice: by judicial fiat, it mandates dismissal of the case against the defendant without a reasoned and thoroughgoing consideration of the governing case law, without affording the state any opportunity to rebut the various presumptions and burdens that the majority retrospectively has placed on it, and without a logical basis for its approach or its conclusion.[58] The result is an outlier decision, ungrounded in fundamental sixth amendment jurisprudence and manifestly unfair to the state.[59] I therefore dissent.

---

[58] I note that the defendant also claims that he is entitled to a new trial because the trial court barred him from adducing certain expert testimony concerning forensic interviews of child victims of sexual abuse. In view of the fact that the majority decides to dismiss the case on other grounds, I do not address this second issue.

[59] The majority takes issue with my characterization of its decision on the basis of what it calls "[a]n objective review of the basic facts of the case . . . ." Footnote 26 of the majority opinion. Specifically, the majority asserts that such a review "shows that the prosecutor had been warned that the defendant's computer contained privileged documents and had been ordered not to review them; the prosecutor read in their entirety documents that clearly were privileged on their face; the privileged documents went to the heart of the defense; the prosecutor failed to notify the defendant and the trial court immediately that he had read the documents; the prosecutor had knowledge of the contents of the privileged documents for well over one year before trial, during which time he discussed the case repeatedly with state witnesses; and the prosecutor's questions to various witnesses at trial strongly support the conclusion that the prosecutor had discussed the contents of the privileged documents with the witnesses before trial." Id. For the reasons previously set forth in this opinion and summarized briefly in

this footnote, not one of the majority's assertions supports its conclusion either that the prosecutor's breach of the attorney-client relationship violated the defendant's sixth amendment rights or that the breach warrants dismissal of the defendant's criminal case.

With respect to the majority's first and second assertions, the fact that the prosecutor was aware that the defendant's computer contained privileged documents and that he nevertheless reviewed several documents that ultimately were determined to be privileged provides no support for the position that the majority advances. The trial court expressly found that the prosecutor had reviewed the documents in good faith and without knowledge that they were privileged because there was insufficient indication on the face of the documents that they were intended to be communicated to counsel, a finding that the majority purports not to disturb. Indeed, the trial court, like the prosecutor, was unable to discern that the documents were privileged until, many months after the prosecutor had read them, the defendant testified at an ex parte hearing that he had forwarded them to counsel. For this reason, the majority's second assertion, namely, that the documents "clearly were privileged on their face"; id.; must be disregarded as improper and unfounded because it conflicts with the undisturbed finding of the trial court to the contrary.

The majority further asserts that the "privileged documents went to the heart of the defense . . . ." Id. In fact, only one document, namely, the e-mail from the defendant to his wife, contained proposed trial strategy; the other four documents contained no information of any value to the state. A review of that e-mail reveals that there is nothing contained therein that the prosecutor reasonably would not have anticipated in a case of this kind. Furthermore, the prosecutor expressly represented that the state derived no benefit from the e-mail, and there is nothing in the record to contradict that representation. Indeed, there is nothing in the record to indicate that the prosecutor read the e-mail more than once and long before trial. In such circumstances, there is no reason to presume prejudice from the prosecutor's review of the documents, let alone to conclude that dismissal is warranted by that review.

The majority next states that the prosecutor failed to notify the defendant and the trial court immediately that he had possession of privileged documents. Id. In fact, the trial court found that the prosecutor reasonably did not believe that the documents were privileged. More importantly, however, the record does not reveal when the prosecutor received and reviewed the documents because the defendant failed to adduce any evidence on the issue. Thus, it may well be that the prosecutor alerted the defendant and the court to the documents as soon as he became aware of them. Because the majority has no idea when the prosecutor learned about the documents, the majority's assertion that the prosecutor did not notify the defendant and the state as soon as he learned about the documents also is improper and unfounded.

The majority also asserts that the prosecutor had knowledge of the documents for more than one year prior to trial and that, during that time, he discussed the case with the state's witnesses. The majority fails to explain, however, that (1) all copies of those documents were placed under seal as

## APPENDIX

## THE DEFENDANT'S APPELLATE BRIEF[60]

### STATEMENT OF THE ISSUES

## I. WHETHER THE PROSECUTING ATTORNEY'S INTENTIONAL INTRUSION UPON THE DEFEN-

soon as the prosecutor advised the defense and the court about them, (2) the prosecutor never reviewed the documents thereafter, (3) only one of the documents, the e-mail from the defendant to his wife, contained trial strategy information, (4) the record does not indicate that the prosecutor reviewed the e-mail more than once, and (5) the prosecutor represented that he did not use the information contained in the e-mail in any way, including for purposes of interviewing witnesses. Moreover, although defense counsel could have adduced the sworn testimony of the prosecutor and any of the state's witness to establish what, if any, conversations they had had relating to the content of the e-mail, defense counsel declined to do so. Finally, the defendant never sought to have the prosecutor removed from the case and never sought an order barring the prosecutor from speaking to the state's witnesses.

The majority finally contends that two questions posed by the prosecutor to the alleged victim might have been prompted by information contained in the e-mail. As I have explained; see part VIII of this opinion; the majority's assertion is entirely speculative (in fact, the defendant himself never even raised the claim), lacks support in the record, and is directly contradicted by the prosecutor's unrebutted representation that he did not rely on any of the information in the e-mail for any purpose.

Thus, each and every one of the majority's assertions is either belied by the record or finds no support in the undisputed facts. Undaunted, however, the majority accuses me of "ignor[ing] the import of the evidence" and of "speculat[ing] that all of [the prosecutor's] conduct somehow could be harmless." Footnote 26 of the majority opinion. The majority has it backwards. To prevail on his claim of a constitutional violation, the *defendant* is required to establish, first, that his trial was rendered fundamentally unfair due to the state's good faith breach of the attorney-client relationship and, second, that any such unfairness cannot be remedied by a new trial, such that dismissal is the only viable alternative. Despite its best efforts on behalf of the defendant, the majority cannot alter the fact that the defendant suffered no actual prejudice from the state's inadvertent breach of the attorney-client relationship; indeed, the defendant himself never even *claimed* actual prejudice, relying, instead, on the presumption of prejudice that a few courts have recognized in cases involving intentional violations of the attorney-client relationship. Consequently, the majority also cannot establish the need for a new trial, let alone the draconian remedy of a dismissal.

[60] This appendix contains the portions of the defendant's brief to this court pertaining to his claim that the criminal case against him should be

DANT'S ATTORNEY-CLIENT PRIVILEGED MATERIAL IN VIOLATION OF A COURT ORDER CONSTITUTES A PER SE VIOLATION OF THE DEFENDANT'S SIXTH AMENDMENT RIGHT TO COUNSEL

\* \* \*

## LAW AND ARGUMENT

## I. THE TRIAL COURT ERRED IN FAILING TO DETERMINE THAT THE PROSECUTING ATTORNEY'S CONDUCT IN THIS CASE CONSTITUTED A PER SE VIOLATION OF THE SIXTH AMENDMENT RIGHT TO COUNSEL

As set forth in more detail below, this court should hold that intentional government conduct that intrudes upon a defendant's attorney-client privileged material constitutes a per se violation of the sixth amendment right to counsel. Therefore, the trial court in this case erred because it required the defendant to show prejudice even though the prosecuting attorney intentionally intruded upon the defendant's attorney-client privileged material. Moreover, in failing to find that the prosecuting attorney's conduct warranted a per se violation of the sixth amendment, the trial court itself prevented the defendant from obtaining effective assistance of counsel.

\* \* \*

## C. The Prosecuting Attorney's Intentional Invasion Upon The Defendant's Attorney-Client Privileged

dismissed because of the breach of the attorney-client privilege. I have omitted all footnotes and transcript references because they have no bearing on the issue of the nature of the defendant's claim. I also have omitted subpart A, entitled "Additional Relevant Facts," and subpart B, entitled "The Claim Is Reviewable," for the same reason. Finally, the defendant also submitted a reply brief that contains nothing pertinent to the nature of the claim presented, and, therefore, I have not reproduced any portions of his reply brief.

## Material In Violation Of A Court Order Warrants A Per Se Finding Of Prejudice Under The Sixth Amendment

At the outset it should be noted exactly what the defendant claims constituted intentional government conduct. In this case, the prosecuting attorney . . . admittedly read and reviewed the materials contained in the lab report, which he helped obtain. Thus, as soon as the [assistant] state's attorney reviewed the material and discovered that the documents were attorney-client material, which was not surprising as defense counsel had warned of exactly such, anything less [than] a complete refrain from further reading necessarily constituted an intentional intrusion upon the attorney-client privileged material. Moreover, the review of these documents violated the court's bench order rendered on November 18, 2004, that the attorney-client materials remain unread. . . . It is also worth noting that the defendant is not claiming . . . the state lab[oratory's] or Simsbury police department's actions as the basis of the intentional government conduct.

The conduct in this case is exactly that which the sixth amendment and our courts have sought to prevent. The sixth amendment of the United States constitution, as applied to the states by the fourteenth amendment, and article first, § 8, of the Connecticut constitution, [guarantee] an accused the right to have assistance of counsel for his defense. *Powell* v. *Alabama*, 287 U.S. 45, 69 [53 S. Ct. 55, 77 L. Ed. 158] (1932); *Gideon* v. *Wainwright*, 372 U.S. 335, 344 [83 S. Ct. 792, 9 L. Ed. 2d 799] (1963) (federal constitution); *State* v. *Connor*, 292 Conn. 483, 507 [973 A.2d 627] (2009) (state constitution). Furthermore, the [United States] Supreme Court has long recognized that this right includes the right to be free from state intrusion into the attorney-client relationship. See *Weatherford* v. *Bursey*, 429 U.S. 545

[97 S. Ct. 837, 51 L. Ed. 2d 30] (1977). As the court in *Weatherford,* albeit in a footnote, noted:

> The [s]ixth [a]mendment would be violated if the government places an informant in the defense camp during a criminal trial and receives from [that] informant privileged information pertaining to the defense of the criminal charges . . . because the [s]ixth [a]mendment's assistance-of-counsel guarantee can be meaningfully implemented only if a criminal defendant knows that his communications with his attorney are private and that his lawful preparations for trial are secure against intrusion by the government, his adversary in the criminal proceeding.

[Id., 554 n.4].

"This right, fundamental to our system of justice, is meant to assure fairness in the adversary criminal process." [*United States*] v. *Morrison,* 449 U.S. 361, 364 [101 S. Ct. 665, 66 L. Ed. 2d 564] (1981). Thus, a claim involving the sixth amendment right to counsel has generally required some showing of prejudice to the defendant. See [*United States*] v. *Cronic,* 466 U.S. 648, 658 [104 S. Ct. 2039, 80 L. Ed. 2d 657] (1984) ("[a]bsent some effect of challenged conduct on the reliability of the trial process, the [s]ixth [a]mendment guarantee is generally not implicated"). This initial requirement, however, is subject to "certain [s]ixth [a]mendment contexts, [where] prejudice is presumed." *Strickland* v. *Washington,* 466 U.S. 668, 692 [104 S. Ct. 2052, 80 L. Ed. 2d 674] (1984). Such situations are referred to as per se violations and do not require any showing of harm by the defendant. This per se violation exception has been said to be particularly applicable to "various kinds of state interference with counsel's assistance." Id. As the District of Columbia [Circuit] Court [of Appeals] explained, per se violations are presumed in certain instances because the state action "impair[s]

the accused's enjoyment of the [s]ixth [a]mendment guarantee by disabling his counsel from fully assisting and representing him. Because these impediments constitute direct state interference with the exercise of a fundamental right, and because they are susceptible to easy correction by prophylactic rules, a categorical approach is appropriate." [*United States*] v. *Decoster*, 624 F.2d 196, 201 (D.C. Cir. 1976) . . . .

The holding that an intentional government intrusion upon attorney-client material constitutes a per se violation of the sixth amendment is rooted in the Supreme Court's decision in *Weatherford* v. *Bursey*, [supra] 429 U.S. 545 . . . . In *Weatherford*, the defendant, Bursey, was arrested along with Weatherford, an undercover agent. [Id.] 547. Bursey's defense counsel invited Weatherford to various trial preparation sessions under the mistaken belief that Weatherford was a codefendant. Id. Weatherford attended these sessions and then testified at trial. At no time, however, did Weatherford pass along to the prosecutor "any details or information regarding the plaintiff's trial plans, strategy, or anything having to do with the criminal action pending against [Bursey]." [Id.] 548. Similarly, at trial Weatherford simply testified as to his undercover work and testified as an eyewitness [to] the events leading to the original charges against Bursey. [Id.] 549.

The District Court held that the government conduct warranted a per se violation of the sixth amendment. Id., 549–50. The [United States] Supreme Court reversed and held that under these particular facts no sixth amendment violation occurred. In reaching its decision, the court emphasized the government's lack of purposeful misconduct in that case:

[T]his is not a situation where the [s]tate's purpose was to learn what it could about the defendant's defense plans and the informant was instructed to

intrude on the lawyer-client relationship or where the informant has assumed himself that task and acted accordingly. . . . There being no tainted evidence in this case, no communication of defense strategy to the prosecution, and no purposeful intrusion by Weatherford, there was no violation of the [s]ixth [a]mendment . . . .

[Id.] 557–58. Although finding no sixth amendment violation, the court's language unquestionably illustrates that the court was concerned with intentional government conduct that would result in defense strategy and other attorney-client material making its way to the prosecuting attorney and thereby usurping the adversarial system. This is exactly what occurred in the pending case.

Numerous commentators and courts have suggested that where the prosecution acts intentionally and without legitimate purpose the *Weatherford* holding does not require a showing of prejudice by the defendant. See, e.g., [3 W. LaFave et al., Criminal Procedure (3d Ed. 2007) § 11.8 (b), pp. 845–54] . . . [*United States*] v. *Morales*, 635 F.2d 177, 179 (2d Cir. 1980) ("[b]ecause the . . . evidence . . . does not disclose an intentional, governmentally instigated intrusion upon confidential discussions between appellants and their attorneys, the evidence does not support appellants' claim of a per se violation of their right to counsel"). Moreover, the Third and Tenth Circuits have adopted a rule that intentional intrusions by the prosecution [constitute] . . . per se violation[s] of the sixth amendment. See [*United States*] v. *Costanzo*, 740 F.2d 251, 254 ([3d] Cir. 1984), cert. denied, 472 U.S. 1017 [105 S. Ct. 3477, 87 L. Ed. 2d 613] (1985); [*United States*] v. *Levy*, 577 F.2d 200, 210 ([3d] Cir. 1978); [see also] *Shillinger* v. *Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1995) (holding "that when the state becomes privy to confidential communications because of its purposeful

intrusion into the attorney-client relationship and lacks a legitimate justification for doing so, a prejudicial effect on the reliability of the trial process must be presumed. In adopting this rule, we conclude that no other standard can adequately deter this sort of misconduct.").

Furthermore, adopting a per se rule in this instance is supported by our own state's sixth amendment jurisprudence. In *State* v. *Mebane*, 204 Conn. 585 [529 A.2d 680] (1987) [cert. denied, 484 U.S. 1046, 108 S. Ct. 784, 98 L. Ed. 2d 870 (1988)], before adjourning for a recess the prosecutor "requested that the defendant not talk to his counsel since the state was in the middle of cross-examination." . . . [Id.] 588. The trial court granted the request. Id. On appeal the defendant argued, and our [Supreme] Court agreed, that this constituted a per se violation of the sixth amendment. The court held: "We believe that a per se rule of automatic reversal more properly vindicates the denial of the defendant's fundamental constitutional right to assistance of counsel guaranteed by the sixth amendment." [Id.] 595.

In doing so, the court expressly rejected the harmless error analysis. See [id.] 596. The court reasoned that the:

harmless error analysis, we submit, is not workable in cases of the complete denial of the assistance of counsel. First, to require a showing [of] prejudice burdens one of the most fundamental rights of a criminal accused, that is, the defendant's right to have the guiding hand of counsel at every step in the proceedings against him. . . . While *Powell* [v. *Alabama*, supra, 287 U.S. 45] was decided over fifty years ago, its vigor persists, particularly when the right to assistance of counsel is denied at a critical state of the proceedings, as in this case. To require the defendant to show prejudice would, of course,

implicate and most likely intrude into the attorney-client relationship—a consequence hardly commendable . . . . It is apparent that the only way a defendant could show prejudice would be to disclose by evidence what he and his counsel would have discussed, what they were prevented from discussing and how the improper court order allegedly interfered with his defense.

[State v. Mebane, supra, 204 Conn.] 596–97. At the heart of the court's reasoning was that requiring a defendant to show harm would necessarily require the disclosure of attorney-client material. Therefore, it is implicit in this holding that an intentional intrusion [into] material protected by the attorney-client privilege would be prejudicial to the defendant. The logic of Mebane is equally applicable to the pending appeal, if not more so, because the lawyer-client privilege has already been invaded.

Finally, the trial court's reliance on [United States] v. Morrison, [supra, 449 U.S. 361] is misplaced. In Morrison, federal agents met with the respondent, who had been indicted on various drug charges, without her counsel's consent. [Id.] 362. In the course of their meeting the agents disparaged her attorney "stating that [the] respondent should think about the type of representation she could expect for the $200 retainer she had paid [her attorney] . . . ." Id. On appeal, the respondent argued that such conduct violated her sixth amendment right to counsel. [See id., 363]. The [United States] Supreme Court held that dismissal of the respondent's indictment was inappropriate absent some form of demonstrable prejudice, or substantial threat thereof. [Id., 365.] In doing so, the court cited several cases in which a purported violation of the sixth amendment right to counsel would not warrant the dismissal of the indictment. [Id.] 364–65. Importantly, however, neither case cited involved the intentional

intrusion of attorney-client material. [See id.] Moreover, the court expressly declined to reach the government's argument that there could be no sixth amendment violation without a demonstration of prejudice. See [id.] 364. Accordingly, the court left open the question of whether intentional intrusions into the attorney-client relationship would violate the sixth amendment even absent proof of prejudice. Thus, *Morrison* does not expressly stand for the proposition that a showing of prejudice is required in instances of intentional government conduct.

In light of the underlying purpose of the sixth amendment, the [United States] Supreme Court's analogous decisions, our own state Supreme Court's decisions and our sister courts' decisions, this court should hold that the prosecuting attorney's intentional intrusion upon the defendant's attorney-client material in this case constituted a per se violation of the sixth amendment. Therefore, the trial court erred when it required that the defendant make an initial showing of prejudice.

## D. Requested Relief

In light of this per se violation, the defendant's sole conviction should not only be reversed, but the charges should be dismissed pursuant to the defendant's motion to dismiss. In a case, as in this one, where the state relied heavily if not entirely on the credibility of the witnesses the type of material the prosecuting attorney read and reviewed would be invaluable. Although this is not an assertion that there was any intentional coaching or fraudulent statements on behalf of the prosecution, it is simply impossible to determine exactly how this material may have influenced the prosecuting attorney in his preparation for trial and specifically how that may have impacted the credibility of the witnesses at trial. To completely disregard such concerns is a complete failure to address the principles that are embodied

by the sixth amendment. Thus, it is appropriate under the circumstances to enter a judgment of dismissal.